**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**CASE NO: Civ. 1:20-cv-24867**

------------------------------------------------------------- x

GRUPO UNIDOS POR EL CANAL, S.A.,  :
SACYR, S.A.,  :
WEBUILD S.p.A.,  :
JAN DE NUL N.V.  :
 :
                        *Movants*,  :
 :
        v.  :
 :
AUTORIDAD DEL CANAL DE PANAMA,  :
 :
                        *Respondent*.  x

------------------------------------------------------------

<u>**DECLARATION OF NICOLAS BOUCHARDIE**</u>

    I, Nicolas Bouchardie, declare as follows:

    1.        I am a partner working in the office of White and Case LLP in Paris, France, and act as one of the counsel to Grupo Unidos por el Canal S.A. ("GUPC S.A."), Sacyr, S.A. ("Sacyr"), Webuild S.p.A ("Webuild") and Jan De Nul N.V. ("Jan De Nul"), the Movants in this action.  I am admitted to the Bars of Paris and New York.  I submit this declaration in support of Movants' motion to vacate the Partial Arbitral Award dated September 21, 2020[1] in ICC Case No. 20910/ASM/JPA (C-20911/ASM) ("Partial Award" or "Award").  Below, I set forth key relevant facts from the dispute between Movants and Respondent, Autoridad del Canal de Panamá ("ACP"), that were the subject of, or are related to, International Chamber of Commerce ("ICC") Arbitration Case No. 20910/ASM/JPA (C-20911) (the "Arbitration" or "Panama 1 Arbitration").

---
[1]    Notified to Movants on September 28, 2020.

## I.   PROCEDURAL HISTORY OF THE RELEVANT PROCEEDINGS

2.      The Panama 1 Arbitration concerns the project for the Third Set of Locks of the Panama Canal ("Project").  The Project was part of the broader Panama Canal Expansion project, possibly the largest civil works project in the world at the time of its implementation.  The Project involves the design and construction of two new sets of locks, and related approach channels, located on the Pacific and Atlantic sides of the 100-kilometer wide isthmus of Panama.

3.      On April 24, 2006, ACP issued its Proposal for the Expansion of the Panama Canal ("ACP's Proposal"), which described its various components, including the Project for a budget of USD 3.35 billion, and explained its economic and technical basis.  On October 22, 2006, ACP's Proposal was approved by the Panamanian voters in a national referendum.  GUPC S.A. and its shareholders (collectively "Movants" or "Claimants"[2]) won the ensuing competitive bidding process with a proposed price of USD 3.22 billion (not including escalation).  The Contract was then signed on August 11, 2009.[3]

4.      ACP chose Movants to carry out the Project based on their bid and due to their reputation and expertise.  Consistent with ACP's demands, Movants carried out the works and delivered in June 2016 what has been described as an "engineering marvel" — the new Locks that generate billions of dollars in revenues for ACP every year.

5.      During the pre-tender period, ACP stated that "the Contractor of the Project will not be required to provide financing for the Project."[4]  This was confirmed in July 2009 (after the

---

[2]   GUPC S.A., together with three of its four shareholders, Sacyr, Webuild, and Jan De Nul (together the "GUPC S.A. Shareholders" or "Claimants 2-4"), were the Claimants in the arbitration and ACP was the Respondent (together the "Parties").  GUPC S.A.'s fourth shareholder, Constructora Urbana S.A. ("CUSA"), was not a party in the Panama 1 Arbitration.

[3]   The Contract is expressly governed by Panamanian law.

[4]   **Exhibit 2:** Request for Qualifications for the Design-Build of the Third Set of Locks Project, Fifth Revision (excerpts), at 12.

submission of tenders but before the award of the contract to GUPC S.A.[5]).  However, Movants experienced massive additional costs and delays during the Project, which Movants consider ACP refused to acknowledge and pay fairly.

6.      Movants' position in the Panama 1 and related arbitrations is that, in order to complete the Project, they provided, overall, over USD 3 billion in cash and financing to cover what Movants consider to be entitlements for which they were entitled to additional payments. Movants have also claimed that their direct cash contributions to the Project have reached nearly USD 2 billion.

7.      There have been a number of disputes between, on the one hand, Movants (as Claimants) and, on the other hand, ACP (as Respondent), in connection with the Project and its Contract.  To date, these disputes have given rise to five related ICC arbitrations.[6]

8.      The first of these arbitrations was ICC Case No. 19962/ASM (the "Cofferdam Arbitration"), covering claims concerning the design and construction of a temporary cofferdam[7] (and related structures) located on the Pacific site of the Project, before an arbitral tribunal consisting of Professor Bernard Hanotiau (President), Mr. Bernardo Cremades (nominated by Claimants) and Dr. Robert Gaitskell QC (nominated by ACP) ("Cofferdam Tribunal").  A majority composed of Professor Hanotiau and Dr. Gaitskell issued a Final Award on July 25, 2017 ("Cofferdam Majority Award"), rejecting Claimants' claims.  The Cofferdam Majority Award was accompanied by a strong dissent by Mr. Cremades.

---

[5]    Which was then an unincorporated consortium.

[6]    Including consolidated cases (see below).

[7]    A cofferdam is a temporary structure that serves as a watertight barrier between the area in which the works are to take place and surrounding bodies of water.

9.      The Cofferdam Arbitration was limited in scope and, in summary, dealt with what Movants considered to be differing physical conditions found in the areas of the cofferdam and related structures on the Pacific site, and the alleged breach of ACP's duties with regard to these issues.   The subject matters of the Cofferdam Arbitration were different from those of the Panama 1 Arbitration (defined below), but the Cofferdam Arbitration addressed broad questions (such as the diligence expected from tenderers in relation to physical conditions at tender stage, the interpretation of exclusions and disclaimers of liability, etc.), which are common to most of the disputes between the Parties (whether addressed in the Cofferdam Arbitration or in other proceedings).

10.      Another arbitration in connection with the Project is ICC Case No. 22588/ASM/JPA ("Advance Payment Arbitration").   The Advance Payment Arbitration was a proceeding for declaratory relief concerning the timing of the repayment of advances and the guarantees securing certain financing in relation to the Project.   It was conducted before an arbitral tribunal consisting of Professor Gabrielle Kaufmann-Kohler (President), Professor Guido Santiago Tawil (co-arbitrator nominated by Claimants) and Stephen Furst QC (co-arbitrator nominated by ACP), and resulted in a final award issued on December 10, 2018, which under the terms of the Contract did not suspend the payment of the guarantees.   Unlike the other four arbitrations between the Parties, the Advance Payment Arbitration did not cover any of Movants' claims for additional payments or extensions of time.

11.      The third arbitration (which is the one at stake here – Panama 1) concerns a group of claims arising under the Contract and the governing law (Panamanian law), covering:

- the unsuitability of the rock (basalt) to be excavated as a source material to produce the aggregates (in particular sand) to be used in turn to produce the

4

millions of cubic meters of concrete needed for the Project – the so-called Concrete Aggregate Production ("CAP") claim;

- issues with the mix design formula to be used for structural marine concrete on the Project – the so-called Concrete Mix Design ("CMD") claim;

- the claimed unforeseeable physical (ground) conditions encountered in the area of the foundations of certain parts of the Pacific Locks – the so-called Foundation Conditions ("FC") claim;

- the variation that Movants claimed was imposed by ACP regarding On-Site Laboratories ("OSL"); and

- the damages claimed by the GUPC S.A. Shareholders[8] on account of their financing of the above additional costs.

12.     Movants' motion to vacate arises from the Partial Award concerning the merits of these claims.

13.     The Panama 1 Arbitration is a consolidation of two different arbitrations.  In accordance with Clause 20 of the Conditions of Contract,[9] on March 17, 2015, the Movants and ACP filed almost simultaneously Requests for Arbitration before the International Court of Arbitration of the ICC, with respect to the above disputes that had been the subject of Dispute Adjudication Board ("DAB") decisions, which had granted part of GUPC S.A.'s claimed entitlements.[10]  The ICC identified these proceedings as ICC Case No. 20910/ASM and ICC Case No. 20911/ASM.  On April 25, 2016, the Parties agreed to consolidate the two arbitrations,

---

[8]    Referred to as Claimants 2-4 in the Arbitration.

[9]    *See* **Exhibit 5:** Conditions of Contract (excerpts), Feb. 2009, Sub-Clause 20.6.

[10]   For instance, the DAB accepted "in principle GUPC S.A's entitlement to recover as damages the additional costs incurred by reason of the PLE not being suitable as the primary feedstock for concrete aggregate." *See* **Exhibit 9:** DAB Decision in respect of Referral No. 11 (excerpts), ¶ 131.

and the ICC then identified the consolidated proceedings as ICC Case No. 20910/ASM/JPA (C-20911).  The ICC tribunal ("Tribunal") for the Panama 1 Arbitration was constituted in April 2016 and consisted of Mr. Pierre-Yves Gunter (President), Mr. Claus von Wobeser (nominated by Claimants) and Dr. Robert Gaitskell QC (nominated by ACP).

14.     The disclosures made by the members of the Tribunal (in their respective Statements of Acceptance, Availability, Impartiality and Independence under the Rules of Arbitration of the International Chamber of Commerce (hereinafter "ICC Rules")) upon their nomination in the Panama 1 Arbitration contained no information that led Movants to doubt their impartiality and independence at the time of their appointment.[11]  The arbitrators made no further disclosures during the proceedings, with the exception of an inconsequential disclosure when the law firm of Schellenberg Wittmer joined Claimants' counsel team.[12]

15.     One of the issues disputed between the Parties was what authority should be given to the Cofferdam Majority Award and the Advance Payment Award, which were communicated to the Tribunal.  The Tribunal ultimately adopted a limited approach to *res judicata* (i.e., covering only claim preclusion),[13] excluded "the doctrine of issue preclusion",[14] and found that it should not be bound by "the legal reasoning contained in the Cofferdam and Advance Payments

---

[11]   **Exhibit 16:** Mr. Gunter's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20910; **Exhibit 15:** Mr. Gunter's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20911; **Exhibit 13:** Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20910; **Exhibit 12:** Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20911; **Exhibit 11:** Mr. von Wobeser's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20910; **Exhibit 10:** Mr. von Wobeser's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20911.

[12]   *See* **Exhibit 22:** Email from Pierre-Yves Gunter to the Parties dated Oct. 24, 2018; *see also* **Exhibit 23:** Email from Robert Gaitskell QC to the Parties dated Oct. 30, 2018.

[13]   **Exhibit 1**: Partial Award in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (hereinafter "Award") ¶ 495.

[14]   **Exhibit 1**: Award ¶ 493.

Awards." [15]   The Tribunal further noted that, while the tribunals' findings in these prior arbitrations may have some persuasive value,[16] the Tribunal "determined the issues before it [in the Panama 1 Arbitration] *de novo*, on the basis of the Parties' submissions in this case and not simply in reliance on the findings of any other tribunal."[17]

16.     The Parties agreed that certain jurisdictional objections raised by ACP would be bifurcated and therefore heard and decided before the merits phase of the Panama 1 Arbitration. The Tribunal rendered a partial award on jurisdiction on May 22, 2017, holding it had jurisdiction to decide the claims raised by Movants.

17.     Following two rounds of submissions on the merits in 2017 and 2018, the hearing on the merits was held in Miami (the seat of the arbitration) from January 21, 2019 to February 15, 2019.  After the hearing, the Parties each submitted two post-hearing briefs.  On October 12 and 13, 2019, an oral closing hearing was held in London, United Kingdom.  On 30 July 2020, the Tribunal declared the close of the proceedings in relation to the matters decided in the draft award to be deposited with the ICC Court, in accordance with the ICC Rules.

18.     On September 21, 2020, the Tribunal signed the Partial Award in the Panama 1 Arbitration.  In accordance with the ICC Rules, Movants received official notification of the Partial Award through counsel by hard copy delivery from the ICC Secretariat on September 28, 2020.

19.     In parallel to the Panama 1 Arbitration, on December 8, 2016, Claimants filed another Request for Arbitration before the ICC, which covers claims for costs and delays relating to Movants' claims listed in the Statement at Completion for the Project, except for the claims

---

[15]   **Exhibit 1**: Award ¶ 498.

