# EXHIBIT 33



GUPC et al. v ACP

Day 22

October 13, 2019

Opus 2 International - Official Court Reporters

Phone: 0203 008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

**Page 161**

1  MS LEGENDRE: Yes, if I may clarify. If I could.
2  MR VON WOBESER: Please, if you could provide your
3  opinion on this point.
4  MS LEGENDRE: Claimants' position is if you look
5  at the terms of the guarantee there are two distinct
6  obligations, as a primary obligor and as a [Spanish] as a
7  guarantor, on a subsidiary manner. As a primary obligor you
8  can say that's an [Spanish] of the obligations of the
9  contractor. And that is why there is no need to call the
10 guarantee because the shareholders have to perform
11 immediately once -- as the contractor, all of the
12 obligations that are required under the main contract.
13 MR VON WOBESER: Would that be an obligation
14 solidaire?
15 MS LEGENDRE: Absolutely. Absolutely it is.
16 MR VON WOBESER: In your opinion, would that make
17 it -- isn't it, an obligation solidaire, different from an
18 fianza under Panamanian law? That's a question I have.
19 Because I didn't know the fianza solidaire. We don't have
20 one in Mexico, so --
21 MS LEGENDRE: The fianza has a chapter in the
22 Civil Code, of course. And these are typical contracts.
23 But, you know, what rules is the terms of what the parties
24 provide. So the fianza would be, typically, a secondary and
25 subsidiary obligation. So there would have to be an actual

**Page 162**

1  call. And the guarantors will only come to perform in the
2  case of a breach by the main contractor. And that's a
3  separate obligation under the terms of the JSG.
4  MR VON WOBESER: So the -- the creditor in this
5  case, ACP, could go directly against --
6  MS LEGENDRE: Yes, and he has.
7  MR VON WOBESER: -- claimants 2 through 4.
8  MS LEGENDRE: Yes.
9  MR VON WOBESER: Without having to go through the
10 process of first, like in a fianza normally you would have
11 to first go to -- against the debtor and then if he doesn't
12 perform, so you would consider there's an obligation
13 solidaire?
14 MS LEGENDRE: Yes, he can go -- it's a primary
15 obligor and it has to perform due and punctually as the
16 contractor. And you see there's a separate obligation that
17 would be a guarantor in the typical, you know, Civil Code
18 structure.
19 MR VON WOBESER: Okay. Thank you very much.
20 And I have a fourth question regarding -- ah, you
21 wanted to clarify something?
22 MR JANA: No. No, no.
23 MR VON WOBESER: Okay.
24 MS LEGENDRE: If I may, a point on the issue of
25 the application of law 22. You would have on your record

**Page 163**

1  our filing on the legal opinion of Dr De Alba(?) who was the
2  ACP's expert in referral 11. And he agreed that law 22
3  could be applied in a suppletory manner. And he agreed that
4  the same principles of (inaudible) contracting and
5  (inaudible) loss, you know, are exactly the same.
6  MR VON WOBESER: Can you repeat, I'm sorry.
7  I didn't follow. Can you repeat the answer -- the last
8  point of the opinion, who was the counsel that gave that
9  opinion?
10 MS LEGENDRE: Dr De Alba(?) who was legal expert
11 for ACP in referral 11, different from Professor Del Moral.
12 He said two things: one, that the principles of public
13 contracting are exactly the same as in law 22 and the
14 regulations; and, second, that law 22 could apply in a
15 suppletory manner to develop these principles. And you have
16 that information on the record.
17 MR VON WOBESER: Okay.
18 MR JANA: Now, I have -- I think I will have to
19 say something. I think the time for submissions is over.
20 They could have mentioned this during the six hours they
21 have for presentation. They didn't say anything about that.
22 But now that it was brought up, I think I'm entitled to say
23 something. I would say --
24 MR VON WOBESER: Of course, Mr Jana. Of course,
25 please.