[16]   **Exhibit 1:** Award ¶ 499.

[17]   **Exhibit 1**: Award ¶ 499.

subject to separate arbitral proceedings.  In response, ACP submitted jurisdictional/admissibility objections, alleging that the contractual pre-conditions for the start of arbitration proceedings had not been met.  As a result, Claimants submitted another Request for Arbitration covering the same claims on July 19, 2017.  The ICC identified these arbitrations as ICC Case No. 22466/ASM/JPA and ICC Case No. 22967/JPA, respectively.  The Parties subsequently agreed to consolidate these two arbitration proceedings in ICC Case No. 22466/ASM/JPA (C-22967) ("Panama 2 Arbitration").

20.     The Parties nominated Mr. von Wobeser (Claimants) and Dr. Gaitskell (ACP) in the Panama 2 Arbitration.  After some back and forth, and relying on his disclosures in Panama 1, the Parties ultimately agreed to the nomination of Mr. Gunter as president.  The Statements of Acceptance, Availability, Impartiality and Independence submitted by Mr. von Wobeser, Dr. Gaitskell and Mr. Gunter in Panama 2, contained no information that led Movants to doubt their impartiality and independence at the time of their appointments, and they were confirmed by the ICC Court.[18]

21.     The composition of the tribunal of the Panama 2 Arbitration is therefore the same as that of the Panama 1 Arbitration, i.e. Mr. Gunter as president, Mr. von Wobeser as co-arbitrator nominated by Movants and Dr. Gaitskell as co-arbitrator nominated by ACP.

22.     At the same time as the Panama 2 Arbitration, Movants also commenced an arbitration against ACP concerning claims for additional costs and delays with regard to the design and manufacture of the Lock Gates for the Project and increases in labor costs (the so-

---

[18]     On March 14, 2017 (ICC Case No. 22466/ASM/JPA) and on January 11, 2018 (ICC Case No. 22967/JPA), the ICC Court confirmed Dr. Claus van Wobeser as co-arbitrator upon the nomination of Claimants. On March 14, 2017 (ICC Case No. 22466/ASM/JPA) and on January 11, 2018 (ICC Case No. 22967/JPA), the ICC Court confirmed Dr.  Robert Gaitskell QC as co-arbitrator upon the nomination of ACP.  On June 27, 2018, the ICC Court confirmed Mr. Pierre-Yves Gunter as president of the arbitral tribunal in the Panama 2 Arbitration.

called "labor escalation" claim). Following the same process as in the Panama 2 Arbitration, ACP raised jurisdictional / admissibility objections, Movants started another arbitration covering the same claims, and the ICC eventually consolidated the two proceedings in ICC Case No. 22465/ASM/JPA (C-22966). The members of the tribunal are Mr. Bernard Audit (president), Mr. Bernardo Cremades (nominated by Claimants) and Dr. Gaitskell (nominated by ACP).

23.     Thus, ACP nominated the same arbitrator, Dr. Gaitskell, for all the past and ongoing arbitrations between the Parties (except for the Advance Payment Arbitration, which as explained above did not decide any claims for additional payments or extensions of time by the Movants).

## II.     THE TRIBUNAL MEMBERS' NON-DISCLOSURE OF RELEVANT INFORMATION

24.     On October 28, 2020, Movants filed a challenge with the ICC Secretariat against the three members of the Tribunal in the Panama 1 and Panama 2 Arbitrations,[19] in the circumstances and for the reasons described below. Movants filed an additional submission in that regard on November 19, 2020.[20] Movants also filed a separate challenge against Dr. Gaitskell in the above-mentioned ICC Case No. 22465/ASM/JPA (C-22966) on November 21, 2020.[21]

### A.     THE PROCESS BY WHICH MOVANTS DISCOVERED THE BASES FOR THE CHALLENGES

25.     Upon an analysis of the Partial Award, Movants noted that, for a number of key findings, the Tribunal based its reasoning on what Movants consider to be:

---

[19]  **Exhibit 53:** ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 54:** ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

[20]  **Exhibit 69**: Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 70**: Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

[21]  **Exhibit 71:** ICC Challenge Application in ICC Case No. 22465/ASM/JPA (C-22966/JPA).

9

- arguments not raised by the Parties, on which the Tribunal did not invite comments;

- factual findings not based on evidence on the record; and

- statements contradicted by evidence on the record, which the Tribunal often did not acknowledge or discuss.

26.     This, together with multiple references to the Cofferdam Majority Award and the fact that, despite having acknowledged that it needed to analyze the issues before it *de novo*, the Tribunal appeared to have imported major parts of the Cofferdam Majority's reasoning, strongly suggested that the members of the Tribunal may have abdicated their obligation to remain independent in the eyes of the Parties and free of reasonable doubts as to their impartiality.

27.     It was only upon reviewing the Award that Movants began to question the reliability of the arbitrators' disclosures and in turn their impartiality and independence. Movants therefore conducted targeted research, in particular on the ICC case database on the ICC website, as well as on the ICSID[22] database.   While this information may have been available prior to Movants' challenges, Movants' had relied on the integrity of the arbitrators to abide by their continuing duty to disclose under the ICC Rules.  It was unreasonable to expect Movants to conduct regular investigations into potential conflicts involving the arbitrators, in light of such a duty.  Movants' searches showed that the arbitrators had failed to disclose connections between themselves, with the president of the Cofferdam Tribunal, and with counsel for ACP, both at the outset of and during the Panama 1 and Panama 2 Arbitrations.[23]  For

---

[22]   International Centre for Settlement of Investment Disputes.

[23]   *See* **Exhibit 72:** ICC website - Information on ICC Case ID 00171; **Exhibit 73:** ICC website - Information on ICC Case ID 00778; **Exhibit 74:** ICC website - Information on ICC Case ID 00729.

example, Movants discovered that Mr. Gunter acted as co-arbitrator on another ICC panel, where Professor Hanotiau was president nominated by Mr. Gunter and the other co-arbitrator.[24]

28.     However, the ICC database does not list all ICC cases (and obviously does not list *ad hoc* cases or cases handled by other arbitral institutions), and most connections in the world of arbitration remain private, if not confidential.

29.     On October 15, 2020, Movants therefore wrote to each member of the Tribunal in the Panama 2 Arbitration (who are the same arbitrators forming the Tribunal of the Panama 1 Arbitration).[25]   In their letter, Movants noted the arbitrators' "ongoing duty under Article 11(3) of the ICC Rules to disclose any facts or circumstances that may affect their independence in the eyes of any of the Parties or that could give rise to reasonable doubts as to their impartiality", and requested each tribunal member to update his disclosures (the "Disclosure Requests").[26]

30.     Between October 16 and 19, 2020, a number of emails were exchanged between the president of the Tribunal and Movants' counsel, in order to clarify the scope of the Disclosure Requests, which the Tribunal considered too broad.[27]   The President of the Tribunal also took what Movants consider to be the unordinary step to invite ACP to "take position on" Movants' Disclosure Requests by October 22, 2020.[28]   Movants responded on October 20, 2020

---

[24]   **Exhibit 72:** ICC website - Information on ICC Case ID 00171.

[25]   **Exhibit 35:** Letter from Claimants to Pierre-Yves Gunter dated Oct. 15, 2020; **Exhibit 34:** Letter from Claimants to Robert Gaitskell dated Oct. 15, 2020; **Exhibit 36:** Letter from Claimants to Claus von Wobeser dated Oct. 15, 2020.

[26]   **Exhibit 35:** Letter from Claimants to Pierre-Yves Gunter dated Oct. 15, 2020, p. 2; **Exhibit 34:** Letter from Claimants to Robert Gaitskell dated Oct. 15, 2020; **Exhibit 36:** Letter from Claimants to Claus von Wobeser dated Oct. 15, 2020.

[27]   **Exhibit 37:** Email from Pierre-Yves Gunter to Claimants dated Oct. 16, 2020; **Exhibit 38:** Email from Pierre-Yves Gunter to Claimants dated Oct. 18, 2020; **Exhibit 40:** Email from Claimants to Pierre-Yves Gunter dated Oct. 19, 2020; **Exhibit 41:** Email from Claimants to Pierre-Yves Gunter dated Oct. 19, 2020.

[28]   **Exhibit 39:** Email from Pierre-Yves Gunter to Claimants dated Oct. 19, 2020.

noting that they "raised questions as to which they have a legitimate interest in receiving prompt answers from each of the arbitrators" and that "[t]hese are not matters for submissions by either Party, at least not at this stage."[29]

31.    On October 21, 2020, upon the Tribunal's invitation,[30] ACP provided its comments on the Disclosure Requests.  While ACP agreed with Movants that the ICC Rules impose an ongoing duty of disclosure in relation to matters of "impartiality and independence", ACP contended that Movants' request went beyond this standard and advocated for a narrower approach to the Tribunal's disclosure obligation.[31]

32.    On October 23 and 24, 2020, the members of the Tribunal responded to the Disclosure Requests.[32]  The responses (although incomplete in Movants' opinion) confirmed that important connections between arbitrators and with Counsel for ACP, which in Movants' view should have been disclosed, had not been disclosed.  In particular, these responses showed that:

- Mr. Gunter had been appointed as president sitting together with Dr. Gaitskell (who sat with Professor Hanotiau in the Cofferdam Arbitration and together authored the Cofferdam Majority Award) in an unrelated ICC case (No. 24400/AYZ), which was apparently still ongoing.  At that point, neither Mr.

---

[29]   **Exhibit 42:** Email from Claimants to Pierre-Yves Gunter dated Oct. 20, 2020.

[30]   **Exhibit 43:** Email from Pierre-Yves Gunter to Claimants dated Oct. 21, 2020.  On Oct. 21, 2020, however, the Tribunal confirmed that ACP would be allowed to make submissions prior to the Tribunal responding to the Disclosure Requests.  **Exhibit 43:** Email from Pierre-Yves Gunter to Claimants dated Oct. 21, 2020.  In addition, the Tribunal drew a distinction between a specific request "to one arbitrator only and based on issues of particular concern vis-à-vis that arbitrator" and "general requests to the arbitrators to update their disclosures".  **Exhibit 43:** Email from Pierre-Yves Gunter to Claimants dated Oct. 21, 2020.  Claimants considered this distinction to be irrelevant because the duty of disclosure of the each arbitrators remains the same irrespective of whether a party has voiced a "particular concern vis-à-vis that arbitrator".

[31]   **Exhibit 44:** Letter from ACP to Tribunal dated Oct. 21, 2020.

[32]   **Exhibit 45:** Letter from Pierre-Yves Gunter to the parties dated Oct. 23, 2020; **Exhibit 46:** Letter from Robert Gaitskell QC to the Parties dated Oct. 24, 2020; **Exhibit 47:** Email from Claus von Wobeser to the Parties dated Oct. 24, 2020.

Gunter nor Dr. Gaitskell explained the process that led to their appointments, as well as the date(s) on which the nominations were proposed and accepted/notified to the Parties.[33]

- During the course of the Panama 1 and Panama 2 Arbitrations, the President of the Tribunal, Mr. Gunter, was sitting with Professor Hanotiau, the president of the Cofferdam Tribunal, in an unrelated but still ongoing London Court of International Arbitration ("LCIA") case, which commenced following the jurisdictional decision in the Panama 1 Arbitration.[34]  At that point, Mr. Gunter did not disclose the process that led to his and Professor Hanotiau's appointment in this case (i.e., how each was nominated), as well as the date(s) on which the nominations were proposed and accepted/notified to the Parties;

33.     The responses received from the members of the Tribunal also showed that they were reluctant to make full disclosures.  In particular, the President Mr. Gunter was reluctant to extend his disclosures to other members of his law firm,[35] and also failed to disclose altogether the appointment involving Professor Hanotiau, which Movants had recently discovered on the ICC database.[36]  Similarly, Dr. Gaitskell failed to extend his disclosures to other members of his barristers' chambers, and his response strongly suggested that he had not carried out any conflict checks extending to other members of his barristers' chambers when accepting his nomination in the Panama 1 and Panama 2 Arbitrations.[37]

---

[33]   See **Exhibit 45**: Letter from Pierre-Yves Gunter to the Parties dated Oct. 23, 2020, at 4.