**Page 164**

1  MR JANA: In the second post hearing brief the
2  claimant presented or referred to this legal opinion of
3  Mr De Alba. The opinion of Mr De Alba first was presented
4  in the -- in the referral 11. And what Mr De Alba really
5  says, he says that you have to apply the contract, the
6  regulation, etc, and says: if at all -- that's the word that
7  he uses hypothetically -- if at all would have to be
8  considered only would be in a suppletory manner; but he adds
9  prevailing the Constitution, law 19 and the contract. So he
10 puts the contract on top of law 22.
11 So I think that is an opinion that you have to
12 look carefully at it. And, second, it is important to
13 say -- and that's in the second conclusion. So anyone can
14 read it. It's in the submission of Mr De Alba.
15 And the second thing that is important: that this
16 has come in a very late hour. The claimant has never relied
17 in this opinion before. ACP has never relied -- the
18 position of ACP has long been different. And I think the
19 most important point: the overwhelming and consistent
20 evidence in this case is that law 22 is not applicable.
21 That was the decision of the Supreme Court of Panama.
22 There -- what we call [Spanish] of the enactment of the law.
23 It is difficult to translate [Spanish] in English, because
24 it is like truthful history but it's really what it says in
25 the minutes of adoption, where they say it is not applicable

**Page 165**

1  at all. The decision of the Supreme Court. The
2  cofferdam -- the same DAB -- the same members of the DAB,
3  decided in DAB 13A and 14A that law 22 was not applicable.
4      So really even it's a hypothetical, that doesn't
5  say -- that said what I said and has not received no value
6  at all by any of the parties, not by any person that has to
7  decide it on Panamanian law and law 22 in this dispute.
8      And, as I said, this overwhelming evidence is
9  confirmed by the Supreme Court decisions and our submission,
10 and we ask you, we have put a lot of words on this in the
11 post hearing brief 1, in particular, but I ask you to read
12 the decision from the Supreme Court when it says it
13 cannot -- law 22 cannot be applied for transparency -- for
14 definition of transparency purposes, they referred to the
15 Constitution, not any suppletory principle and not to the
16 proceedings. They are clear that law 22 is not applicable
17 at all to the ACP. But as I said this is -- we spent a lot
18 of pages on that, so I don't think that we need to speak
19 more about it.
20     MR VON WOBESER: Okay. The last question that
21 I wanted to ask both parties: Mr Jana, regarding the
22 interpretation of contracts and the main rule of going to
23 the words of the contract unless there is -- it's proven
24 that the common intent of the parties was different. In the
25 agreement in this dispute the entire clause agreement

**Page 166**

1  excludes the possibility of going to the intent of the
2  parties. How would you reconcile the rule of the Civil Code
3  with the agreement? Can you really renounce to looking at
4  the common intent of the parties when the Civil Code is
5  quite clear that common intent of the parties prevails over
6  words?
7      MR JANA: Thank you very much --
8      MR VON WOBESER: And of course it has to be
9  proven. I make that point very clear.
10     MR JANA: Now, thank you very much. Let me -- let
11 me make a couple -- a couple of points. Thank you for the
12 question. First of all, the Civil Code doesn't say that the
13 common intention prevails over the words. What the Civil
14 Code said is that the literal words has to be applied unless
15 there is a doubt on the words, about their meaning. But
16 then it says that you can go -- you can apply the common
17 intention against the words when it is evident -- the
18 evident common intention, which I think is the same text in
19 the Mexican Civil Code. It is not just in the --
20     MR VON WOBESER: It comes from the French --
21     MR JANA: Evident; and, evident, we know, as
22 I said, (inaudible) patent -- evident. So it is important
23 the word "evident" here.
24     THE PRESIDENT: Can you just remind us, is it
25 1132?

**Page 167**

1      MR JANA: Yes, this is the second paragraph of
2  1132, which is there.
3      With respect to the second point, this is our
4  answer to the question 2, if my memory is not bad, which is
5  about 1.16, entire agreement clause. And our response says
6  that the provision says that -- it's not the provision does
7  not refer to common intention; the provision refers to prior
8  communications or agreements. Our position is that the
9  parties can agree, by virtue of the autonomy of their will,
10 on clauses of -- that establish (inaudible) interpretation
11 of the contract. But they cannot exclude all together the
12 common intention. So -- and that's our position -- that in
13 the case of the entire agreement, following the cofferdam,
14 if there is an objective ambiguity in the clause and the
15 Tribunal needs to go with other rules to determine the
16 common intention of the parties, they may resort, in that
17 case, to the prior communications or negotiations.
18     And, as I said -- as I said yesterday, I think
19 it's important to insist that, from my understanding, this
20 is not an issue in this moment where the parties -- that is
21 relevant for the decision because, first of all, there is no
22 evidence of any mutual intention different to that in the
23 contract, less an evident one, nor the submission of -- and
24 the submission of claimant is that the Tribunal has to apply
25 the literal terms of the contract.