[34]   See **Exhibit 45**: Letter from Pierre-Yves Gunter to the Parties dated Oct. 23, 2020, at 4.

[35]   *See* **Exhibit 45**: Letter from Pierre-Yves Gunter to the Parties dated Oct. 23, 2020, at 5.

[36]   **Exhibit 72**: ICC website - Information on ICC Case ID 00171.

[37]   *See* **Exhibit 46**: Letter from Robert Gaitskell QC to the Parties dated Oct. 24, 2020, at 1.

34.     On October 26, 2020, Movants therefore sent further questions to each of the members of the Tribunal, aimed at obtaining full answers to their Disclosure Requests, given what Movants perceived to be a reluctance of the arbitrators to make complete disclosures.[38]

35.     On October 28, 2020, Movants submitted a challenge to the ICC against all three members of the Tribunal on the basis of the above information, so that there could be no suggestion that the challenge is inadmissible under Article 14 of the ICC Rules.[39]  Movants reserved the right to submit additional observations upon receiving further information from the members of the Tribunal.

36.     On that day, Mr. Gunter also sent new clarification requests to Movants concerning the involvement of the lawyers at his law firm as co-counsel or arbitrator in unrelated proceedings with any of the Parties' Counsel since 2013.[40]  In particular, Mr. Gunter asked Movants to point to provisions of the IBA Guidelines on Conflicts of Interest in International Arbitration ("IBA Guidelines") specifically dealing with this issue, which Movants consider was an improper attempt at limiting his disclosure obligations to the non-exhaustive lists provided in the IBA Guidelines.

---

[38]   **Exhibit 49**: Email from Claimants to Pierre-Yves Gunter dated Oct. 26, 2020; **Exhibit 48**: Email from Claimants to Robert Gaitskell QC dated Oct. 26, 2020; **Exhibit 50**: Email from Claimants to Claus von Wobeser dated Oct. 26, 2020.

[39]   *See* **Exhibit 6**: ICC Rules, art. 14(2)

> For a challenge to be admissible, it must be submitted by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such arbitration.

[40]   **Exhibit 52**: Email from Pierre-Yves Gunter to the Parties dated Oct. 28, 2020.

37.     On October 29 and 30, 2020, the members of the Tribunal provided partial responses to Movants' additional questions.[41]   These responses further reinforced Movants' doubt as to the impartiality and independence of the arbitrators.   For example, Mr. Gunter disclosed the existence of yet another arbitration in which he sat with Prof. Hanotiau, before the Panama 1 and Panama 2 Arbitrations.   In this *ad hoc* arbitration, after he was appointed as co-arbitrator on April 8, 2013, Mr. Gunter, together with his co-arbitrator, appointed Prof. Hanotiau as president on October 3, 2013.[42]

38.     On November 2, 2020, Mr. Gunter made additional disclosures in response to ACP's request.[43]

39.     On November 2, 2020, Movants answered Mr. Gunter's clarification requests, highlighting the broad scope of arbitrators' disclosure obligations under the ICC Rules, and that the lists provided in the ICC Note to Parties and Arbitral Tribunals on the Conduct of the Arbitration ("ICC Note") and the IBA Guidelines are non-exhaustive.

40.     On November 3, 2020, Mr. Gunter wrote to Movants, notably stating that "an arbitrator or prospective arbitrator cannot be expected to provide information as extensive as some of the information contained in Movants' request of October 15, 2020 and follow-up communications/clarifications."[44]   On that day, Dr. Gaitskell also provided some clarifications.[45]

---

[41]   **Exhibit 56**: Letter from Pierre-Yves Gunter to the Parties dated Oct. 29, 2020; **Exhibit 55**: Email from Robert Gaitskell QC to the Parties dated Oct. 29, 2020; **Exhibit 57**: Email from Claus von Wobeser to the Parties dated Oct. 29, 2020; **Exhibit 58**: Email from Pierre-Yves Gunter to the Parties dated Oct. 30, 2020.

[42]   **Exhibit 56**: Letter from Pierre-Yves Gunter to the Parties dated Oct. 29, 2020, at 5.  The award was issued in September 2015.

[43]   **Exhibit 59**: Email from Pierre-Yves Gunter to the Parties dated Nov. 2, 2020.

[44]   **Exhibit 60**: Email from Pierre-Yves Gunter to Claimants dated Nov. 3, 2020.

[45]   **Exhibit 61**: Email from Robert Gaitskell QC to Claimants dated Nov. 3, 2020.

41.     At the end of this process, having adopted a piecemeal approach to disclosing relevant information, which in Movants' view should have been disclosed spontaneously at the time the relevant circumstances occurred, Mr. Gunter and Dr. Gaitskell maintained their refusal to disclose certain information in relation to connections that they or their law firm/chambers have with other involved arbitrators or Parties' counsel.

42.     In light of the above, Movants' position is that, despite repeated requests, Mr. Gunter and Dr. Gaitskell have still not fully complied with their disclosure obligations.

43.     On November 5, 2020, the ICC Secretariat invited ACP and the members of the Tribunal to comment on Movants' challenge by November 16, 2020.[46]  On November 10, 2020, ACP asked for an extension to submit comments on Movants' challenge and on the same day the ICC Secretariat granted ACP until November 20, 2020 to do so.[47]

44.     On November 12, 2020, the members of the Tribunal submitted their comments on Movants' challenge.[48]  Their defensive answers further confirmed, in Movants' view, that they have been following an opaque and unduly restrictive approach to the disclosure of relevant information.

45.     On November 19, 2020, Movants submitted to the ICC additional observations on the additional disclosures, or lack thereof, made by the arbitrators following the submission of their challenges on October 28, 2020.[49]  Together with this supplemental submission, Movants

---

[46]  **Exhibit 62**: Email from the ICC Secretariat to the Tribunal and the Parties dated Nov. 5, 2020.

[47]  **Exhibit 63**: Email from Respondent to the ICC Secretariat dated Nov. 10, 2020; **Exhibit 64**: Email from the ICC Secretariat to Respondent dated Nov. 10, 2020.

[48]  **Exhibit 65**: Letter from Pierre-Yves Gunter to the ICC Secretariat dated Nov. 12, 2020; **Exhibit 66**: Letter from Robert Gaitskell QC to the ICC Secretariat dated Nov. 12, 2020; **Exhibit 67**: Letter from Claus von Wobeser to the ICC Secretariat dated Nov. 12, 2020.

[49]  **Exhibit 69**: Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 70**: Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

16

provided a letter of the CEOs of the GUPC Shareholders to the President of the ICC International Court of Arbitration, dated November 12, 2020.  In this letter, the CEOs complain about the behavior of the arbitrators and confirm that they would have taken action earlier had they known about the circumstances recently disclosed.  This is the first time in my career that I see users of the ICC dispute resolution services take such as extraordinary step.[50]

46.     At the time of this Declaration, ACP has not yet commented on Movants' challenges (and has been given until December 1, 2020 to do so), and the ICC Court has not ruled on the challenges.

**B.     THE BASIS OF MOVANTS' CHALLENGE FILED WITH THE ICC COURT OF ARBITRATION IN OCTOBER AND NOVEMBER 2020**

47.     Article 11(2) of the ICC Arbitration Rules requires arbitrators to disclose "any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties, as well as any circumstances that could give rise to reasonable doubts as to the arbitrator's impartiality."[51]  This is required not only at the outset of the arbitration, but also throughout the proceeding, as provided in Article 11(3).[52]

48.     As noted above, upon receiving and reviewing the Partial Award rendered in the Panama 1 Arbitration, Movants noted a number of elements that gave rise to serious concerns as to the impartiality and independence of the members of the Tribunal.  After sending Disclosures Requests to the members of the Tribunal, Movants discovered that all of the arbitrators had failed to make disclosures of relationships and cross-appointments resulting in significant

---

[50]   **Exhibit 68**: Letter from Sacyr, Webuild, and Jan De Nul to the ICC dated Nov. 12, 2020.

[51]   **Exhibit 6:** ICC Rules, art. 11(2).

[52]   **Exhibit 6:** ICC Rules, art. 11(3).

remuneration[53] and opportunities of sharing information, which in Movants' view raise serious concerns as to their independence and impartiality.

49.     As a result of these late disclosures, Movants had to challenge all three members of the Tribunal upon discovering these conflicts, on October 28, 2020 (as supplemented on November 19, 2020).[54]   In their challenge, Movants observed that the conduct of all three arbitrators, and their failure to disclose (until prompted by Movants) what Movants consider to be important and relevant information, constituted in Movants' opinion a violation of the ICC Rules and U.S. law (the law of the seat of arbitration).

### 1.     Bases for the Challenge of Mr. Gunter (President)

50.     Movants explained in their challenge that, the information obtained to date (including from Mr. Gunter himself) shows that Mr. Gunter failed to disclose facts and circumstances calling into question his independence and giving rise to reasonable doubts about his impartiality, and that he failed to carry out a proper conflict check at the level of his firm.

51.     *First*, in response to Movants' initial request, Mr. Gunter belatedly disclosed that he is sitting with Dr. Gaitskell, ACP's nominee, in an unrelated, but apparently still ongoing, ICC case (No. 24400).   At first, Mr. Gunter did not explain the process that led to his and Dr. Gaitskell's nominations and appointment (despite Movants' request).   At Movants' repeated insistence, Mr. Gunter then disclosed that he was appointed president by Dr. Gaitskell and the other co-arbitrator, and was later confirmed by the ICC Court on August 1, 2019.[55]   Mr. Gunter

---

[53]   Indeed, the ICC Rules of Arbitration set out the significant remuneration an arbitrator may earn as a result of their appointment.   *See* **Exhibit 6:** ICC Rules, app. III, art. 3(4) (setting out the fee scale for ICC arbitrators).

[54]   **Exhibit 53:** ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 54:** ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

[55]   **Exhibit 56:** Letter from Pierre-Yves Gunter to the Parties dated Oct. 29, 2020, at 4.

and Dr. Gaitskell have thus been sitting together on another tribunal, without Mr. von Wobeser, Movants' nominee, during the deliberations of the Tribunal in Panama 1 (and after the start of the Panama 2 arbitration).

52.     Movants explained in their challenge that their concerns are two-fold: (i) the fact that Mr. Gunter owes his appointment in another case to Dr. Gaitskell (ACP's nominee) creates a connection and a situation of dependence between them, which may have improperly influenced the deliberative process in the Panama 1 and Panama 2 Arbitrations; and (ii) the fact that Mr. Gunter and Dr. Gaitskell sat together in another case throughout the duration of deliberations in Panama 1 means that they had opportunities to discuss the issues at stake in the Arbitrations in the absence of Mr. von Wobeser, thus improperly influencing the deliberations.

53.     *Second*, the information obtained (including from Mr. Gunter himself, following several rounds of exchanges) shows that Mr. Gunter sat on three occasions with the president of the Cofferdam Tribunal, without disclosing it to the Parties:

- Following Movants' Disclosure Requests, Mr. Gunter disclosed that he is sitting with Prof. Hanotiau, the president of the Cofferdam Tribunal, in an unrelated LCIA case. After a further question from Movants, Mr. Gunter clarified that he was in fact appointed president in that case by Prof. Hanotiau and the other co-arbitrator on July 22, 2017, after the start of the Arbitrations. Movants understand that these proceedings are still ongoing.

- Movants' own research showed that Mr. Gunter also acted as co-arbitrator on a panel where Prof. Hanotiau was president nominated by the co-arbitrators (including Mr. Gunter), which Mr. Gunter failed to disclose, even following

19

Movants' Disclosure Requests.[56]   At Movants' insistence, Mr. Gunter finally confirmed the existence of this arbitration, and clarified that he and his co-arbitrator appointed Prof. Hanotiau as president in November 2016.[57]   The award in that case was issued on June 6, 2019.   This means that this arbitration effectively ran in parallel with the Panama 1 and Panama 2 Arbitrations.