**Page 168**

1      MR VON WOBESER: Ms Legendre.
2      MS LEGENDRE: Yes, I would like to point out
3  something that Mr Jana said, and I think that that's the --
4  the main issue in dispute, is that nowhere in 1132 there is
5  a reference to objective clarity or objective intent. And
6  I would like to make that very clear, because his position
7  is that you have to look at the clause and that's it, at the
8  four corners of the contract, and that's it. And if
9  objective -- which, for ACP, means that it is not subject to
10 any other meaning, that, you know, it is evident and clear,
11 then you cannot look at the evidence of the prior acts, as a
12 result of the entire agreement clause.
13     We're all from civil law systems. This is an
14 absolute, you know, fabrication. The limits -- the limits
15 of the entire agreement clause are the mutual intent which
16 is the basis of our system, which is a subjective system,
17 and good faith. And the parties, as a matter of due
18 process, can bring evidence of the acts prior to establish
19 the mutual intent. And the Tribunal can look to see if the
20 terms are clear, that means consistency between the literal
21 terms and the intent. And that's precisely what the
22 Tribunal can do in -- when there is a dispute in terms of
23 the -- an interpretation of a clause.
24     MR VON WOBESER: So your view is that limitation
25 in an entire clause of using acts of prior to the signing of

1  and see whether it says what the claimants say or whether it
2  doesn't, as we say.
3          DR GAITSKELL: Thank you.
4          Thank you both.
5          MR McMULLAN: It should also be noted, I'm
6  prompted to say by my instructing solicitors, that it does
7  not appear in the interim claim, this claim.
8          MR BRUMPTON: Subject to checking, I'm sure the
9  quantities are included in the interim claim.
10         THE PRESIDENT: I have also a few questions.
11         If I can take both parties to slide 23 of the
12 binder we received today which relates to clause 1.07.D.1 of
13 the --
14         PROFESSOR CAPPER: Which binder, sir?
15         THE PRESIDENT: I think it is claimants' -- yes,
16 the claimants' binder, the first section on basalt, page 23.
17 Maybe we can display it. I don't know. Slide 23. The one
18 where the clause is quoted. Do you have that? Yes. Thank
19 you.
20         My question to both parties is the following: do
21 the claimants and does the respondent consider that this
22 clause requires interpretation by us or that the text is
23 sufficiently clear? I start with the claimants.
24         PROFESSOR CAPPER: Sir, we -- as we say on the
25 slide, there is no need for you to interpret this provision.

                                   173

1  You can apply it according to its literal terms.
2          THE PRESIDENT: Respondent?
3          MR McMULLAN: We agree, Mr President. There is
4  context. This is important; and I didn't have time to deal
5  with this in my submissions and perhaps I should have.
6          Could I ask the operator to bring up {C-0973/7},
7  which is the contract. And it's the part of the contract
8  just preceding the bit that you are looking at. Because, as
9  you know, it is a principle of interpretation that you must
10 construe the contract as a whole. And if you -- this is --
11 it should be page 7. {C-0973/7}. This should be the borrow
12 material.
13         Now, when you read section D, you must bear in
14 mind section B, which precedes it, and the borrow material.
15 And section B.2, which says:
16         "The employer in no way guarantees that the
17 material at the borrow areas indicated on the drawings is
18 adequate or meets the requirements of the employer's design
19 or is suitable for the works, moreover, the contractor may
20 procure borrow material from other sources or propose other
21 sources within the areas under the responsibility of the
22 employer. In the latter case, the contractor shall submit
23 the areas for approval by the employer representative."
24         Now, this is relevant in two ways for the claim.
25 First of all, in construing clause D.1, you must bear in