- Finally, Mr. Gunter belatedly disclosed that he had also sat with Prof. Hanotiau in another *ad hoc* arbitration.[58]   Mr. Gunter and his co-arbitrator appointed Prof. Hanotiau as president on October 3, 2013.   The award was rendered on September 7, 2015, after Mr. Gunter's nomination as President by the Parties in Panama 1.[59]

54.   In light of the above, Movants pointed out in their challenge that Mr. Gunter and Prof. Hanotiau have been cross-appointing each other as president on three different tribunals since 2013.   Movants also explained that Mr. Gunter has been almost continuously sitting on tribunals with Prof. Hanotiau, and Mr. Gunter and Prof. Hanotiau must have repeatedly spent time together since 2013.   Movants cannot help but wonder whether Prof. Hanotiau has shared his views with Mr. Gunter, during the course of the three above-mentioned arbitrations in which they sat together, in relation to the issues that were considered in the Cofferdam Arbitration (which are closely related to issues that the Tribunal had to decide in Panama 1) and the conduct of the Parties.

---

[56]   **Exhibit 72:** ICC website - Information on ICC Case ID 00171.

[57]   **Exhibit 56:** Letter from Pierre-Yves Gunter to the Parties dated Oct. 29, 2020, at 5.

[58]   **Exhibit 56:** Letter from Pierre-Yves Gunter to the Parties dated Oct. 29, 2020, at 5.

[59]   But before his nomination in Panama 2.

55.     Movants concluded that, while they cannot know with certainty what was discussed behind closed doors, these undisclosed appointments with Professor Hanotiau and Dr. Gaitskell call into question Mr. Gunter's independence of judgment in the eyes of Movants and create, at a minimum, an appearance of possible bias and prejudgment, and thus give rise to reasonable doubts as to Mr. Gunter's impartiality.  This is precisely the reason why those relationships should have been disclosed at the time of Mr. Gunter's acceptance of the presidency in what is a significant arbitration for Movants, for which they relied on his impartiality and independence.  To the extent that some of these relationships arose after the start of the Panama 1 and Panama 2 Arbitrations, they should also have been disclosed at that point in time.

56.     *Third*, Movants explained in their challenge that Mr. Gunter's initial reluctance to investigate and disclose potential connections of other members of his current law firm (or his prior law firm following his switch midway through the proceedings) further undermined his independence and impartiality in the eyes of Movants.  Although Mr. Gunter finally agreed to provide information about the involvement of members of his current firm in arbitration matters, Mr. Gunter refused to disclose similar information regarding non-arbitration matters. [60] Mr. Gunter merely stated that, to his knowledge (and it is not clear whether Mr. Gunter actually investigated the matter), "for the period 2013 until today (and without admitting the relevance of that period) [there were] no 'matters of any nature generating revenues for [his] Firm' … which are such as to call into question [his] independence in the eyes of the parties or to give rise to reasonable doubts as to [his] impartiality."[61]

---

[60]   **Exhibit 60:** Email from Pierre-Yves Gunter to Claimants dated Nov. 3, 2020.

[61]   **Exhibit 60:** Email from Pierre-Yves Gunter to Claimants dated Nov. 3, 2020.

57.     Movants then concluded that Mr. Gunter's recent disclosures show that, while the Panama 1 and Panama 2 Arbitrations were already ongoing:

- He has been nominated as president by Dr. Gaitskell on at least one (still ongoing) arbitration;

- He has been sitting with Professor Hanotiau on at least three arbitrations (at least once appointed as president by Professor Hanotiau); and

- This occurred in a context where Professor Hanotiau and Dr. Gaitskell sided to render the Majority Award in the previous Cofferdam arbitration, which denied Movants' claim in what Movants consider to be a poorly-reasoned and sub-standard award.

58.     Movants' view is that these undisclosed appointments with Professor Hanotiau and Dr. Gaitskell call into question Mr. Gunter's independence of judgment in the eyes of Movants and create an appearance of possible bias and prejudgment, and thus give rise to reasonable doubts as to Mr. Gunter's and Dr. Gaitskell's impartiality.  Given these overlapping appointments to remunerative tribunal positions, and the opportunity to share views and information, Movants consider that disclosure was required.  If such disclosures had been made, the Parties would have been able to assess the matter, object to these appointments or even (for issues having arisen after such appointments) seek removal of Mr. Gunter and Dr. Gaitskell.

59.     I can attest that given the importance of the Panama 1 and Panama 2 Arbitrations to Movants in both monetary and reputational terms, they would most likely not have accepted to consider Mr. Gunter as president nominee in the Arbitrations if, at the time of his nomination, he had disclosed his recent dealings with Professor Hanotiau.  Similarly, Movants would most likely have opposed Mr. Gunter's other appointments (in cases with Professor Hanotiau and Dr.

Gaitskell) during the course of the Arbitrations, if Mr. Gunter had disclosed the possibility of these appointments to Movants before accepting them.  The CEOs of the GUPC Shareholders have confirmed in their recent letter to the President of the ICC Court (attached to the Movants' challenge) that Movants would not have consented to the nomination or confirmation of Mr. Gunter, or accepted the above-mentioned parallel appointments, if they had been timely informed about the above.[62]

### 2.    Bases for the Challenge of Dr. Gaitskell

60.    Movants also explained in their challenge that the information obtained to date (including from Dr. Gaitskell himself) shows that Dr. Gaitskell failed to disclose facts and circumstances calling into question his independence and giving rise to reasonable doubts about his impartiality, and that he failed to carry out a proper conflict check at the level of his chambers (which to date he still refuses to do).

61.    *First*, as explained above, Dr. Gaitskell has disclosed that he is sitting with Mr. Gunter in an unrelated and apparently still pending ICC case (No. 24400), and Dr. Gaitskell has now clarified, upon Movants' insistence, that he nominated Mr. Gunter as president of that tribunal.  Unbeknownst to Movants, Mr. Gunter and Dr. Gaitskell have therefore been sitting together on that other tribunal since August 1, 2019,[63] including during the deliberations of the Tribunal in Panama 1.  As explained above, Movants' view is that this appointment is problematic, and the CEOs have explained in their above-mentioned letter to the President of the

---

[62]  **Exhibit 68:** Letter from Sacyr, Webuild, and Jan De Nul to the ICC dated Nov. 12, 2020.

[63]  **Exhibit 61:** Email from Robert Gaitskell QC to Claimants dated Nov. 3, 2020; **Exhibit 56:** Letter from Pierre-Yves Gunter to the Parties dated Oct. 29, 2020, at 4.

ICC Court that Movants would never have accepted it, had they been informed at the relevant time.[64]

62.      *Second*, Movants have stressed that Dr. Gaitskell failed to provide a complete answer to their Disclosure Request concerning any personal or professional relationship between him and members of the law firms and chambers (including Atkin Chambers) representing the Parties in this arbitration, including but not limited to whether he serves or has served as arbitrator with, or has been appointed by, members of the law firms and chambers representing the Parties in this arbitration.   Dr. Gaitskell provided limited information in that regard on October 24, 2020,[65] which prompted Movants to insist on full disclosure on October 26, 2020.[66] However, on October 29, 2020, Dr. Gaitskell answered Movants' request for clarification concerning certain specific instances unveiled by Movants, and did not confirm whether the information provided was complete.[67]

63.      In response to Movants' Disclosure Requests, Dr. Gaitskell also disclosed that Mr. Manus McMullan QC of Atkin Chambers (counsel for ACP) is currently representing a party in an ICC arbitration in which Dr. Gaitskell is an arbitrator.[68]   A recent search conducted by Movants in the ICC database on the Internet shows that Dr. Gaitskell was also nominated as president in at least two ICC cases by his co-arbitrators, where one of the co-arbitrators was Andrew White QC, a member of Atkin Chambers.[69]   The ICC database only shows a limited

---

[64]   **Exhibit 68:** Letter from Sacyr, Webuild, and Jan De Nul to the ICC dated Nov. 12, 2020.

[65]   **Exhibit 46:** Letter from Robert Gaitskell QC to the Parties dated Oct. 24, 2020.

[66]   **Exhibit 48:** Email from Claimants to Robert Gaitskell QC dated Oct. 26, 2020.

[67]   **Exhibit 55:** Email from Robert Gaitskell QC to the Parties dated Oct. 29, 2020.

[68]   Dr. Gaitskell has also now clarified that he was appointed president by the co-arbitrators.   *See* **Exhibit 55:** Email from Robert Gaitskell QC to the Parties dated Oct. 29, 2020.

[69]   **Exhibit 73:** ICC website - Information on ICC Case ID 00778; **Exhibit 74:** ICC website - Information on ICC Case ID 00729.   While Dr. Gaitskell explained that, in that particular case, Mr.

number of cases.  Dr. Gaitskell, who is a busy arbitrator, may have been appointed by or have
appointed, other members of Atkin Chambers in a number of additional arbitrations (ICC or
otherwise).  Movants explained in their challenge that they have a legitimate interest in being
informed of any such circumstances, and that Dr. Gaitskell's lack of transparency in that regard
is another cause of concern.[70]

64.     *Third*, with respect to the relationship between members of Dr. Gaitskell's
chambers and the Parties' Counsel in the Arbitrations, Dr. Gaitskell has taken the position that he
has "no knowledge of what other members of Keating Chambers do professionally" and has "no
way of knowing" it.[71]  This means that, when Dr. Gaitskell filled in his Statement of Acceptance,
Availability, Impartiality and Independence in the Panama 1 and Panama 2 Arbitrations, he did
not conduct any conflict checks extending to the members of his barristers' chambers, and that
Dr. Gaitskell still has not done so.  Movants explained in their challenge that they do not accept
that Dr. Gaitskell has "no way of knowing" what his colleagues at Keating Chambers "do
professionally".[72]  Indeed, it is well known that clerks at chambers are able to gather the
information needed for a conflict search, and indeed a number of chambers do this routinely for
arbitration matters, precisely because of the evolution of the law and practice of international

---

White was apparently nominated by a client of White & Case LLP, Movants have explained in their
challenge why this circumstance is not relevant in their opinion.  **Exhibit 54:** ICC Challenge
Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM), ¶¶ 63–64; **Exhibit 69**: Updated
Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM), ¶ 32.

[70]  **Exhibit 53:** ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit
54:** ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM); **Exhibit 69**:
Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 70**:
Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

[71]  **Exhibit 46:** Letter from Robert Gaitskell QC to the Parties dated Oct. 24, 2020, at 1.

[72]  **Exhibit 53:** ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit
54:** ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM); **Exhibit 69**:
Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 70**:
Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

arbitration.[73]  The England & Wales Bar Council itself now encourages arbitrators to disclose relationships with another arbitrator or counsel who is a member of the same barristers' chambers.[74]

65.     Movants explained in their challenge why Dr. Gaitskell's insistence that a barrister is forbidden by the England & Wales Bar Council rules to disclose to another member of his chambers whether he or she has acted for a particular party or firm is incorrect.[75]  Movants consider relevant whether Dr. Gaitskell and other members of his chambers have been appointed by (or have appointed) members of Atkin Chambers (counsel for ACP).  Movants' view is that it is not acceptable for a barrister to abstain from conducting any sort of conflict check within his or her chambers.

66.     Movants concluded in their challenge, in light of the above, that they have reasonable doubts as to the independence and impartiality of Dr. Gaitskell.[76]  Dr. Gaitskell has been nominated as arbitrator by ACP in four ICC arbitrations arising from the Project, including

---

[73]     **Exhibit 53:** ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 54:** ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM); **Exhibit 69:** Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 70:** Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-229967/ASM).

[74]     **Exhibit 14:** Bar Council of England and Wales, Information Note regarding barristers in international arbitration dated 6 July 2015, at 5, ¶ 15(d) ("[G]ood practice would dictate that in circumstances where a barrister comes to understand that he or she has been instructed in an arbitration where one or more of the members of the Tribunal are barristers in the same set of chambers, prompt disclosure ought to be made by those instructing the barrister advocate to the legal representatives of the other side. This will ensure as far as possible that the guidance set out in the IBA Guidelines on Conflicts of Interest in International Arbitration is followed (see further below). A failure to make prompt disclosure, could ultimately, lead to a challenge to the independence of the member(s) of the Tribunal in question.").