                                   174

1  mind clause B.2. So it's being suggested that, in some way,
2  a different approach is being suggested -- is being
3  suggested in D.1 than B.2. We say that is not a sensible
4  interpretation of the contract.
5          But, secondly, section B.2 is the appropriate
6  clause. Why do I say that? I say that for two reasons.
7  First of all, because all of the material which you are
8  considering is borrow material. Whether that's the
9  excavation from the PLE or whether it's Aguadulce. And so
10 section B.2 is the operative clause. Even if I'm -- even if
11 you're against me on that -- let's say you were against me
12 on that, and you said: no, no, the PLE is not borrow
13 material -- well, we don't agree with that; but even if you
14 were against me, Aguadulce Quarry is defined as borrow
15 material. And the claim being made is that additional
16 excavation was required because the borrow material from
17 Aguadulce wasted or degraded and, therefore, more of it had
18 to be excavated.
19         So either, on the claimants' case, section B.2
20 applies only to the Aguadulce material, but still applies to
21 the Aguadulce material, or, on our case, applies wholesale.
22         And, finally, I'd remind you of section -- the
23 section to do with excavation and fill, which I took you to
24 yesterday, section 31 23 00. I won't -- the employer's
25 requirements -- I won't take you to it. For the record,

                                   175

1  it's {R-0342/1}.
2          PROFESSOR CAPPER: Well, that's a very long answer
3  to your question: does it require interpretation or not?
4  The first point is you will have noticed, very, very
5  clearly, that you were told that 1.07.D.1 does not require
6  interpretation and you can apply its literal words. That's
7  what you've been told by the respondent and that is correct.
8          Then you were offered some context. We don't need
9  to offer you context because you apply the provision as it
10 is. I will offer you a further observation in a few moments
11 about 1.07.D.
12         Thirdly, it is absolutely wrong -- and we
13 established that in Miami -- that the PLE is a borrow area.
14 It is not. It is a paid excavation. There's no question
15 about that.
16         Third, the breach by ACP of 194, because of the
17 breach of the -- the error in the employer's requirements,
18 relates to the material in the PLE. That breach and the
19 consequent need for additional excavation requires the
20 claimants to go elsewhere. So the cause of action arises in
21 the PLE. The fact that the substitute material comes from
22 Aguadulce that happens to be a borrow area is neither here
23 nor there; it is a cost consequence properly incurred as a
24 result of the breach of 1.9.4.
25         We note, of course, that when you ask the question

                                   176

1   and see whether it says what the claimants say or whether it
2   doesn't, as we say.
3           DR GAITSKELL: Thank you.
4           Thank you both.
5           MR McMULLAN: It should also be noted, I'm
6   prompted to say by my instructing solicitors, that it does
7   not appear in the interim claim, this claim.
8           MR BRUMPTON: Subject to checking, I'm sure the
9   quantities are included in the interim claim.
10          THE PRESIDENT: I have also a few questions.
11          If I can take both parties to slide 23 of the
12  binder we received today which relates to clause 1.07.D.1 of
13  the --
14          PROFESSOR CAPPER: Which binder, sir?
15          THE PRESIDENT: I think it is claimants' -- yes,
16  the claimants' binder, the first section on basalt, page 23.
17  Maybe we can display it. I don't know. Slide 23. The one
18  where the clause is quoted. Do you have that? Yes. Thank
19  you.
20          My question to both parties is the following: do
21  the claimants and does the respondent consider that this
22  clause requires interpretation by us or that the text is
23  sufficiently clear? I start with the claimants.
24          PROFESSOR CAPPER: Sir, we -- as we say on the
25  slide, there is no need for you to interpret this provision.