[75]     **Exhibit 69:** Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM), ¶ 33; **Exhibit 70:** Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/JPA), ¶ 33.

[76]     **Exhibit 53:** ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 54:** ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM); **Exhibit 69:** Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 70:** Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

the Panama 1 Arbitration.  He sided with Professor Hanotiau in the Majority Cofferdam Award (which dismissed Movants' claims).  This situation was initially accepted by Movants on the basis of Dr. Gaitskell's assurance of impartiality and independence and his disclosures at the time, and without knowledge of his cross-nomination of Mr. Gunter as President in another arbitration, or any other of the various connections summarized above.

67.     Upon his nomination in the Panama 1 and Panama 2 Arbitrations, the only disclosures that Dr. Gaitskell made related to his involvement in the parallel arbitrations concerning the Project.[77]  Under the circumstances, Movants did not oppose his confirmation by the ICC Court.  I can attest that the situation would have been different, had Movants known about the circumstances that have now emerged, as also confirmed by the GUPC Shareholders' CEOs in their letter to the President of the ICC Court.[78]

### 3.     Bases for the Challenge of Mr. von Wobeser

68.     Movants explained that their challenge against Mr. von Wobeser is based on two main considerations.[79]

69.     *First*, having sat with Mr. Gunter and Dr. Gaitskell, Mr. von Wobeser's impartiality and independence was indirectly, but necessarily, affected by the above-described circumstances in Movants' view.   Mr. von Wobeser may not have known of all of the

---

[77]  **Exhibit 13:** Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20910 dated Mar. 26, 2015; **Exhibit 12:** Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20911 dated May 15, 2015; **Exhibit 17:** Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 22466 dated Jan. 27, 2017.

[78]  **Exhibit 68:** Letter from Sacyr, Webuild, and Jan De Nul to the ICC dated Nov. 12, 2020.

[79]  **Exhibit 53:** ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 54:** ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM); **Exhibit 69**: Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM); **Exhibit 70:** Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM).

interrelationships between Mr. Gunter, Dr. Gaitskell and Professor Hanotiau, but may have been influenced by their views of the evidence and legal arguments.

70.     *Second*, in response to Movants' Disclosure Requests, Mr. von Wobeser belatedly disclosed that he has been sitting with Mr. Andrés Jana, Counsel for ACP in the Arbitrations, in an unrelated ICSID case.  Mr. von Wobeser later clarified that, in that case, Mr. Jana accepted his appointment as arbitrator on 7 November 2018, Mr. von Wobeser accepted his appointment as arbitrator on 21 November 2018, and the president of the tribunal accepted his appointment on 18 July 2019.[80]  Movants explained in their challenge that it is a real cause for concern that Mr. von Wobeser spent time sitting with counsel for ACP, shortly before the oral closings in Panama 1, during the deliberations of Panama 1, and during the course of Panama 2, in particular since Mr. von Wobeser disclosed further involvement in a case in which Mr. Jana was also involved.[81]

71.     The GUPC Shareholders' CEOs have confirmed in their letter to the President of the ICC Court that they would have objected to the above nomination in a case involving Counsel for ACP, had they been informed of it at the relevant time.[82]

---

[80]   **Exhibit 57:** Email from Claus von Wobeser to the Parties dated Oct. 29, 2020.

[81]   Mr. von Wobeser also acted the *Vieira v. Chile* case (ICSID Case No. ARB/04/7) in which Mr. Jana was counsel for the respondent, and in the *Highbury International v. Venezuela* case (ICSID Case No. ARB/11/1), in which Mr. Carlos Arrue Montenegro (now in-house counsel to ACP) was counsel for respondent.  At first, Mr. von Wobeser had not disclosed the existence of these cases or the method of appointment.  Mr. von Wobeser has now provided clarifications on these cases.  See **Exhibit 57:** Email from Claus von Wobeser to the Parties dated Oct. 29, 2020.  Finally, Petitioners note that Mr. von Wobeser and Mr. Jana are, respectively, part of the *Comité Ejecutivo* and *Consejo Directivo* of *Asociación Latinoamericana de Arbitraje* (ALARB)  (http://www.alarb.org/esp/asociacion.php).  Mr. von Wobeser further disclosed that he is acting as president of an ICC tribunal in which Mayer Brown, counsel to ACP in the Arbitrations, appears as counsel to the respondent, and that he is currently sitting with arbitrators who were also members of the tribunal in related ICC cases arising from the Project, although not Prof. Hanotiau or Dr. Gaitskell.  See **Exhibit 46:** Email from Claus von Wobeser to the Parties dated Oct. 24, 2020.

[82]   **Exhibit 68:** Letter from Sacyr, Webuild, and Jan De Nul to the ICC dated Nov. 12, 2020.

72.     The facts and circumstances described above show, in Movants' view, that the members of the Tribunal did not disclose important connections between themselves, the president of the Cofferdam Tribunal (who has sided with ACP's nominee Dr. Gaitskell to render the Majority Award in the Cofferdam Arbitration), and Counsel for ACP, both at the outset of and during the Panama 1 Arbitration.

73.     For the aid of the Court, Movants have prepared a visual timeline that shows the overlap of appointments—appended to this Motion as Exhibit 75—and highlights the problematic nature of these appointments.[83]

## III.   THE TRIBUNAL'S FINDINGS IN THE PARTIAL AWARD

74.     Having received the Partial Award, Movants thoroughly reviewed it and made several observations on the Tribunal's findings, which are summarized in the sections below.

### A.   THE TRIBUNAL'S FINDINGS REGARDING CONCRETE AGGREGATE PRODUCTION

75.     To recall, GUPC S.A.'s CAP claim related to the production of aggregates (in particular sand) to be used to produce the millions of cubic meters of concrete needed to build the Locks, using rock (basalt) to be excavated in the Pacific site.[84]

#### 1.   The Tribunal's Findings Regarding Paragraph 1.07.D.1 of Section 01 50 00 of the Employer's Requirements

76.     The Employer's Requirements are part of the Contract between ACP and GUPC S.A.  They contain prescriptive requirements as to what ACP, as the employer, was demanding with respect to the design and construction of the Locks.

---

[83]   **Exhibit 75:** Timeline of Undisclosed Appointments During the Pendency of the Panama 1 Arbitration.

[84]   Specifically the suitability for concrete aggregate production of the basalt excavated in the Pacific Locks, *i.e.*, the "PLE Basalt", a particular area of the Project.

77.     A particular paragraph, Paragraph 1.07.D.1, contained in Section 01 50 00 of the Employer's Requirements entitled "Temporary Facilities, Accesses and Controls" was central to ACP's defense that it bore no responsibility regarding the source material (basalt) to be used by the contractor for the production of aggregates—in particular, sand.

78.     Paragraph 1.07.D.1 of Section 01 50 00 of the Employer's Requirements reads:

> Aggregate for the Atlantic and Pacific Locks: A potential source of aggregates for the Atlantic and Pacific Sites may be the rock coming from the excavation at the Pacific site and sand that may be manufactured from that rock.  The Employer in no way guarantees that such aggregate is adequate or meets the requirements for the Contractor's proposed design or is suitable for the Works. The Contractor may wish to consider other options; however, the Contractor should be aware that the areas of the Chagres River upstream from the Gamboa Bridge cannot be used for supply of aggregates.[85]

79.     A central issue in relation to Movants' claims related to CAP concerned the scope and meaning of Paragraph 1.07.D.1, and in particular:

- the distinction in the first sentence between "the rock coming from the excavation at the Pacific site" (source material) and the "aggregates" or "sand that may be manufactured from that rock" (end product); and

- the disclaimer contained in the second sentence covering "such aggregate".[86]

80.     Despite the fact that the Parties agreed[87] that the Tribunal should interpret this provision in accordance with its literal terms, as required by Panamanian law, the Tribunal

---

[85]  **Exhibit 3:** Employer's Requirements - Section 01 50 00 - Temporary Facilities, Accesses and Controls, ¶ 1.07.D.1.

[86]  **Exhibit 1:** Claimants' First Post-Hearing Brief (excerpts), Ch. III, ¶¶ 210-213 (describing Movants' theory on the provision); **Exhibit 31:** Claimants' Second Post-Hearing Brief (excerpts), Ch. III, ¶¶ 195-197 (same).

[87]  **Exhibit 1:** Award, ¶ 906 ("[B]oth Parties consider[ed] that these provisions of the Contract [were] clear and require[d] no interpretation . . . ."); **Exhibit 33**: Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 22) (excerpts), at 174:1 ("You can apply [the provision]

disregarded this agreement (and in Movants' view, the applicable law), and sought to interpret this provision based on arguments not raised by the Parties, including by reference to prior negotiations.  The Tribunal did so while acknowledging that "both Parties consider[ed] that these provisions of the Contract [were] clear and require[d] no interpretation,"[88] as the Parties expressly confirmed during the Closing Hearing.[89]

81.    The Tribunal recognized[90] (as accepted by both Parties)[91] that

> [a]s there is a clear distinction made in the first sentence of Paragraph 1.07.D.1 between aggregate and the rock coming from the PLE, . . . a literal reading of the wording of this provision indeed suggests that the disclaimer concerning 'such aggregate' refers only to the aggregate produced from the rock excavated from the PLE, and not to the rock itself.[92]

82.    The Tribunal added that, as such, "the second sentence cannot be read as an exclusion of liability limited to the source of aggregate, and clearly includes an exclusion of liability for the end-product aggregates."[93]  Surprisingly, given this conclusion, the Tribunal decided to proceed with a new analysis and interpreted the word "aggregate" in the second sentence of Paragraph 1.07.D.1 as covering both the "source of aggregates" (i.e., the source material) and the "aggregates" (i.e., the end product)[94] and applied the above disclaimer to both

---

according to its literal terms.").   The Parties disagreed only about what precisely a literal interpretation of the provision entailed.

[88]    **Exhibit 1:** Award, ¶ 906.

[89]    **Exhibit 33:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 22) (excerpts), at 174:3 (showing ACP's response, "[w]e agree, Mr. President," to the assertion that Paragraph 1.07.D.1 should be interpreted in accordance with its express language).

[90]    **Exhibit 1:** Award, ¶ 927.

[91]    **Exhibit 29:** Claimants' First Post-Hearing Brief (excerpts), ¶¶ 209-213 (describing Movants' theory on the provision); **Exhibit 21:** ACP's Statement of Rejoinder (excerpts), Ch. III, ¶¶ 2.55-2.66 (describing ACP's theory on the provision).

[92]    **Exhibit 1:** Award, ¶ 927.

[93]    **Exhibit 1:** Award, ¶ 927.

[94]    **Exhibit 1:** Award, ¶ 938.

the source material and the end product.  Having made this finding, the Tribunal then concluded that Movants' claims "relating to the suitability of the PLE Basalt for the production of concrete aggregates are subject to the exclusion of liability contained in Paragraph 1.07.D.1, second sentence, of Section 01 50 00 of the Employer's Requirements."[95]

83.     Movants consider that the Tribunal reached the above conclusions based on arguments not raised by the Parties during the Arbitration.

84.     *First*, the Tribunal noted that the disclaimer in Paragraph 1.07.D.1 covered three distinct aspects: "(i) adequacy; (ii) '*meet[ing] the requirements for the Contractor's proposed design*'; and (iii) the '*suitab*[ility] *for the Works*'."[96]  The Tribunal explained that adequacy meant "whether there would be enough aggregate resulting from the processing of the PLE Basalt . . . ."[97]  The Tribunal then stated, without any further explanation, that the elements of adequacy and suitability for the Works led "to the conclusion that the disclaimer applie[d] both to the aggregate as well as to the source of the aggregate", and concluded that "the second sentence of Paragraph 1.07.D.1 [could not] be construed as an exclusion of liability limited to the end-product aggregate, whereas the source of the aggregate would not be subject to such exclusion."[98]

85.     Neither party (nor their respective legal experts) raised this argument in the arbitration and the Tribunal's reading of the elements of "adequacy and suitability" was not advanced by any of the Parties nor discussed at the merits hearing.  On this topic, ACP had argued that Movants' claim related to the aggregates themselves and was thus covered by the

---

[95]     **Exhibit 1:** Award, ¶ 939.