                                    173

1   You can apply it according to its literal terms.
2           THE PRESIDENT: Respondent?
3           MR McMULLAN: We agree, Mr President. There is
4   context. This is important; and I didn't have time to deal
5   with this in my submissions and perhaps I should have.
6           Could I ask the operator to bring up {C-0973/7},
7   which is the contract. And it's the part of the contract
8   just preceding the bit that you are looking at. Because, as
9   you know, it is a principle of interpretation that you must
10  construe the contract as a whole. And if you -- this is --
11  it should be page 7. {C-0973/7}. This should be the borrow
12  material.
13          Now, when you read section D, you must bear in
14  mind section B, which precedes it, and the borrow material.
15  And section B.2, which says:
16          "The employer in no way guarantees that the
17  material at the borrow areas indicated on the drawings is
18  adequate or meets the requirements of the employer's design
19  or is suitable for the works, moreover, the contractor may
20  procure borrow material from other sources or propose other
21  sources within the areas under the responsibility of the
22  employer. In the latter case, the contractor shall submit
23  the areas for approval by the employer representative."
24          Now, this is relevant in two ways for the claim.
25  First of all, in construing clause D.1, you must bear in

                                    174

1   mind clause B.2. So it's being suggested that, in some way,
2   a different approach is being suggested -- is being
3   suggested in D.1 than B.2. We say that is not a sensible
4   interpretation of the contract.
5           But, secondly, section B.2 is the appropriate
6   clause. Why do I say that? I say that for two reasons.
7   First of all, because all of the material which you are
8   considering is borrow material. Whether that's the
9   excavation from the PLE or whether it's Aguadulce. And so
10  section B.2 is the operative clause. Even if I'm -- even if
11  you're against me on that -- let's say you were against me
12  on that, and you said: no, no, the PLE is not borrow
13  material -- well, we don't agree with that; but even if you
14  were against me, Aguadulce Quarry is defined as borrow
15  material. And the claim being made is that additional
16  excavation was required because the borrow material from
17  Aguadulce wasted or degraded and, therefore, more of it had
18  to be excavated.
19          So either, on the claimants' case, section B.2
20  applies only to the Aguadulce material, but still applies to
21  the Aguadulce material, or, on our case, applies wholesale.
22          And, finally, I'd remind you of section -- the
23  section to do with excavation and fill, which I took you to
24  yesterday, section 31 23 00. I won't -- the employer's
25  requirements -- I won't take you to it. For the record,

                                    175

1   it's {R-0342/1}.
2           PROFESSOR CAPPER: Well, that's a very long answer
3   to your question: does it require interpretation or not?
4   The first point is you will have noticed, very, very
5   clearly, that you were told that 1.07.D.1 does not require
6   interpretation and you can apply its literal words. That's
7   what you've been told by the respondent and that is correct.
8           Then you were offered some context. We don't need
9   to offer you context because you apply the provision as it
10  is. I will offer you a further observation in a few moments
11  about 1.07.D.
12          Thirdly, it is absolutely wrong -- and we
13  established that in Miami -- that the PLE is a borrow area.
14  It is not. It is a paid excavation. There's no question
15  about that.
16          Third, the breach by ACP of 194, because of the
17  breach of the -- the error in the employer's requirements,
18  relates to the material in the PLE. That breach and the
19  consequent need for additional excavation requires the
20  claimants to go elsewhere. So the cause of action arises in
21  the PLE. The fact that the substitute material comes from
22  Aguadulce that happens to be a borrow area is neither here
23  nor there; it is a cost consequence properly incurred as a
24  result of the breach of 1.9.4.
25          We note, of course, that when you ask the question

                                    176

     1   about 1.07.D.1, on which the respondent has focused for so
     2   much of this arbitration, provision in the temporary
     3   facilities part of the employer's requirements, at this
     4   stage, on this day, of this arbitration, you are now
     5   encouraged to go and look at B.2.
     6        Now, the first reason it was suggested that you
     7   should go to B.2 was somehow to understand how to read
     8   literally D.1. That cannot be right because the only
     9   possible sense that could be given to that submission is a
    10   hollow attempt, once more, to align "rock" with "aggregate",
    11   because the distinction in D.1 is not a distinction drawn in
    12   B.2. And, in that sense, is not relevant.
    13        Of course you do not read B.2 for any purpose.
    14   You read D.1, for the reasons I've explained.
    15        Now, since you've been offered context, may I just
    16   remind you, please, of one clarification, because you asked
    17   me a question yesterday on this provision. And at that time
    18   you took me to the last sentence, which -- in the middle of
    19   which is the word "options".
    20        But there's one point I want to make very, very
    21   clear to this Tribunal: of course our principal submission
    22   to you has been that the requirements to use the PLE basalt
    23   as the primary feedstock results from prescriptive
    24   requirements in the employer's requirements. But that is
    25   not necessary for our case. And I have said to you over and