[96]     **Exhibit 1:** Award, ¶ 931 (emphasis in original).

[97]     **Exhibit 1:** Award, ¶ 931.

[98]     **Exhibit 1:** Award, ¶ 931.

exclusion of liability, regardless of whether it covered the source of the aggregates too or not.[99] Notably, ACP argued that Paragraph 1.07.D.1 had to be read "in context" with the disclaimers of liability contained in the preceding paragraph 1.07 B and in Sub-Clause 4.20 of the Conditions of Contract,[100] but the Tribunal rejected this argument and found that such disclaimers of liability "contained in Sub-Clause 4.20 and Sub-Paragraph 1.07 B.3 . . . do not cover the PLE Basalt."[101]

86.     *Second*, the Tribunal ruled that "the evolution of Paragraph 1.07.D.1 in the various drafts of the Employer's Requirements sheds further light on its proper interpretation."[102] Specifically, the Tribunal noted that "Amendment 16 of 16 September 2008 introduced, at the same time, a modification of the first sentence concerning the PLE as a source of aggregates, as well as the second sentence concerning the exclusion of liability" and concluded that this "definitely reinforce[d] the direct connection between the second sentence (exclusion of liability) and the first sentence (source of the aggregate)."[103]

87.     The Tribunal's reasoning in this regard was not based on the arguments made by either Party in the Panama 1 Arbitration or on the literal reading of the provision.   In its submissions, Movants commented on the evolution of Paragraph 1.07.D.1 only to stress that the exclusion of liability only applied to the quality of the end-product, i.e., the aggregates/sand, not to the suitability of the source of the aggregate, i.e., the PLE Basalt.[104]   ACP never relied on the

---

[99]   *See*, *e.g*., **Exhibit 28:** ACP's First Post-Hearing Brief (excerpts), ¶ 7.29 ("[T]he Contractor forgets that its claims relate to the very aggregates that it has made from the basalt.").

[100]   **Exhibit 33:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 22) (excerpts), at 173:20-175:9 (noting that other clauses must be taken into account when analyzing the provision).

[101]   **Exhibit 1:** Award, ¶ 918.

[102]   **Exhibit 1:** Award, ¶ 933.

[103]   **Exhibit 1:** Award, ¶ 933.

[104]   *See, e.g.*, **Exhibit 18:** Claimants' Statement of Claim (excerpts), ¶ 980 ("ACP's exclusion of guarantee . . . does not cover suitability . . . .").

evolution of this paragraph to support its position that the disclaimer of liability covered both the basalt and the aggregates.  Rather, ACP rejected the reference to prior drafts of the Contract to interpret the contract terms on the basis of the Entire Agreement clause (Sub-Clause 1.16 of the Conditions of Contract)[105] and the Tribunal agreed that such reference "must not result in <u>adding contractual</u> terms to the Parties agreement . . . ."[106]  ACP had argued that Paragraph 1.07.D1. evolved to ensure consistency with Sub-Clause 4.20 and the Employer's Requirements, whereby ACP disclaimed liability for other materials (free-issue material),[107] but the Tribunal found that these provisions were not applicable (see above).[108]  Therefore, the particular inference arising from the evolution of Paragraph 1.07.D.1 of Section 01 50 00 of the ER that the Tribunal made to support its interpretation of that provision had not been raised by the Parties or discussed during the merits hearing.

88.     Third, notwithstanding the Parties' agreement that Paragraph 1.07.D.1 was to be interpreted in accordance with its literal terms,[109] as required by Panamanian law, the Tribunal relied on the Parties' conduct prior to the execution of the Contract in order to interpret this

---

[105]   **Exhibit 30:** ACP's Reply Post-Hearing Brief (excerpts)  ¶ 7.9

> The ACP's primary position remains (as it has always been) that investigations and consideration of **the RFP process, and the history of the relevant contractual provisions, is unnecessary** and provides limited assistance to the Tribunal, for the very simple and straightforward reason, that the contractual provisions allocating the risk for physical conditions, **were clear and unambiguous and agreed** by both Parties. **The Contract says what it means, and the Contract means what it says. The mutual intent of the Parties is evident in the words agreed in the Contract**. (emphasis added)

[106]   **Exhibit 1:** Award, ¶ 638 (emphasis added).

[107]   *See, e.g.*, **Exhibit 21:** ACP's Statement of Rejoinder (excerpts), Ch. III ¶¶ 2.79-2.83.

[108]   See supra ¶ 85 and nn. 100–01.

[109]   **Exhibit 33:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 22) (excerpts), at 173:20-174:3 (noting that both parties agree that the provision should be interpreted by their literal terms).

provision.  The Tribunal ruled that, "[t]o the extent that the . . . textual analysis does not fully resolve the inherent ambiguity of the term 'aggregates' and whether it refers to the raw material coming from the PLE or the end product", Panamanian law (Articles 1132 and 1133 of the Panamanian Civil Code) invited the interpreter to "review the parties' conduct, including contemporaneous conduct, to assess their mutual intention . . . ."[110]

89.     To this end, the Tribunal reviewed the Questions and Answers ("Q&As") exchanged at tender stage between ACP and the tenderers, which according to the Tribunal, led to the wording "aggregates" being inserted in RFP Amendment 16, and noting that "the Tenderers' questions repeatedly referred to the sources of the aggregate as 'aggregates'."[111]  The Tribunal also reviewed internal communications of ACP—obtained by Movants during the document production phase of the Panama 1 Arbitration—and stated that, in these, "ACP equally made clear that when it referred to 'aggregate' it was in fact referring to the raw material, i.e. the 'natural sand for concrete'."[112]  The Tribunal then used these elements, together with certain GUPC S.A.'s statements in the DAB proceedings relied upon by ACP,[113] to conclude that "on the basis of the application of Articles 1132 and 1133 of the [Panamanian] Civil Code, [] at the relevant time of RFP Amendment 16 both GUPC and the ACP understood the term 'aggregates' to include the raw material, and that this is how the Parties intended the term when it was used in Paragraph 1.07.D."[114]

90.     Movants consider that the Tribunal's reasoning is problematic for two reasons. First, none of the Parties raised these arguments during the Panama 1 Arbitration.  In particular,

---

[110]  **Exhibit 1:** Award, ¶ 934.

[111]  **Exhibit 1:** Award, ¶ 935.

[112]  **Exhibit 1:** Award, ¶ 936.

[113]  **Exhibit 1:** Award, ¶ 937.

[114]  **Exhibit 1:** Award, ¶ 938.

none of the Parties argued that (i) the Tribunal should assess the Parties' mutual intention by reference to prior conduct and negotiations in respect of Paragraph 1.07.D.1; or that (ii) the Q&As exchanged at tender stage between ACP and tenderers evidenced that mutual intention. Second, none of the tenderers' questions relied upon by the Tribunal came from GUPC S.A – rather they came from other tenderers and cannot therefore evidence Movants' understanding at the time.  ACP put on the record a compilation of all the letters sent by Movants to ACP during the tender period.[115]  These letters, which the Tribunal did not address or mention, do not contain the questions relied upon by the Tribunal to interpret the Parties' mutual understanding of Paragraph 1.07.D.1.  On the contrary, these letters show that Movants asked a question about "material availability" after having reviewed RFP Amendment 16 and that they did clearly distinguish between the basalt (the source) and the aggregates (the product):

> The studies carried out by GUPC are showing <u>a deficiency of suitable basalt to produce aggregates resulting from the excavation foreseen in the TSoL Contract</u>.
>
> In order to have a full picture of the available rock we should know the volume of the on-site stock pile of material coming from the '39 excavation.
>
> ACP drawing 5803-57 identified three areas of 'Rock Stockpiles' adjacent to the project boundary.  Two of the stockpiles are identified as 'Basalt Stockpile South 2A and 2B' and indicate a volume of approximately 0,9 mcm available in January 2010.  The other stockpile is located within the approach channel excavation and is identified as '1939 Excavation Basalt'.  This stockpile is made 'mostly' with rock without giving any indication of the percentage of sound rock over the total.
>
> GUPC would greatly appreciate the ACP to clarify and confirm the amount of stockpiled basalt that will be available for the Third Set of Locks project.
>
> In any case, it appears that a significant volume of the material will still be needed from other sources other than the TSoL required excavations.

---

[115]  **Exhibit 4:** GUPC Letters during Tender Period (excerpts) dated Jan. 15 2008 to Feb, 12, 2009.

> Considering this situation, is the ACP prepared to extend northward the limit of the TSoL scope of work to include roughly 500 m of the excavation now foreseen to be excavated within PAC 4 and 5?[116]

91.     This is the only question in which Movants referred to the basalt (the source material) and the aggregates (the end product), and it contradicts the Tribunal's finding that the Parties had the same understanding that term "aggregates" (the end product) also "include[d] the raw material" used to produce these aggregates.  Had Movants been given an opportunity to respond to the Tribunal's reasoning, they would have so explained.

92.     In sum, it appears that the Tribunal relied upon arguments that none of the Parties raised in order to support its conclusion that, despite a wording that the Parties agreed had to be read literally, the disclaimer found in Paragraph 1.07.D.1 of Section 01 50 00 of the Employer's Requirements, applied to both the source material (basalt) and the end product (aggregates).

## 2.     The Tribunal's Treatment of Prudent Industry Practices

93.     When determining whether Movants were entitled to compensation for errors in the Employer's Requirements in relation to the CAP claim, the Tribunal decided that "Prudent Industry Practices would require that [at tender stage, Movants] inspect the actual PLE Basalt on the Site and conduct tests on the PLE Basalt to determine its suitability for crushing into aggregates."[117]  In particular, the Tribunal found that Movants should have done crushing tests at tender stage on the PLE Basalt to abide by Prudent Industry Practices but did not do so, so that Movants did not act according to Prudent Industry Practices.[118]  When examining the Parties' duties under Panamanian law, the Tribunal also found, on similar factual grounds, that "GUPC

---

[116]  **Exhibit 4:** GUPC Letters during Tender Period (excerpts) dated Jan. 15 2008 to Feb, 12, 2009, at 83.

[117]  **Exhibit 1:** Award, ¶ 987.

[118]  **Exhibit 1:** Award, ¶¶ 982-88.

did not undertake sufficient efforts to self-inform", [119] thereby breaching its duty to self-inform.[120]

94.     When assessing what tests a tenderer to the Project should have done, the Tribunal found that crushing tests, in particular bulk tests, should have been undertaken at the tender stage.   Indeed, the Tribunal found that "an experienced contractor exercising Prudent Industry Practices" should have conducted "further investigations into the use of the PLE Basalt through actual crushing tests . . . ."[121]   When analyzing Movants' duty to self-inform in the context of ACP's duty to plan, the Tribunal further ruled that it "[was] convinced that any issues with the crushing of the PLE Basalt could indeed only be discovered by actually crushing the material."[122]   Similarly, it found that "unless and until the material was actually excavated and crushed, the problems that the Contractor eventually faced with the processing of the PLE Basalt likely would not have been discovered, regardless of any further chemical or petrographic testing."[123]   Movants consider that the Tribunal's reasoning in this regard raises the following issues.

95.     *First*, Movants had offered evidence that (i) Prudent Industry Practices do not require bulk testing (which is the crushing of large quantities of rock), and that (ii) none of the other tenderers did any such bulk testing, which according to Movants was indicative of Prudent

---

[119]   **Exhibit 1:** Award, ¶ 1081; *see also* **Exhibit 1:** Award, ¶ 1084 ("[T]he Arbitral Tribunal considers that the Tenderers should have performed further investigations of the PLE Basalt, even if it was not bulk testing.").

[120]   **Exhibit 1:** Award, ¶¶ 1081, 1085 (majority decision on ACP's duty to plan), 1089 (minority decision on ACP's duty to plan), 1102 (ACP's duty to inform).

[121]   **Exhibit 1:** Award, ¶ 982.

[122]   **Exhibit 1:** Award, ¶ 1079.

[123]   **Exhibit 1:** Award, ¶ 1101.

Industry Practices on that particular issue.[124]   The Tribunal however did not address this evidence in reaching its conclusion regarding Prudent Industry Practices.