                                    177

     1   over again -- and I give you two references, we don't need
     2   to go there -- it's slide 61 of my presentation yesterday,
     3   slide 21 of my presentation today -- where in both instances
     4   I made it very, very clear that, at a minimum, even on ACP's
     5   view, if it were suggested it were in some way optional to
     6   use the PLE basalt as the primary feedstock, even so there
     7   would be an error in the employer's requirements because
     8   I have made very clear to you, and it's very clear from the
     9   proper and literal interpretation of the contract, that an
    10   error in the employer's requirements under clause 1.9.4 does
    11   not require that the error occurs in a prescriptive
    12   requirement. That's absolutely clear for all of the reasons
    13   I've addressed you on over this weekend.
    14        So, let me be clear, even if you were against
    15   me -- although I don't believe you would be -- even if you
    16   were against me on the proposition that there is no
    17   prescriptive requirement -- and I'm prompted by the word
    18   "options" you referred me to yesterday, and I explained to
    19   you the proper meaning of the clause yesterday -- it remains
    20   the case that, even if it were a question of the
    21   contractor's choice, as a result of all that's said, the
    22   employer chose to make statements in the employer's
    23   requirements about the suitability of that basalt for the
    24   feedstock. And those statements were in error. And because
    25   they're errors in the employer's requirements, the

                                    178

     1   contractor's case is still made.
     2        I repeat, finally, that the cause of action arises
     3   in the PLE. It is not a borrow area; it is a paid
     4   excavation. The cost consequences of that are recoverable.
     5   And the way in which the contractor had to perform the works
     6   as a result of that breach by the employer was to go to
     7   Aguadulce. And the question of B.2 never arises.
     8        MR McMULLAN: I really must respond to that
     9   because it's important. We're at risk of re-arguing the
    10   case but it is important that you understand what our
    11   position is, Mr Chairman.
    12        The first suggestion that's made is that somehow
    13   this is new, the reference to the borrow areas. It's
    14   obvious that, on the one hand, Professor Capper says that
    15   this is a new submission, but on the other hand he says: we
    16   disproved this in Miami. Therefore illustrating that it's
    17   not new; that it had been brought up before. So that's the
    18   first point.
    19        And I have set out to you that whether the borrow
    20   material provisions relate to the PLE and Aguadulce or only
    21   to Aguadulce alone, they are relevant to the claims and
    22   apply to the claims. And so it cannot be ignored.
    23        Professor Capper seeks to say: well, that's just
    24   the consequence. But that doesn't stop the actions of
    25   clause B.2.

                                    179

     1        The second point is it's said, quite correctly,
     2   and I agree: read the clause. And the reason I say is --
     3   read the clause is it says:
     4        "A potential source of aggregates for the Atlantic
     5   and Pacific sites may be the rock coming from the excavation
     6   at the Pacific site and sand that may be manufactured from
     7   that rock. The employer in no way guarantees that such
     8   aggregate is adequate or meets the requirements for the
     9   contractor's proposed design or is suitable for the works."
    10        What's the error? What's the error? A potential
    11   source of aggregates may be the rock. What's the error?
    12        Thirdly, I showed you a slide and it's been said
    13   today -- sorry, it's been said before Mr Page, for example,
    14   the claimants' own expert in ref 11 admitted that the
    15   aggregates from the PLE could be used for the concrete. He
    16   says it in terms.
    17        What's the error?
    18        Fourthly, when reading the clause, you must read
    19   the entire clause. Look what it says:
    20        "A potential source of aggregates may be the rock
    21   coming from the excavation".
    22        That's true. It may be:
    23        "The contractor may wish to consider other
    24   options".
    25        There is no -- it is neither a prescriptive

                                    180