96.     *Second*, the Tribunal noted that it "agree[d] with [ACP's expert] Mr. Pauletto, and with his opinion that where an owner has not carried out bulk testing on material to be used as aggregate, it would be prudent for a tenderer to do so."[125]   Mr. Pauletto, however, had not taken such a position; instead he had explained that "a reasonably prudent tenderer would have conducted bulk <u>and/or pilot testing</u> on representative samples"[126], clarifying that "pilot testing is small samples, bulk testing is large samples."[127]   Contrary to the Tribunal's finding, Mr. Pauletto thus never opined that bulk testing was a necessary step for a prudent tenderer, as he noted that pilot testing, *i.e.* tests made on small samples, was enough.   Thus, the Tribunal's ruling that a prudent tenderer would have carried out bulk testing on material to be used for aggregate production, was not based on the testimony presented by ACP's experts.

97.     Third, the Tribunal noted that Movants "in fact did carry out some crushing tests on the material [basalt] from Cerro Escobar"[128] and added that Movants' witness Mr. Buffa confirmed that "these tests did not raise any concerns regarding the suitability of the basalt when crushed . . . ."[129]   The Tribunal, however, failed to consider the evidence of Movants' crushing tests on Cerro Escobar basalt in its decision, insisting that the PLE Basalt should have been crushed instead.   The Tribunal thereby did not even engage with Movants' and its expert's

---

[124]   **Exhibit 31:** Claimants' Second Post-Hearing Brief (excerpts), Ch. III, ¶ 56 (describing expert testimony on the issue); **Exhibit 24:** Presentation by Claimants' Expert Greg G. Gold (excerpts), at 22.;

[125]   **Exhibit 1:** Award, ¶ 984.

[126]   **Exhibit 26:** Presentation by ACP's Expert Mike Pauletto (excerpts), at 11 (emphasis added).

[127]   **Exhibit 25:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 10) (excerpts), at 94:1–3.

[128]   **Exhibit 1:** Award, ¶ 985.

[129]   **Exhibit 1:** Award, ¶ 986.

arguments that Cerro Escobar basalt was representative of PLE Basalt and that it was adequate and prudent to carry out testing on this material.[130]  The Tribunal also did not engage with Movants' arguments that it was not physically possible for Movants to conduct "bulk testing" on the PLE Basalt as the PLE excavation had not started when the tender phase was taking place,[131] which explains why none of the tenderers carried out bulk testing of the PLE Basalt.

98.     Movants therefore consider that the Tribunal adopted its own reasoning and views of (i) what Prudent Industry Practices entail, and (ii) what a crushing test of the PLE Basalt would yield at tender stage, by reference to evidence or testimony that had not been presented by the Parties.

### 3.     C.A.N.A.L.'s Tender Price

99.     As part of its assessment of the existence of a "fundamental technical datum," whereby the PLE Basalt should have been used by the contractor as the primary source for the production of concrete aggregates for the Project, the Tribunal analyzed all of the Tenderers' tenders to verify whether they all understood this fundamental datum," and concluded that they did not.[132]  In doing so, the Tribunal decided:

> Even if the ACP assumed that there would be no need to import materials for the concrete aggregates because there was material available on site, they also stressed in the Contract that they were providing no guarantee as to the suitability of the aggregates produced from such material.  While this placed a considerable

---

[130]  **Exhibit 29:** Claimants' First Post-Hearing Brief (excerpts), Ch. III, ¶¶ 78, 81 (describing Movants' measures to determine comparability of basalts).

[131]  **Exhibit 31:** Claimants' Second Post-Hearing Brief (excerpts), Ch. III, ¶ 56 (describing that bulk testing was not required at the time); **Exhibit 18:** Claimants' Statement of Claim (excerpts), Ch. III, ¶¶ 682, 685 (describing Movants testing efforts); **Exhibit 19:** Claimants' Statement of Reply (excerpts), Ch. 4, ¶¶ 851–52 (describing that bulk testing was not required at the time).

[132]  **Exhibit 1:** Award, ¶¶ 1052-60 (discussing the importance of the fundamental datum).

risk upon the Contractor in terms of its choice to use such material, those were the terms upon which the Contract was concluded.[133]

100.     The Tribunal then turned to the tender of one of the tenderers, a consortium called C.A.N.A.L., noting that C.A.N.A.L. had proposed a much higher price than Movants.[134]  The Tribunal drew two conclusions from this finding.

101.     *First*, the Tribunal concluded that "[t]he position of C.A.N.A.L., who bid for [a] much higher amount, . . . suggests that a higher contingency for risk had been factored into their tender."[135]  However, no evidence on the record supports the Tribunal's conclusion.

102.     *Second*, the Tribunal added that "[i]t may be no coincidence that the Tenderer who chose not to rely primarily on PLE Basalt for the Project's aggregate needs [i.e., C.A.N.A.L.] put in a much more expensive bid."[136]

103.     The Parties in fact had not made such an assumption as to the reasons for C.A.N.A.L.'s much higher bid price in the Panama 1 Arbitration, and the record does not support the Tribunal's interpretation.  On the contrary, evidence on the record shows that ACP itself recognized that the bid prices would be very dependent on the quantities of concrete that the Tenderers would plan to use, which in turn would have depended on the Tenderers' design for the Locks.  In fact, ACP even produced a short video explaining that C.A.N.A.L.'s bid price was

---

[133]  **Exhibit 1:** Award, ¶ 1058.

[134]  **Exhibit 1:** Award, ¶ 1060.

[135]  **Exhibit 1:** Award, ¶ 1060 (referring to ACP's Statement of Defense, but only in so far as it set out the Tenderers' bid prices).

[136]  Here, the Tribunal referred to Claimants' expert Mr. Shilston's explanation that "if the PLE basalt was judged to be unsuitable for the production of concrete aggregate, the overall cost of the project would have been significantly different." **Exhibit 1:** Award, ¶ 1060 (referring to the Second Expert Report of Mr. David Shilston but not considering the fact that Mr. Shilston had made this statement it in a different context, entirely unrelated to C.A.N.A.L.'s tender).

higher precisely for these reasons.[137]  The concrete quantities and numerous other aspects of each

of the Tenderers' bids could have had major repercussions on the bid prices.

104.    Movants therefore consider that in reaching the above two conclusions, the

Tribunal made factual determinations on the basis of arguments which had not been presented by

the Parties and without factual support.

### B.    THE TRIBUNAL'S FINDINGS REGARDING CONCRETE MIX DESIGN

105.    Movants' concrete mix design claim concerned what Movants considered to be

ACP's unlawful prohibition against the start of structural marine concrete placement.

### 1.    Movants' Claim that ACP Prohibited it From Starting Concrete Placement

106.    One of the central issues in dispute in relation to the CMD claim was whether

ACP prohibited Movants from starting placement of its structural marine concrete in early 2011,

in particular during a meeting held on February 16, 2011.[138]  In this regard, both Parties agreed

that if ACP had prevented Movants from starting concrete placement at the time without issuing

an instruction for suspension,[139] ACP would have been in breach of the Contract.[140]

107.    In the Partial Award, the Tribunal acknowledged that a representative of CH2M

Hill (ACP's main consultant on the Project), Mr. Joe Cazares, "stated in no uncertain terms at

---

[137]  **Exhibit 8:** The Panama Canal, *Difference Between Panama Canal New Locks Project Proposals*, Youtube (Feb. 13, 2014), https://www.youtube.com/watch?v=L2x3WTb5Jn8.

[138]  **Exhibit 1:** Award, ¶ 1762 (describing Movants' claim on concrete placement).

[139]  Both the Parties agree that ACP did not issue a formal suspension letter at the time.

[140]  **Exhibit 27:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 15) (excerpts), at 219:7–10  ("[MR. BOUCHARDIE] And would you agree that if a submittal is for review, ACP has no right to stop GUPC from proceeding with the works, based on the submittal; right? [MS. GEORGE] That is correct.").

that meeting that [ACP] would not accept any placement of [Structural Marine Concrete]."[141] However, the Tribunal concluded that this could not be understood as an instruction from the Employer's Representative to suspend the pouring of concrete.[142]  The Tribunal also found that "ACP had the legitimate right to suggest to GUPC that it could exercise its right to suspend the works to prevent pouring of allegedly non-compliant concrete"[143], thereby implying that this is what was communicated to Movants during the February 16, 2011 meeting.  Further, while reproducing an excerpt from the ACP-prepared minutes of that meeting, the Tribunal held that "[b]y the language 'more than a letter [of suspension of the works]', Mr. Cazares was indicating both a suspension of the works and that legal action would result should GUPC have decided to pour its concrete mixes."[144]  The relevant extract of the minutes is reproduced below:

> **Joe Cazares:**  If you are intending on going ahead and ignoring the Contract, will send you a letter, if that's the case.  Are you indicating that you are not going to comply with the Contract, so you need a letter?
>
> **Keith Lefley:**  No.  We are saying that we are going to move forward with the operation, if we have a problem within ourselves will stop.
>
> **Joe Cazares:**  I am telling you right now that we will not accept any structural concrete pour period, based on the facts we have today.
>
> **Keith Lefley:**  OK, so we pour and you will not accept it.
>
> **Joe Cazares:**  No, we don't even accept that; then you will then end up with more than a letter.
>
> **Antonio Betti:** ¿¿¿¿?????

      108.     Movants consider that the Tribunal's reasoning raises a number of issues.

---

[141]  **Exhibit 1:** Award, ¶ 1763.

[142]  **Exhibit 1:** Award, ¶¶ 1762–63 (However, this was not an instruction from the Employer's Representative, and the Contractor did not have any grounds to consider it as such.").

[143]  **Exhibit 1:** Award, ¶ 1764.

[144]  **Exhibit 1:** Award, ¶ 1765.

109.    *First*, the Tribunal did not address the implication of the statement of Mr. Cazares recorded in the meeting minutes that his statement "comes from the most senior management of ACP",[145] despite the Tribunal acknowledging elsewhere in the Partial Award that "for all intents and purposes, CH2M Hill [the organization headed by Mr. Cazares] was essentially a wing of [ACP] during the Project".[146]   Movants had argued in this regard that the fact that Mr. Cazares was communicating the message from the "most senior management of ACP"[147] was a ground for Movants to believe that Mr. Cazares was present at that meeting as a representative of ACP's senior management.   Moreover, it was made clear by Movants at the Oral Closings that Mr. Cazares was a very senior ACP personnel, almost the same level as Mr. De La Guardia, the Employer's Representative.[148]   The Tribunal did not consider this evidence when deciding that Mr. Cazares's words could not be understood as an instruction from the Employer to suspend the pouring of concrete.

110.    *Second*, Movants' position was that the excerpt reproduced above shows that Mr. Cazares was not simply putting Movants on notice that concrete pour would not be accepted by ACP.   It also made clear that ACP did not "even accept" that Movants pour any concrete at all.   However, the Tribunal did not discuss the implications of this particular language, which in Movants' view contradicts its finding on this central point of contention between the Parties, namely whether ACP (directly or through Mr. Cazares) prohibited Movants from starting concrete placement.   Moreover, of all the witnesses who testified at the Hearing, only three had actually attended this key meeting – Mr. Hillebrenner (GUPC S.A./CICP), Mr. Belken (ACP),

---

[145]   **Exhibit 1:** Award, ¶ 1657.

[146]   **Exhibit 1:** Award, ¶ 1788.

[147]   **Exhibit 1:** Award, ¶ 1657.

[148]   **Exhibit 1:** Award, ¶ 1657.

and Mr. Montanari (ACP).  Of these, Mr. Hillebrenner had provided evidence as to what was said by Mr. Cazares on behalf of ACP,[149] but he was not cross-examined on that.[150]  In the Partial Award, the Tribunal, did not address this evidence when reaching its conclusion that no instruction was made by ACP.

111.    *Third*, the Tribunal interpreted the phrase "more than a letter" in the excerpt of the minutes reproduced above to mean "legal action" by ACP.  Movants had stated this phrase to be a threat of termination of the Contract (as testified by Movants' Project Director at the time, Mr. Antonio Zaffaroni).[151]  On the other hand, ACP's position was that this phrase meant ACP would withhold payments under the Contract, as stated by ACP's Counsel during the Oral Closings:[152]

> 19          Well, again, that was perfectly in line with the
> 20   ACP's contractual entitlement under sub-clause 7.5.   It
> 21   would have been entitled to reject the work. We never got
> 22   that far.
> 23          And if we had -- so where does that leave the
> 24   contractor?  Well, it leaves the contractor really hanging
> 25   on the words "more than a letter"; but if the ACP had issued
>
> 1   a letter of suspension and if the contractor had gone ahead
> 2   and poured then there would have been more than a letter, in
> 3   the sense that the ACP would have been perfectly entitled to
> 4   withhold payment. And that, really, gentlemen, is at the
> 5   heart of this.

---

[149]    **Exhibit 20:** First Witness Statement of Mr. Gregory Hillebrenner (excerpts), ¶ 62 (describing that Mr. Cazares told Movants not to proceed with the works, despite the readiness to do so); **Exhibit 19:** Claimants' Statement of Reply (excerpts), Ch. VI, ¶ 298 ("'[I]t was my impression (and I assume to any reasonable person in the room) that Mr. Joe Cazares was presenting ACP's position at this meeting, and was very clear in his message that GUPC should not proceed with the works, even though GUPC was prepared to do so.'").

[150]    While ACP's witness Mr. Montanari did make a reference to this meeting in his first witness statement, it was with respect to another issue, and not any CMD works prohibition.

[151]    **Exhibit 29:** Claimants' First Post-Hearing Brief (excerpts), Ch. V, ¶ 105.

[152]    **Exhibit 32:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 21) (excerpts), at 294:19–295:5.

112.     The Tribunal's interpretation of the words "more than a letter" (which was also relevant to the Tribunal's assessment that there was no instruction from ACP) is thus not based on the position taken by either Party during the Panama 1 Arbitration, and this possible interpretation was not discussed during the merits hearing.   Movants therefore had no opportunity to respond to and refute this theory of interpretation during the Panama 1 Arbitration.

**2.     The 1,000 Coulomb Requirement in the Employer's Requirements**

113.     A key contentious issue in the concrete mix design claim was the testing "age" at which the 1,000 Coulomb threshold, based on ASTM C1202 testing mandated by the Employer's Requirements for concrete, was to be reached.   The ASTM C1202 testing is an indicator of the rate of permeability of chloride ion particles in concrete (i.e., indicating the corrosion risk for the reinforced steel in concrete), which, in the case of the Panama Canal, occurs when concrete is in contact with water containing chloride ion particles (salt water particles).   While Movants argued that the 1,000 Coulomb threshold had to be reached at or before the time the new Locks were put into service and came into contact with water (which would be a year or more after concrete was poured),[153] ACP argued that the threshold had to be reached at the time of Movants' Final Design Submittal for concrete (which meant a much earlier testing age).[154]   The Tribunal noted in this regard that the applicable "testing could not have been reasonably understood as a requirement that the Contractor would carry out long after pouring tons of concrete, in light of the risk of non-compliant concrete having been poured . . . [c]onsidering the size and importance of the Project, it made sense for the Employer to have

---

[153]   **Exhibit 29:** Claimants' First Post-Hearing Brief (excerpts), Ch. V, ¶ 37.

[154]   **Exhibit 28:** ACP's First Post-Hearing Brief (excerpts), Ch. V, ¶ 25.108.

sufficient visibility on the concrete properties and be reassured as soon as possible that the concrete would meet the required standards."[155]

114.    In making this finding, the Tribunal did not address or discuss the evidence on industry practice in this regard by several leading industry specialists who testified at the Hearing, and the findings of the unanimous DAB composed of engineers.[156]  These leading industry specialists consistently explained that what the Tribunal concluded "could not have been reasonably understood" is actually done on large projects all over the world.[157]  The Tribunal thus failed to address a significant part of the evidence on the issue, and appears instead to have followed its own notion of industry practice in the field of concrete, without explaining why it considered itself entitled to disregard this evidence.

## IV.    RELEVANT DOCUMENTATION

115.    Attached hereto are true and correct copies of the documents (excerpted where appropriate) referenced in this Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this November 25, 2020, in Paris, France.

_____
Nicolas Bouchardie

---

[155]  **Exhibit 1:** Award, ¶¶ 1744–45.

[156]  **Exhibit 31:** Claimants' Second Post-Hearing Brief (excerpts), Ch. V, ¶ 63; **Exhibit 77:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 16) (excerpts), at 249:14–250:7; **Exhibit 76:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 14) (excerpts), at 232:8–18.

[157]  **Exhibit 77:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 16) (excerpts), at 249:14–250:7; **Exhibit 76:** Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 14) (excerpts), at 232:8–18.

**INDEX OF EXHIBITS TO DECLARATION OF NICOLAS BOUCHARDIE**

| No. | Description | Date |
|-----|-------------|------|
| 1. | Partial Award in ICC Case No. 20910/ASM/JPA (C-20911/ASM) | September 21, 2020 |
| 2. | Request for Qualifications for the Design-Build of the Third Set of Locks Project, Fifth Revision (excerpts) | November 8, 2007 |
| 3. | Employer's Requirements - Section 01 50 00 - Temporary Facilities, Accesses and Controls (excerpts) | November 2008 |
| 4. | GUPC Letters during Tender Period (excerpts) dated Jan. 15 2008 to Feb, 12, 2009 | February 12, 2009 |
| 5. | Conditions of Contract (excerpts) | February 2009 |
| 6. | Rules of Arbitration of the International Chamber of Commerce | January 1, 2012 |
| 7. | IBA Guidelines on Conflicts of Interest in International Arbitration (excerpts) | 2014 |
| 8. | The Panama Canal, *Difference Between Panama Canal New Locks Project Proposals*, Youtube (Feb. 13, 2014), https://www.youtube.com/watch?v=L2x3WTb5Jn8 | Feb. 13, 2014 |
| 9. | DAB Decision in respect of Referral No. 11 (excerpts) | December 30, 2014 |
| 10. | Mr. von Wobeser's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20911 | April 10, 2015 |
| 11. | Mr. von Wobeser's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20910 | May 13, 2015 |
| 12. | Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20911 | May 15, 2015 |
| 13. | Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20910 | March 26, 2015 |
| 14. | Bar Council of England and Wales, Information Note regarding barristers in international arbitration | July 6, 2015 |
| 15. | Mr. Gunter's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20911 | March 23, 2016 |
| 16. | Mr. Gunter's Statement of acceptance, availability, impartiality and independence in ICC Case No. 20910 | March 24, 2016 |

| No. | Description | Date |
|---|---|---|
| 17. | Dr. Gaitskell's Statement of acceptance, availability, impartiality and independence in ICC Case No. 22466 | January 27, 2017 |
| 18. | Claimants' Statement of Claim (excerpts) | June 19, 2017 |
| 19. | Claimants' Statement of Reply (excerpts) | June 3, 2018 |
| 20. | First Witness Statement of Mr. Gregory Hillebrenner (excerpts) | June 3, 2018 |
| 21. | Respondent's Statement of Rejoinder (excerpts) | October 15, 2018 |
| 22. | Email from Pierre-Yves Gunter to the Parties | October 24, 2018 |
| 23. | Email from Robert Gaitskell QC to the Parties | October 30, 2018 |
| 24. | Presentation by Claimants' Expert Greg G. Gold (excerpts) | January 30, 2019 |
| 25. | Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 10) (excerpts) | February 1, 2019 |
| 26. | Presentation by ACP's Expert Mike Pauletto (excerpts) | February 1, 2019 |
| 27. | Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 15) (excerpts) | February 8, 2019 |
| 28. | ACP's First Post-Hearing Brief (excerpts) | May 31, 2019 |
| 29. | Claimants' First Post-Hearing Brief (excerpts) | May 31, 2019 |
| 30. | ACP's Reply Post-Hearing Brief (excerpts) | July 26, 2019 |
| 31. | Claimants' Second Post-Hearing Brief (excerpts) | July 26, 2019 |
| 32. | Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 21) (excerpts) | October 12, 2019 |
| 33. | Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 22) (excerpts) | October 13, 2019 |
| 34. | Letter from Claimants to Robert Gaitskell | October 15, 2020 |
| 35. | Letter from Claimants to Pierre-Yves Gunter | October 15, 2020 |
| 36. | Letter from Claimants to Claus von Wobeser | October 15, 2020 |

| NO. | DESCRIPTION | DATE |
|---|---|---|
| 37. | Email from Pierre-Yves Gunter to Claimants | October 16, 2020 |
| 38. | Email from Pierre-Yves Gunter to Claimants | October 18, 2020 |
| 39. | Email from Pierre-Yves Gunter to Claimants | October 19, 2020 |
| 40. | Email from Claimants to Pierre-Yves Gunter | October 19, 2020 |
| 41. | Email from Claimants to Pierre-Yves Gunter | October 19, 2020 |
| 42. | Email from Claimants to Pierre-Yves Gunter | October 20, 2020 |
| 43. | Email from Pierre-Yves Gunter to Claimants | October 21, 2020 |
| 44. | Email from ACP to the Tribunal | October 21, 2020 |
| 45. | Letter from Pierre-Yves Gunter to the Parties | October 23, 2020 |
| 46. | Letter from Robert Gaitskell QC to the Parties | October 24, 2020 |
| 47. | Email from Claus von Wobeser to the Parties | October 24, 2020 |
| 48. | Email from Claimants to Robert Gaitskell QC | October 26, 2020 |
| 49. | Email from Claimants to Pierre-Yves Gunter | October 26, 2020 |
| 50. | Email from Claimants to Claus von Wobeser | October 26, 2020 |
| 51. | Email from Claus von Wobeser to the Parties | October 28, 2020 |
| 52. | Email from Pierre-Yves Gunter to the Parties | October 28, 2020 |
| 53. | ICC Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM) | October 28, 2020 |
| 54. | ICC Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM) | October 28, 2020 |
| 55. | Email from Robert Gaitskell QC to the Parties | October 29, 2020 |
| 56. | Letter from Pierre-Yves Gunter to the Parties | October 29, 2020 |
| 57. | Email from Claus von Wobeser to the Parties | October 29, 2020 |
| 58. | Letter from Pierre-Yves Gunter to the Parties | October 30, 2020 |

| NO. | DESCRIPTION | DATE |
|---|---|---|
| 59. | Letter from Pierre-Yves Gunter to the Parties | November 2, 2020 |
| 60. | Email from Pierre-Yves Gunter to Claimants | November 3, 2020 |
| 61. | Email from Robert Gaitskell QC to Claimants | November 3, 2020 |
| 62. | Email from the ICC Secretariat to the Tribunal and the Parties | November 5, 2020 |
| 63. | Email from Respondent to the ICC Secretariat | November 10, 2020 |
| 64. | Email from the ICC Secretariat to Respondent | November 10, 2020 |
| 65. | Letter from Pierre-Yves Gunter to the ICC Secretariat | November 12, 2020 |
| 66. | Letter from Robert Gaitskell QC to the ICC Secretariat | November 12, 2020 |
| 67. | Letter from Claus von Wobeser to the ICC Secretariat | November 12, 2020 |
| 68. | Letter from Sacyr, Webuild, and Jan De Nul to the ICC | November 12, 2020 |
| 69. | Updated Challenge Application in ICC Case No. 20910/ASM/JPA (C-20911/ASM) | November 19, 2020 |
| 70. | Updated Challenge Application in ICC Case No. 22466/ASM/JPA (C-22967/ASM). | November 19, 2020 |
| 71. | ICC Challenge Application in ICC Case No. 22465/ASM/JPA (C-22966/ASM) | November 22, 2020 |
| 72. | ICC website - Information on ICC Case ID 00171 | |
| 73. | ICC website – Information on ICC Case ID 00778 | |
| 74. | ICC website – Information on ICC Case ID 00729 | |
| 75. | Timeline of Undisclosed Appointments During the Pendency of the Panama 1 Arbitration | |
| 76. | Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 14) (excerpts) | February 7, 2019 |
| 77. | Transcript of Closing Hearing in ICC Case No. 20910/ASM/JPA (C-20911/ASM) (Day 16) (excerpts) | February 11, 2019 |