**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

Case No. 20-cv-24867-SCOLA

------------------------------------------------------------- x
GRUPO UNIDOS POR EL CANAL, S.A.,       :
SACYR, S.A.,       :
WEBUILD S.p.A.,       :
JAN DE NUL N.V.,       :
       :
     *Petitioners,*       :
       :
     v.       :
       :
AUTORIDAD DEL CANAL DE PANAMA,       :
       :
     *Respondent.*     x
------------------------------------------------------------- 

## DECLARATION OF NICHOLAS HENCHIE

I, Nicholas Henchie, solicitor of the Senior Courts of England and Wales, of 20 Fenchurch St, London EC3M 3BY, will say as follows:

1.    I am a Partner in the firm of Vinson & Elkins RLLP based at the above address. Together with Mayer Brown International LLP, and Reed Smith LLP, my firm acts for the Autoridad del Canal de Panamá (the "ACP"), the Respondent in these proceedings.

2.    I make this Declaration in support of (1) the ACP's Response to the Motion to Vacate Partial Award and Incorporated Memorandum of Law (the "Motion") submitted by Grupo Unidos por el Canal S.A. ("GUPCSA"); Sacyr S.A. ("Sacyr"); WeBuild S.p.A.; ("WeBuild"); and Jan de Nul N.V. ("JDN") (together the "Movants"); and (2) the ACP's Cross-Motion to Confirm and Enforce Partial Arbitration Award and Supporting Memorandum of Law.

3.    The facts which I state herein are derived either from my own knowledge gained through my involvement in this matter, in which case they are true, or from information supplied to me in the conduct of this matter, in which case they are true to the best of my information or belief.

4.    In this Declaration, I set out some of the facts relevant to and in support of the ACP's Response in Opposition to Movants' Motion to Vacate and in support of the ACP's Motion to Confirm Partial Award.  I have also reviewed, and respond to certain matters raised in, the

Declaration of Nicolas Bouchardie, which was served with the Motion (the "Bouchardie Declaration").

5.      This is the second time that GUPCSA and Sacyr have petitioned this court to vacate a final arbitral award rendered in connection with disputes concerning the Third Set of Locks Project of the expansion program of the Panama Canal, arising under the very same Contract. On October 31, 2017, GUPCSA and Sacyr filed what they referred to as a Petition to Vacate Final Arbitral Award in Part, requesting that this Court vacate the award rendered in ICC Case No. 19962/ASM, which is referred to as the "Cofferdam Arbitration." On January 26, 2018, I made my First Declaration to this Court, which was made in support of the ACP's Response to the Cofferdam Petition.[1] The Court denied the Cofferdam Petition on June 20, 2018.[2]

6.      The Cofferdam Arbitration concerned the same project and included the same parties as ICC Case No. 20910/ASM/JPA (C-20911/ASM), which the Movants refer to as the "Panama 1 Arbitration." In these proceedings, just as they did after receiving an unfavorable award in the Cofferdam Arbitration, the Movants have requested that the Court vacate the Partial Award in the Panama 1 Arbitration.

7.      In the sections that follow, I will first provide a general overview of the Third Set of Locks Contract (the "Project" or the "Works"), in Section I. Section II then provides background information about the various arbitrations arising out of the Works, including the constitution of the tribunals in those arbitrations, and the timeline of those tribunals' activity. Section III discusses the "Panama 1 Arbitration" (the Partial Award which is at issue before this Court), providing a description of the various stages of the proceedings and the Parties' opportunities to present their cases and to be heard on the issues arising. Section IV describes the challenges to the Panama 1 Tribunal members that the Movants filed before the ICC Court, shortly after receiving the unfavorable decision. Section V provides information about the various connections among the Panama 1 Tribunal members and others, which are raised in the Motion and the Bouchardie Declaration. Finally, Section VI provides information about aspects of the Partial Award referred to in the Motion and the Bouchardie Declaration.

---

[1]      Declaration of Nicholas Henchie, Case No. 17-23996-SCOLA/Torres, January 26, 2018. (**R-1**)

[2]      See Omnibus Order on Motion to Vacate, Motion to Dismiss, and Motion to Confirm Arbitral Award. (**R-2**)

## I.     BACKGROUND TO THE WORKS

### A.     The Third Set of Locks Project

8.      The Third Set of Locks design and build contract was the largest contract of the estimated US$5.25 billion expansion program of the Panama Canal.

9.      As is customary for many large projects like this, potential bidders had to demonstrate that they were technically and financially capable of performing the works. During this pre-qualification process in 2007, it was made clear that any future contract with the ACP for the Works would be a design-build contract, meaning that the contractor ultimately selected would be responsible for both the design of the Third Set of Locks and for constructing them, for a fixed price, lump sum amount (subject to adjustment in accordance with the Contract terms).

10.     The Contract was ultimately awarded to the consortium "Grupo Unidos por el Canal," or "GUPC," which was comprised of a group of companies that included Sacyr Vallehermoso, S.A. (subsequently Sacyr), Impregilo S.p.A. (subsequently Salini-Impregilo S.p.A., and now Webuild S.p.A.), Jan de Nul N.V. and Constructora Urbana, S.A. GUPC were awarded the Contract for a fixed, lump sum Contract Price of approximately US$3.1 billion. After the Contract was executed, GUPC chose to incorporate, and assign (with effect from the original date of the Contract) all of their rights and obligations under the Contract to a special purpose Panamanian entity, GUPCSA. All the original consortium members became shareholders of GUPCSA and guaranteed the performance of GUPCSA to the ACP under a separate agreement.

11.     In this Declaration, the term "GUPC," generally speaking, refers to the unincorporated consortium that tendered for the Contract, while "the Contractor" refers to GUPCSA. "Movants" refers collectively to Sacyr S.p.A., Webuild S.p.A., Jan de Nul N.V. and GUPCSA – all parties in the proceedings before this Court.

12.     The Works commenced in August 2009. Pursuant to the Contract, they were to be completed by October 2014.  However, the progress of the Works was severely delayed and disrupted, delaying completion by over 20 months. The ACP took over the Works after completion, in June 2016.  In broad terms, the Movants say they lost considerable sums of money performing the Contract and have sought to recover those sums from the ACP via a series of DAB referrals and ICC arbitrations.

### B.     The Tender Period and the Contract

13.     In December 2007, the four consortia that had pre-qualified received their first version of the Request for Proposal (the "RFP"). An RFP is the beginning of the process in which

bidders (or "tenderers") will evaluate the project and tender a bid for the performance of the works. In December 2007, the 14-month RFP period formally commenced. The four tenderers were (1) GUPC, who were ultimately awarded the Contract; (2) Consorcio C.A.N.A.L. ("CANAL"); (3) Consorcio Atlántico-Pacífico de Panamá ("CAPP"); and (4) Bechtel, Taisei, Mitsubishi Corporation ("BTM").

14.    There is no dispute that during the RFP period, the ACP made vast quantities of information available for the tenderers to review and consider as they prepared their respective bids. This information included historical data dating back several decades, from the work of the U.S. administration before the handover of the Panama Canal from the U.S. to the Republic of Panama in 1999. It also included new studies and investigations carried out in more recent times by or for the ACP.

15.    The specific information and resources available to the qualifying tenderers during the RFP period included:

(a)    access to the Project Site, allowing the tenderers to undertake their own investigations of the Site, which some of them did;

(b)    access to 8,600 boxes of borehole cores, and 1,800 borehole core logs;[3]

(c)    a stipend so that the Tenderers whose bids were not selected recovered a significant amount of their bid costs (US$5 million if there were three compliant losing bids);[4]

(d)    provision of numerous volumes of information about the site in the form of tests, studies and other documents, largely provided as reference information;

(e)    individual meetings between the ACP and the tenderers, including with GUPC; and

(f)    the opportunity for the tenderers to raise questions to the ACP, the answers to which the ACP made available to all tenderers in the form of a Q&A log.[5]

16.    During the 14-month RFP period, the tenderers had ample opportunity to evaluate the information made available and to further inform themselves of the site conditions.

---

[3]   See paragraph 4.27 on pdf page 136 of the ACP's Statement of Defense. (**R-3**)

[4]   As it happened, one pre-qualified tenderer (CAPP) did not submit a bid, and the two losing tenderers ultimately shared the stipend in the amount of US$7.5 million each.

[5]   See paragraph 4.32 on pdf page 138 of the ACP's Statement of Defense. (**R-3**)

17.     This was important because the Contract expressly allocated responsibility and risk for certain aspects of the site conditions to the Contractor.  The Tribunal recognized this in the Partial Award including, for example, in discussing the Contractor's duty to "self-inform" in paragraph 697 set out below:[6]

> 697.   Sub-Clause 4.10 of the Conditions of Contract is also important in respect of the Contractor's duty to self-inform prior to concluding the Contract, as Sub-Clause 4.10.2 provides:
>
> > *The Contractor shall be deemed to have obtained all necessary information as to risks, contingencies and other circumstances which may influence or affect the Tender or the Works. To the same extent, the Contractor shall be deemed to have inspected and examined the Site, its surroundings, the data referred to in Sub-Clause 4.10.1 and other available information, and to have been satisfied before submitting the Tender as to all relevant matters, including:*
> >
> > *(a)   the form and nature of the Site, which shall include physical conditions, sub-surface, hydro-geologic and topographical conditions at the Site and environmental aspects;*
> >
> > *(b)   the hydrological and climatic conditions;*
> >
> > *(c)   the extent and nature of the work and Goods necessary for the execution and completion of the Works and the remedying of any defects;*
> >
> > *(d)   the applicable Laws, procedures and labor practices of the Country;*
> >
> > *(e)   the Contractor's requirements for access, accommodation, facilities, personnel, power, transport, water and other services; and*
> >
> > *(f)   availability of labor.[446]*
>
> 698.   Under the agreed contractual terms, the Contractor therefore accepted to obtain for itself all of the information necessary for its Tender. Again, good faith requires that this contractual obligation be complied with.

18.     Paragraph 701 of the Partial Award is also instructive about the how the Contract allocated risk between the ACP and the Contractor for the information supplied. The Tribunal confirmed that a significant amount of the information that the ACP made available to the tenderers during the RFP period was reference information, for which the ACP assumed no risk:[7]

> 701.   In the present case, the Parties specifically agreed that the ACP was not taking responsibility for the accuracy of certain information that had been provided and that the Contractor could not rely on such information. By agreeing to these non-reliance provisions, for example in Sub-Clauses 1.16 and 5.1 of the Conditions of Contract, GUPC could not have had a legitimate expectation that it could rely upon the information that the ACP was specifically disclaiming any responsibility for, or that the ACP had verified the accuracy of the same.

## C.     The Excavation of the Site

19.     The Contract required several million cubic meters of concrete, including approximately 4.8 million cubic meters of structural concrete for construction of the key lock

---

[6]   Partial Award at paragraph 697. (**DKT No. 6-1**)
[7]   Partial Award at paragraph 701. (**DKT No. 6-1**)

structures for the Permanent Works. As Contractor, GUPCSA was responsible for sourcing of aggregates to be used for the production of such concrete. The Contractor was also responsible for developing the concrete mix design. The key lock structures were to have a 100-year design life, which underscored the importance of sourcing quality aggregates and producing a high quality, durable concrete mix design that was in compliance with the Employer's Requirements.

20.     The Contractor was required to blast and excavate significant quantities of material from the Pacific Site, including basalt rock, in order to create the excavations to build the lock structures. The RFP information indicated that the basalt from the Pacific Locks Excavation (the "PLE") may be a potential source of concrete aggregate for the Works. GUPC had the opportunity to assess the characteristics of the PLE basalt and many other potential sources during the 14-month RFP period (and even before), and to then determine whether and how to use it. As discussed below, the Parties' responsibilities in relation to the PLE basalt were a key point of dispute between the ACP and the Movants during the arbitration, and from long before then dating back to the original claim which was made in July 2012.

### D.     The Concrete Mix Designs

21.     Under the Contract, the Contractor was responsible for the design of the structural concrete mix or mixes (the concrete mix design or "CMD") which it would then use to construct the key lock structures. It had to submit a Final Design which complied with the contractual requirements set out *inter alia* in the Employer's Requirements.

## II.     THE FIVE PANAMA CANAL ARBITRATIONS

22.     As mentioned above, the progress of the Works was delayed and disrupted, which resulted in numerous disputes between the ACP and the Movants. If not resolved by agreement, disputes had to be resolved through proceedings before a contractually agreed Dispute Adjudication Board, or a "DAB." The DAB proceedings were called "Referrals," and each Referral was numbered in the order in which it was formally referred to the DAB, starting with Referral 1. If either of the Parties was dissatisfied with a DAB Decision, then that Party had the right to issue a Notice of Dissatisfaction within the contractually prescribed time limit, and to then proceed to ICC arbitration.

23.     The Motion concerns the Partial Award in what the Movants refer to as the "Panama 1 Arbitration," but the Panama 1 Arbitration is only one of several arbitrations concerning the Third Set of Locks Project of the expansion program of the Panama Canal. The Movants have filed a total of seven ICC arbitrations against the ACP since 2013 in which they

have asserted claims in connection with the Third Set of Locks Project. As a result of three separate consolidations, the total number of arbitrations is now five. As discussed further below, the Panama 1 Arbitration is one of those three consolidated arbitrations, as the ACP originally filed an arbitration against the Contractor, and the Movants then filed an arbitration against the ACP—those two arbitrations were consolidated into the Panama 1 Arbitration. The arbitrations concerning the Third Set of Locks Project have numerous overlapping contractual, factual, legal and technical issues, as they all relate to the same Project, on the same Contract, and with one exception,[8] they involve identical Parties.

24.     Some of the arbitrations have also had overlapping timetables and overlapping arbitrators, and certain arbitrators have served on more than one Tribunal at once. This made perfect sense given the commonality of many issues. The Parties were content to proceed this way for many years until very recently, shortly after the decision in the Panama 1 Arbitration, which was unfavorable to the Movants. Neither party questioned the professional or personal relationships between the arbitrators sitting on the various cases until October 2020, when the Movants requested that the Tribunal members "update [their] disclosures," and provide additional information regarding various previous arbitral appointments. This request to do so, almost 7 years after the first arbitration had been commenced, was made less than 3 weeks after the Parties received the Partial Award in the Panama 1 Arbitration. Given that the Motion is premised in part on certain relationships concerning the arbitrators, it is worth providing some context as to the constitution and periods of activity of the tribunals in the Panama Canal arbitrations, as set out below.

A.     The Cofferdam Arbitration

25.     The Cofferdam Arbitration was (in fact) the first arbitration filed by the Movants against the ACP (not the so-called Panama 1 Arbitration). The Cofferdam Arbitration was filed after the Cofferdam claims had been totally rejected by the DAB. It concerned the conditions at and around the site of a temporary cofferdam to be constructed at the Pacific entrance to the Canal, in addition to the nature and location of a potential diversion of the Cocoli River. The Tribunal was constituted as follows:

---

[8]     The one exception to this is ICC Case No. 22588/ASM/JPA, referred to as the "Advance Payments Arbitration." GUPCSA, Sacyr, Jan de Nul and Salini Impregilo were all parties to the Advance Payments Arbitration. There were also two additional parties, namely, Constructora Urbana, S.A. and Sofidra S.A.

    (a)     On December 28, 2013, the Movants filed their Request for Arbitration against the ACP, and in doing so nominated Prof. Bernardo Cremades as co-arbitrator.

    (b)     On February 7, 2014, the ACP nominated Dr. Robert Gaitskell QC as co-arbitrator.

    (c)     On June 4, 2014, the ICC confirmed Prof. Bernard Hanotiau as President of the Tribunal.

26.　　The Movants did not challenge Prof. Cremades, Dr. Gaitskell QC or Prof. Hanotiau in the Cofferdam Arbitration, nor did they request any additional information regarding any of the arbitrators' professional or personal relationships. The Cofferdam Tribunal issued its Final Award on July 25, 2017, dismissing (as the DAB had done) the claims asserted against the ACP, and ordering the Movants to repay substantial legal costs incurred by the ACP.[9] On November 1, 2017, GUPCSA and Sacyr filed their Petition to Vacate Final Arbitral Award in Part, which this Court denied.[10]

### B.　　The "Panama 1 Arbitration"

27.　　As discussed further below, the "Panama 1 Arbitration" concerned numerous issues, including the Parties' responsibilities in relation to the basalt excavated at the Pacific Site for use as concrete aggregate, and the delays associated with the Contractor's submittal of a compliant concrete mix design. The Tribunal was constituted as follows:

    (a)     On March 17, 2015, the ACP and the Movants filed separate Requests for Arbitration following a DAB decision in favor of the Contractor. The ACP nominated Dr. Gaitskell QC as co-arbitrator, while the Movants nominated Mr. von Wobeser.

    (b)     On April 4, 2016, the ICC confirmed Mr. Pierre-Yves Gunter as President of the Tribunal, pursuant to a selection protocol agreed by the Parties.

    (c)     On April 25, 2016, the Parties agreed to consolidate the two arbitrations, into what the Movants now refer to as the Panama 1 Arbitration.

---

[9]　　See Cofferdam Final Award. (**R-4**)

[10]　　See Omnibus Order on Motion to Vacate, Motion to Dismiss, and Motion to Confirm Arbitral Award (**R-2**). Meanwhile, the Movants failed to honor the Cofferdam Final Award and the ACP accordingly took enforcement action in Belgium against Jan de Nul to recover the awarded sums.

28.     In accepting his nomination, Dr. Gaitskell QC disclosed that he had been appointed to the Cofferdam Tribunal.[11] The Parties were of course already aware that Dr. Gaitskell QC was sitting on that Tribunal with Prof. Cremades and Prof. Hanotiau. At the time of Dr. Gaitskell QC's disclosure, the Cofferdam Arbitration was in the relatively early stages, as the ACP was in the process of preparing its Statement of Defence.

29.     The Movants did not challenge Dr. Gaitskell QC, Mr. von Wobeser or Mr. Gunter in the Panama 1 Arbitration at the time of their nominations. Nor did the Movants seek any additional information regarding any of their professional or personal relationships, with each other or with any other arbitrators.

30.     It was not until October 15, 2020—four and a half years after the constitution of the Panama 1 Tribunal—that the Movants for the first time requested additional information from the arbitrators regarding their personal and/or professional relationships.[12] This was less than three weeks after the Panama 1 Tribunal rendered the highly unfavorable (for the Movants) Partial Award on September 21, 2020.

### C.     The Panama 2 Arbitration

31.     The "Panama 2 Arbitration," which is also referred to as the Disruption Arbitration, concerns alleged delays and disruption, *inter alia*, to the Contractor's concrete works and earthworks. It is ongoing as of the date of this Declaration. The Tribunal was constituted as follows:

(a)     On December 8, 2016 and July 19, 2017, the Movants filed two separate arbitrations, nominating Mr. von Wobeser as co-arbitrator in both.

(b)     On January 13, 2017 and September 28, 2017, the ACP nominated Dr. Gaitskell QC as co-arbitrator in both arbitrations.

(c)     The Parties subsequently agreed to consolidate the two arbitrations into what is now referred to as the Panama 2 Arbitration.

(d)     On June 27, 2018, the ICC confirmed Mr. Gunter as President of the Tribunal, by agreement of the Parties.

32.     In accepting his nomination, Dr. Gaitskell QC again disclosed that he was sitting on the Cofferdam Tribunal with Prof. Hanotiau and Prof. Cremades.[13] The Cofferdam

---

[11] See Dr. Gaitskell QC's Disclosures in the Panama 1 Arbitration. (**R-5**)
[12] See Emails from the Claimants to the Tribunal dated October 15, 2020. (**R-6**)
[13] See Dr. Gaitskell QC's Disclosures in the Panama 2 Arbitration. (**R-7**)

Arbitration was still ongoing, as the Tribunal was in the process of drafting the Cofferdam Final Award, which it issued approximately four months later, on July 25, 2017. Dr. Gaitskell QC also disclosed that he was sitting in the Panama 1 Arbitration, with Mr. Gunter and Mr. von Wobeser.[14] In addition, both Mr. von Wobeser and Mr. Gunter disclosed that they were sitting on the Panama 1 Tribunal with Dr. Gaitskell QC and Mr. Gunter, and Dr. Gaitskell QC and Mr. von Wobeser, respectively.[15]

33.     The Movants did not challenge any of Dr. Gaitskell QC, Mr. von Wobeser or Mr. Gunter in the Panama 2 arbitration at the time of their nomination. Nor did the Movants seek any additional information regarding any of their relationships with each other or with any other arbitrators, until October 15, 2020. This was over two years after the constitution of the Panama 2 Tribunal, and again, less than three weeks after the issuance of the Partial Award in the Panama 1 Arbitration.

34.     That said, the Movants did question whether Dr. Gaitskell QC had sufficient time to devote to the Panama 2 Arbitration. In a letter dated September 21, 2017, the Movants noted that "Mr. Gaitskell has disclosed that he acts as chair or sole arbitrator in seven pending arbitrations and as co-arbitrator in fourteen pending arbitrations."[16] The Movants then requested that the ICC seek clarifications from Dr. Gaitskell QC regarding his availability.[17] The Movants did not request any particular information from Dr. Gaitskell QC regarding any of the twenty-one arbitrations that they referenced in their letter. The ICC granted the Movants' request for clarifications and Dr. Gaitskell QC provided the requested additional information on September 25, 2017.[18] The Movants thanked Dr. Gaitskell QC for the clarifications, and stated that they were reserving their rights.[19] The Movants made no further inquiries in this regard.

35.     It is also worth noting that the Movants at one time wanted the Panama 1 and Panama 2 claims to be heard in the same arbitration, and to be heard by the same Tribunal appointed by the ICC for those arbitrations (namely, Mr. Gunter, Dr. Gaitskell QC and Mr. von Wobeser). The Movants made two separate and unsuccessful applications to that effect. The first

---

[14]  See Dr. Gaitskell QC's Disclosures in the Panama 2 Arbitration. (**R-7**)

[15]  See Mr. Gunter's and Mr. von Wobeser's Disclosures in the Panama 2 Arbitration. (**R-8 and R-9**)

[16]  See the Claimants' Letter to the ICC dated September 21, 2017. (**R-10**)

[17]  See the Claimants' Letter to the ICC dated September 21, 2017. (**R-10**)

[18]  See Email dated September 25, 2017 from Dr. Gaitskell QC to the ICC. (**R-11**)

[19]  See Claimants' Letter to the ICC dated October 9, 2017. (**R-12**)

application, which the Movants referred to as their "Application to Add a Tranche to the Arbitration", was submitted on August 16, 2017.[20] The Movants sought to add their concrete disruption claim from the Panama 2 Arbitration to the Panama 1 Arbitration, relying primarily on Article 24(3) of the ICC Rules. The Tribunal rejected the Movants' request.[21] The Movants then submitted an application to consolidate the entirety of the Panama 2 Arbitration into the Panama 1 Arbitration on October 17, 2017.[22] This application was similarly rejected.[23]

**D.    The Lock Gates Arbitration**

36.    The Lock Gates Arbitration concerns disputes relating to the rolling lock gates that are part of the Third Set of Locks. The Tribunal was constituted as follows:

(a)    On December 8, 2016 and July 19, 2017, the Movants filed two separate arbitrations, nominating Prof. Cremades as co-arbitrator in both.

(b)    On January 13, 2017 and September 28, 2017, the ACP nominated Dr. Gaitskell QC as co-arbitrator in both arbitrations.

(c)    The Parties subsequently agreed to consolidate the two arbitrations into what is now referred to as the Lock Gates Arbitration.

(d)    On June 26, 2019, the ICC confirmed Professor Bernard Audit as President of the Tribunal, by agreement of the Parties.

37.    The ICC confirmed Prof. Cremades as co-arbitrator on October 23, 2017, which was approximately three months after the Cofferdam Tribunal rendered the Cofferdam Final Award, on July 25, 2017. To recall, Prof. Cremades served on the Cofferdam Tribunal as co-arbitrator nominated by the Movants. Prof. Cremades wrote a dissenting opinion in the Movants' favor in the Cofferdam Final Award.[24]

38.    In accepting his nomination, Dr. Gaitskell QC disclosed that he previously sat on the Cofferdam Tribunal with Prof. Hanotiau and Prof. Cremades.[25] Dr. Gaitskell QC also

---

[20]    See the Claimants' Application to Add a Tranche dated August 16, 2017. (**R-13**)

[21]    See Procedural Order No. 4 dated October 3, 2017. (**R-14**)

[22]    See Claimants' Application to Consolidate dated October 17, 2017. (**R-15**)

[23]    See ICC Order denying Consolidation Request dated December 6, 2017. (**R-16**)

[24]    It is worth noting that the ACP proposed that Prof. Bernard Hanotiau, who previously acted as President of the Cofferdam Tribunal, be nominated as President of the Tribunal in the Lock Gates Arbitration. However, the Movants objected to this, on the basis that they were dissatisfied with the Cofferdam Final Award, criticizing it as "deeply flawed." See pdf page 1 of Email from the Claimants to the ICC dated June 1, 2018. (**R-79**)

[25]    See Dr. Gaitskell QC's Disclosures in the Lock Gates Arbitration. (**R-17**)

disclosed that he was sitting in the Panama 1 Arbitration, which was also ongoing, with Mr. Gunter and Mr. von Wobeser.[26] This was already known to the Movants given that they were parties to both of these arbitrations.

39.     The Movants did not seek to challenge Dr. Gaitskell QC, nor did they request any additional information from him regarding his professional or personal relationships with any arbitrators or counsel. Again, the Movants' inquiries to Dr. Gaitskell QC came over two years later, and less than three weeks after issuance of the (unfavorable) Panama 1 Arbitration Partial Award.

### E.     The Advance Payments Arbitration

40.     The Advance Payments Arbitration concerned, among other things, the Contractor's obligation to repay certain advance payments issued by the ACP in connection with the Works. In addition to the Movants, Constructora Urbana, S.A. and Sofidra S.A. acted as claimants in the Advance Payments Arbitration. The Tribunal was constituted as follows:

      (a)     On January 31, 2017, the Claimants filed their Request for Arbitration, nominating Mr. Guido Santiago Tawil as co-arbitrator.

      (b)     On May 10, 2017, the ACP filed its Answer, nominating Mr. Stephen Furst QC as co-arbitrator.

      (c)     On August 9, 2017, the ICC confirmed the appointment of Prof. Gabrielle Kaufmann Kohler as President of the Tribunal.

41.     The Advance Payments Tribunal was comprised of three arbitrators who had never sat on any of the Tribunals in any of the Panama Canal arbitrations and would not do so again (so far). Again, the Claimants did not challenge any of these arbitrators, nor did they request any additional information beyond that provided in their disclosures.

42.     The Tribunal issued its Final Award in the Advance Payments Arbitration on December 10, 2018, which resulted in them having to repay over US$800 million in advance payments to the ACP, and costs.[27] The Movants did not attempt to challenge this decision.

---

[26]   See Dr. Gaitskell QC's Disclosures in the Lock Gates Arbitration. (**R-17**)
[27]   See the Final Award in the Advance Payments Arbitration. (**R-18**)

### III. THE CONCRETE AGGREGATE AND MIX DESIGN CLAIMS IN THE PANAMA 1 ARBITRATION

43.     In the Motion, the Movants seek to vacate the Partial Award rendered in the Panama 1 Arbitration. This section provides general background as to the disputes in those proceedings.

44.     The Panama 1 Arbitration has lasted nearly six years since the filing of the Request for Arbitration in March of 2015. It involved numerous complex technical and factual issues, and included dozens of fact witnesses and experts. The parties have also submitted thousands of pages of pleadings and thousands of factual exhibits and legal authorities. There have been a number of in-person hearings both in the US and in the UK, with the final merits hearing taking place over the course of 20 sitting days in Miami, Florida in early 2019. This Declaration does not set out to provide an exhaustive history of the arbitration, but instead will provide background information as to the claims, and the scope of the proceedings, insofar as it is relevant to the Motion and the Bouchardie Declaration. It is, of course, necessarily higher level as there is no way to adequately or fully summarize such a hugely complex arbitration in a few short pages.

#### A.     The Claims

45.     The Movants made a variety of claims in the Panama 1 Arbitration, two of which are referred to in the Motion and/or the Bouchardie Declaration. The Movants refer to the Concrete Aggregate Production, or "CAP" claim in the Motion. Mr. Bouchardie also refers to the CAP claim in his Declaration. In addition, the Bouchardie Declaration refers to the Concrete Mix Design, or the "CMD" claim, although the Motion itself makes no mention of the CMD claim.

#### 1.     The Concrete Aggregate Production Claim

46.     The CAP claim was founded, *inter alia*, on an alleged error in the Employer's Requirements (which were part of the Contract), and allegations that the ACP breached various provisions of the Contract and/or Panamanian law. Specifically, the Contractor alleged that the ACP misrepresented that the basalt to be excavated from the PLE was a suitable source for the production of concrete aggregate. The Contractor claimed that the PLE basalt was in fact unsuitable for aggregate production, and as a result, the Contractor incurred substantial additional costs, including those associated with sourcing basalt from other areas, and modifications to the crushing plant.

### 2. The Concrete Mix Design Claim

47.     The Contractor's claim in relation to CMD was largely a claim for an extension of time and prolongation costs allegedly due to the Contractor's delayed start to placing structural marine concrete ("SMC"). One of the central issues was whether the Contractor's CMD Final Design Submittal for SMC in February 2011 (and subsequent submittals in March 2011 and May 2011) complied with the terms of the Contract (in particular the Employer's Requirements). The ACP's case was that the Contractor had to establish that it was ready, willing and able to start and proceed with SMC placement in February 2011 <u>in accordance with the Contract</u>. The Contractor also made a claim for costs in respect of an alleged instruction by the ACP to use silica fume in its mixes.

### B. The Dispute Adjudication Board Proceedings ("Referral 11")

48.     The Contractor had previously referred both the CAP and the CMD claims to the Dispute Adjudication Board (the "DAB") pursuant to Sub-Clause 20.4 [*Obtaining Dispute Adjudication Board's Decision*] of the Conditions of Contract. This was part of "Referral 11" to the DAB. The original interim claim that gave rise to these DAB proceedings was first issued in July 2012. The Referral 11 proceedings themselves took place over some 15 months between September 2013 and December 2014 (although they were temporarily suspended / put on hold due to other issues between the Parties).  There were two rounds of very detailed submissions (together with a number of expert reports), followed by a two-week, in-person hearing in Panama, in September and October 2014, before the DAB, at which the Contractor was represented by its current counsel White & Case.

49.     The DAB determined that the Contractor was entitled to certain damages in respect of the CAP and CMD claims.[28] The DAB also awarded the Contractor an extension of time to the Date for Completion in respect of critical delays. The ACP promptly paid the amounts to the Contractor that it was ordered to pay pursuant to the DAB decision, which was in excess of US$230 million. However, the ACP strongly disagreed with the DAB's decision in Referral 11, and submitted a timely "Notice of Dissatisfaction" with the DAB's decision, which is a contractual prerequisite to initiating arbitration proceedings. After submitting the Notice, as already described, the ACP commenced arbitration seeking the repayment of the sums wrongly awarded by the DAB, which the ACP had paid.  It is these sums – subsequently decided in Panama

---

[28]   In regards to the CAP claim the decision was by majority. See DAB Decision in Referral 11. (**R-19**)

1 Arbitration not to have been due to the Contractor – that the Partial Award has ordered the repayment of to the ACP, and which the Partial Award is now challenged by the Movants.

## C. The Panama 1 Arbitration Proceedings

50.     From commencement of the Arbitration in March 2015 to the rendering of the Partial Award in September 2020, the Arbitration proceedings comprised the following, all of which were considered by the Tribunal:

    (a)     a detailed bifurcated phase to address jurisdiction and standing, which resulted in an 86-page Partial Award on Jurisdiction;

    (b)     a detailed phase to address Movants' emergency application for interim measures (albeit unrelated to the CAP and CMD claims);

    (c)     two full rounds of pleadings, totalling over 3,500 pages (excluding witness statements, expert reports, exhibits, authorities, and the like);

    (d)     two lengthy and detailed document production phases in which close to 15,000 documents (including audio, video, and data files) were produced;

    (e)     4 procedural orders;

    (f)     78 statements of fact witnesses;

    (g)     63 expert reports;

    (h)     Over 3,500 exhibits;

    (i)     A 20-day merits hearing in Miami, Florida;

    (j)     Two rounds of post-hearing briefs (totalling approximately 1,290 pages); and

    (k)     A further two-day hearing for closing arguments (with closing presentations containing some 1,460 slides in total).

51.     On September 21, 2020, the Tribunal rendered a comprehensive, detailed, and exhaustively reasoned 565-page Partial Award. It is understood that the Tribunal will also shortly issue a Final Award that addresses final remaining outstanding issues, including the Parties' claims in relation to the huge costs of the arbitration, which are in the combined total of over US$140 million.[29]

---

[29]   See page 4 of Updated Appendix 11 on pdf page 50 of the ACP's Reply Cost Submission of December 20, 2019 (**R-75**), page 1 of Appendix 1 on pdf page 22 of the ACP's Cost Submission of November 20, 2019 (**R-74**), pdf page 8 of ACP's Reply Updated Cost Submission of December 18, 2020 (**R-77**), paragraph 42 on pdf page 16 and Annex E on pdf page 33 of

52.     From the filing of the initial Requests for Arbitration in 2015 to the close of the proceedings, the duration of the Panama 1 Arbitration has been approximately 5 years and 10 months. If the conditions precedent to arbitration as required under the Contract are taken into consideration, then the duration of the CAP claim from the filing of the Contractor's Sub-Clause 20.1 notice on February 16, 2011 to the close of the Panama 1 Arbitration is approximately 10 years. The duration of the CMD claim from the filing of the Contractor's Sub-Clause 20.1 notice (which the ACP asserted was untimely) on May 5, 2011 to the close of the proceedings is also approximately 10 years.

**D.      The Partial Award in Panama 1**

53.     As mentioned, the Tribunal rendered the Partial Award on September 21, 2020, and it was notified to the Parties on September 25, 2020. The Movants had quantified their claims against the ACP at approximately US$427 million.[30] The Tribunal dismissed the majority of those claims, including the CAP and CMD claims. In doing so, the Tribunal also ordered that the Movants reimburse the ACP amounts previously awarded by the DAB, in the amount of US$265,299,500. The Tribunal further determined that such reimbursement should be reduced by the amounts due to the Contractor for the Foundations Conditions and On-Site Laboratories claims. The Tribunal determined that the Contractor was entitled to US$17,197,673.20 in relation to the On-Site Laboratories claim.[31] As to the Foundations Conditions claims, the Tribunal invited the Parties to reach an agreement as to the calculation of the sums due to the Contractor.[32] The Parties reached such agreement and made a joint submission to the Tribunal on November 12, 2020, determining that the total amount that should be deducted from the amount reimbursable to the ACP was US$26,838,878.20.[33] This resulted in a total net amount owed to the ACP of approximately US$238 million.[34]

---

Movants' Reply Cost Submission of December 20, 2019 (**R-76**), and pdf page 6 of Movants' Reply Updated Cost Submission of December 18, 2020 (**R-78**).

[30]   See table at paragraph 5 of Chapter IX on pdf page 236 of the Movants' Second Post-Hearing Brief. (**R-20**)

[31]   Partial Award at Section XIX paragraph 39. (**DKT No. 6-2**)

[32]   See the Partial Award in the Panama 1 Arbitration at Section XIX paragraphs 18-38 (**DKT No. 6-2**). The net result is US$238,460,621.80 owing to the ACP. See Parties' Joint Quantum Summary dated November 12, 2020. (**R-21**)

[33]   See Parties' Joint Quantum Summary dated November 12, 2020. (**R-21**)

[34]   See Parties' Joint Quantum Summary dated November 12, 2020. (**R-21**)

54.     I will discuss the Partial Award in further detail in Section VI, which responds with facts about specific aspects of the Partial Award that the Movants and Mr. Bouchardie have raised and aspects of the Partial Award that Mr. Bouchardie has chosen not to mention or set in proper context. A few general observations about the Partial Award are first worth making. The Partial Award was very comprehensive and lengthy at 565 pages, as the scope of the claims was significant, and the technical and factual issues were, in places, exceptionally complex.

55.     Prior to addressing the Parties' respective positions, the Tribunal gave a detailed, 43-page, 396-paragraph recitation of the procedural history of the dispute, from the filing of the Requests for Arbitration to the rendering of the Partial Award.[35] This was followed by a section addressing the factual background to the dispute.[36] The Tribunal then described the structure of the Partial Award, focusing on and setting out each of the Parties' specific prayers for relief. The Tribunal set out the prayers for relief as each Party framed them in their Post-Hearing Briefs, which were the final substantive written pleadings submitted to the Tribunal in advance of the Closing Arguments Hearing.[37]

56.     This was followed by a series of sections addressing the Parties' specific arguments and claims, including those related to (1) evidentiary issues; (2) the preclusive effect of the Cofferdam Final Award and the Advance Payments Award; (3) the legal and contractual framework; (4) the CAP claim; (5) the Foundations Conditions Claim; (6) the CMD Claim; (7) the On-Site Laboratories Claim; (8) GUPCSA's claim for an Extension of Time; (9) the ACP's claim for Delay Damages; (10) GUPCSA's claim for damages and the ACP's Counterclaim; (11) the claims of the GUPCSA's shareholders; (12) costs; and (13) the Operative Part of the Partial Award, in which the Tribunal stated its specific ruling as to each claim.[38]

57.     Each of these individual sections had the same general structure, which consisted first of the Tribunal's summary of the Tribunal's understanding of the Parties' positions, followed by a sub-section titled "Arbitral Tribunal's Determination." The Arbitral Tribunal's Determination was supported by detailed contractual, factual and/or legal analysis, as applicable. The Tribunal noted that it "has not provided a summary of each and every argument raised by

---

[35]  Partial Award at Section II. (**DKT No. 6-1**)
[36]  Partial Award at Section V. (**DKT No. 6-1**
[37]  Partial Award at Section VI. (**DKT No. 6-1**)
[38]  Partial Award at Sections VII-XIX. (**DKT Nos. 6-1 and 6-2**). It is expected that the Tribunal will also issue a Final Award that addresses final remaining outstanding issues, including the Parties' claims in relation to the costs of the arbitration.

the Parties, as it would be unnecessary."[39] Instead, the Tribunal "reproduced only what it views as the important and relevant arguments for its decision."[40] The Tribunal confirmed that "[e]ven if not explicitly [sic] reproduced, the Arbitral Tribunal has considered all Parties' arguments."[41]

58.     It is again worth noting that, at the time of the Partial Award, two other final awards had already been issued in the arbitrations involving each of the Movants and the ACP concerning the Third Set of Locks Project of the expansion program of the Panama Canal. Those awards were rendered in the Cofferdam Arbitration and the Advance Payments Arbitration. Throughout the Panama 1 proceedings, the ACP took the position that both the Cofferdam Final Award and the Advance Payments Final Award (both of which found in the ACP's favor) had preclusive effect on certain issues presented in the Panama 1 Arbitration, pursuant to the U.S. doctrine of collateral estoppel, in addition to other applicable contractual and legal provisions. The Tribunal considered the ACP's argument, but ultimately rejected it, determining that "the doctrine of issue preclusion does not bind this Tribunal to the legal reasoning contained in the Cofferdam and Advance Payments Awards," and the Tribunal "shall only be bound by the dispositive parts of those decisions."[42]

59.     But the Tribunal recognized that the Cofferdam and Advance Payments arbitrations "were heard by highly experienced and eminent international commercial arbitration experts."[43] This of course included Dr. Gaitskell QC, who also sits on the Panama 1 Tribunal. The Tribunal stated that it "has determined the issues before it *de novo*, on the basis of the Parties' submissions in this case and not simply in reliance on the findings of any other tribunal."[44] Notwithstanding, the Tribunal confirmed that "it should come as no surprise that the Arbitral Tribunal agrees with many of the legal findings of the Cofferdam (Majority) and Advance Payment tribunals, as will be clear from the Arbitral Tribunal's findings . . ."[45]

## IV.   THE ICC CHALLENGE PROCEEDINGS

60.     Approximately three weeks after the Partial Award was issued, on October 15, 2020, the Movants made the first of several requests to each member of the Panama 1 Tribunal,

---

[39]   Partial Award at paragraph 450. (**DKT No. 6-1**)
[40]   Partial Award at paragraph 450. (**DKT No. 6-1**)
[41]   Partial Award at paragraph 450. (**DKT No. 6-1**)
[42]   Partial Award at paragraph 498. (**DKT No. 6-1**)
[43]   Partial Award at paragraph 499. (**DKT No. 6-1**)
[44]   Partial Award at paragraph 499. (**DKT No. 6-1**)
[45]   Partial Award at paragraph 499. (**DKT No. 6-1**)

requesting that each member "update your disclosures" under the ICC Rules.[46] The Movants made these requests of the Tribunal members in connection with their role as arbitrators in both the Panama 1 and Panama 2 Arbitrations. This Declaration does not provide a description of each of the Movants' requests and the Tribunal members' responses. The Court may refer to the ACP's submissions to the ICC in December 2020 for a detailed chronology in that regard.[47] Instead, this Section provides only a brief summary of the ICC proceedings. In making their October 15, 2020 requests, the Movants referred to a specific paragraph of the ICC's Note to Parties and Arbitral Tribunals of the Conduct of the Arbitration Under the ICC Rules of Arbitration (the "ICC Note").

61.    Paragraph 23 states as follows:[48]

> 23.  Each arbitrator or prospective arbitrator must assess what circumstances, if any, are such as to call into question his or her independence in the eyes of the parties or give rise to reasonable doubts as to his or her impartiality. In making such assessment, an arbitrator or prospective arbitrator should consider all potentially relevant circumstances, including **but not limited to** the following:
>
> - The arbitrator or prospective arbitrator or his or her law firm represents or advises, or has represented or advised, one of the parties or one of its affiliates.
> - The arbitrator or prospective arbitrator or his or her law firm acts or has acted against one of the parties or one of its affiliates.
> - The arbitrator or prospective arbitrator or his or her law firm has a business relationship with one of the parties or one of its affiliates, or a personal interest of any nature in the outcome of the dispute.
> - The arbitrator or prospective arbitrator or his or her law firm acts or has acted on behalf of one of the parties or one of its affiliates as director, board member, officer, or otherwise.
> - The arbitrator or prospective arbitrator or his or her law firm is or has been involved in the dispute, or has expressed a view on the dispute in a manner that might affect his or her impartiality.
> - The arbitrator or prospective arbitrator has a professional or close personal relationship with counsel to one of the parties or the counsel's law firm.
> - The arbitrator or prospective arbitrator acts or has acted as arbitrator in a case involving one of the parties or one of its affiliates.
> - The arbitrator or prospective arbitrator acts or has acted as arbitrator in a related case.
> - The arbitrator or prospective arbitrator has in the past been appointed as arbitrator by one of the parties or one of its affiliates, or by counsel to one of the parties or the counsel's law firm.

62.    In addition to paragraph 23, the Movants set out certain examples of what they contended were relevant circumstances that required additional information, as provided below:[49]

---

[46]  See Emails from the Claimants to the Tribunal dated October 15, 2020. (**R-6**)

[47]  See paragraphs 100-206 of the ACP's Response to Challenge dated December 1, 2020 at **R-30.**

[48]  See paragraph 23 of the ICC Note. (**R-36**)

[49]  See Emails from the Claimants to the Tribunal dated October 15, 2020. (**R-6**)

> - Any professional or personal relationship between you (or other members of your law firm) and either or both of the other arbitrators in this arbitration, including but not limited to serving as (i) members of the same arbitral tribunal in related or unrelated arbitrations (whether pending or closed), or (ii) members of the same dispute board in related or unrelated dispute board proceedings (whether pending or closed), including the respective roles in any such arbitral tribunal or dispute board (i.e., whether wing or presiding member of the tribunal or dispute board) and the process that led to the appointment.
>
> - Any professional or personal relationship between you (or other members of your law firm) and counsel for either Party in unrelated arbitration or litigation matters, including but not limited to having been nominated or serving as arbitrator, dispute board member, or counsel in matters (whether pending or closed), in which members of any of the law firms or chambers involved in these proceedings are involved.
>
> - Any professional or personal relationship between you and other arbitrators in related arbitration matters between the Parties (whether pending or concluded), including serving as arbitrators together in other arbitration matters.

63.    It was the ACP's position that the requests made were overbroad, vague and went well beyond what the Tribunal was required to disclose under the ICC Rules, the ICC Note and the IBA Guidelines. The Tribunal itself queried why the Movants had requested information that was "different and much broader than [the information] contained in § 23 of the ICC Note."[50]

64.    As set out more fully in the exhibits to the ACP's submissions to the ICC, there was a series of exchanges between the Movants and the members of the Tribunal. The Tribunal members consistently stated that they had no further disclosures to make under the ICC Rules, but that they were nevertheless willing to provide information that went beyond the ICC Rules.[51]

65.    On October 28, 2020, the Movants filed two identical challenges under Article 14 of the ICC Rules, against each member of the identical Tribunals sitting on both the Panama 1 and Panama 2 Tribunals, i.e, Mr. Gunter, Dr. Gaitskell QC, and Mr. von Wobeser.[52]

66.    The Parties submitted two rounds of detailed written submissions to the ICC Court in respect of the Movants' ICC Challenges.[53] The ICC Court invited comments from each

---

[50]   See page 2 of Email from the Tribunal to the Parties dated October 18, 2020. (**DKT No. 6-39**)

[51]   See page 4 Email dated October 29, 2020 from Mr. Gunter to the Claimants (**DKT No. 6-57**) (clarifying that "a distinction needs to be made between i) disclosures (as the case may be updated disclosures) pursuant to the applicable rules on the one hand and on the other hand ii) the acceptance by an arbitrator (without being bound to do so pursuant to the applicable rules) to provide specific information in order to reassure a party/parties who may have expressed a specific concern as the case may be specific concerns." (DKT No. 6-48) (DKT No. 6-52) (DKT No. 6-56) (DKT No. 6-57) (DKT No. 6-61) )

[52]   See the Claimants' ICC Challenge. (**R-22**)

[53]   **R-22 through R-35**

of the arbitrators on the Challenges, and each arbitrator accepted that invitation, providing detailed comments. The ICC Court considered the Challenges at its Plenary Session on December 17, 2020, and notified the Parties on the same day that the Challenges were rejected, as to all three arbitrators in both the Panama 1 and Panama 2 Arbitrations.[54] The ICC Court then provided a separate, 10-page document on December 29, 2020, setting out the reasons for its decision.[55]

## V.   THE ALLEGATIONS ABOUT THE ARBITRATORS' INDEPENDENCE AND IMPARTIALITY

67.    I understand that the Movants now seek to vacate the Partial Award in the Panama 1 Arbitration on various grounds, including alleged "evident partiality" of each of the three arbitrators as well as what they say are applicable grounds under the New York Convention. The factual basis on which they seek to vacate for alleged evident partiality and New York Convention grounds are substantially the same as the factual grounds alleged in the ICC Challenges, which as described above, have already been comprehensively rejected by the ICC. In this Section, I provide comments as to the factual allegations made with respect to each of the Tribunal members, with reference to the Motion and the Bouchardie Declaration.

### A.   Mr. Gunter

68.    The Movants' complaint against Mr. Gunter is based, *inter alia*, upon his sitting (or having sat) as arbitrator in an unrelated arbitration with Dr. Gaitskell QC (as arbitrator) and in unrelated arbitrations with Prof. Hanotiau (as arbitrator).[56] Although it is not mentioned as a ground for complaint in the Motion to Vacate, reference is made in the Bouchardie Declaration to an alleged reluctance to investigate and disclose potential connections of other members of his current law firm.[57]

69.    It should be noted that the breadth and vagueness of Movants' requests were immediately noted by Mr. Gunter on behalf of himself and on behalf of the entire Tribunal.  On receipt of the letters, he and they requested a number of clarifications, including why the Movants had chosen to request information which was "different and much broader than those contained

---

[54]  ICC's Notification of its Rejection of the Claimants' Challenge. (**R-37**)
[55]  ICC's Statement of Reasons as to its Rejection of the Claimants' Challenge. (**R-38**)
[56]  See Claimants' Motion to Vacate at paragraphs 17-18.
[57]  See Bouchardie Declaration at paragraphs 33 and 50.

in § 23 of the ICC Note."[58] As the ACP pointed out in its Response to the Challenges, sitting as an arbitrator with members of other tribunals in unrelated arbitrations is not listed as a relevant circumstance for arbitrators or prospective arbitrators even to consider in paragraph 23 of the ICC Note; nor does it feature on any of the lists (Red, Orange or Green) within the IBA Guidelines.[59]

70.     Nevertheless, Mr. Gunter responded to the Movants' disclosures by providing the information outlined below.

71.     First, Mr. Gunter, in his email to the Parties dated October 23, 2020, referred to an unrelated pending ICC arbitration, ICC Case No. 24400, in which he sits with a co-arbitrator on this Tribunal, Dr. Gaitskell QC.[60]  Dr. Gaitskell QC and his co-arbitrator in ICC Case No. 24400, Mr. James C. Parry, appointed Mr. Gunter as President in the arbitration because, to Mr. Gunter's understanding, they were looking for a President who had experience with construction arbitration cases.[61]  This arbitration is unrelated to the Panama Canal arbitrations and involves different parties and different law firms.[62]

72.     Second, Mr. Gunter, in his email to the Parties dated October 23, 2020, referred to an unrelated London Court of Arbitration case 173632 ("LCIA" case), in which Mr. Gunter sat with Prof. Hanotiau.[63]  Mr. Gunter further explained that the LCIA case was immediately stayed by the Arbitral Tribunal on August 9, 2017 due to bankruptcy proceedings.  The case is currently stayed and it is unclear if and when the proceedings will resume.[64]  Mr. Gunter has since confirmed that he was contacted by his co-arbitrators (Prof. Hanotiau and Dr. Luca Radicati di Brozolo), on July 22, 2017 and accepted his appointment on July 24, 2017.[65]  Again, this

---

[58]   See page 2 of Email from the Tribunal to the Parties dated October 18, 2020. (**DKT No. 6-39**)

[59]   See paragraphs 107 and 109 of the ACP's Response to Challenge dated December 1, 2020 at **R-30.**

[60]   See pdf page 7 of Letter from Mr. Gunter to the Parties dated October 23, 2020 at **R-39.**

[61]   See pdf page 5 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57**.

[62]   See pdf page 5 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57.**

[63]   See pdf page 7 of Letter from Mr. Gunter to the Parties dated October 23, 2020 at **R-39.**

[64]   See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57.**

[65]   See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57.**

arbitration is unrelated to the Panama Canal arbitrations, and involves different parties and counsel.[66]

73.     Third, the Movants asked Mr. Gunter about ICC Case No. 22166, in an unrelated arbitration in which Mr. Gunter previously sat with Prof. Hanotiau.[67] The ICC website indicates that this case is closed.  This case also involves different parties and different counsel, and is unrelated to the Panama Canal arbitrations.[68] The award in this case was issued on June 6, 2019, several months before the start of the deliberations in Panama 1.[69] Prof. Philippe Delebecque and Mr. Gunter (who were confirmed by the ICC Court as party appointed arbitrators on October 14, 2016) appointed Prof. Hanotiau as President in November 2016, after the usual consultation process with the Parties and their counsel.[70]

74.     Fourth, Mr. Gunter, in his email to the Parties dated October 29, 2020, referred to an unrelated *ad hoc* arbitration in which he previously sat with Prof. Hanotiau.[71]  This case is closed.  As above, this case also involves different parties and different counsel, and is unrelated to the Panama Canal arbitrations.[72]  The award in this case was issued on September 7, 2015.[73] As Mr. Gunter himself notes, this was "more than 4 years before the start of the deliberations in Panama 1."[74]  Mr. Gunter and his co-arbitrator, Mr. Andreas Rüd appointed Prof. Hanotiau as president on October 3, 2013 after the usual consultation process with the parties and their counsel.[75]

---

[66]  See pdf page 7 of Letter from Mr. Gunter to the Parties dated October 23, 2020 at **R-39.**

[67]  See pdf page 2 of Email from the Claimants to Mr. Gunter dated October 26, 2020 at **DKT 6-50**.

[68]  See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 **DKT No. 6-57**.

[69]  See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57;** see pdf page 11 of Mr. Gunter's Response to the Supplemental Challenge dated November 24, 2020 at **R-27.**

[70]  See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57**.

[71]  See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57**.

[72]  See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57**.

[73]  See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57**.

[74]  See pdf page 11 of Mr. Gunter's Response to the Supplemental Challenge dated November 24, 2020 at **R-27.**

[75]  See pdf page 6 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57**.

75.     I understand that the Movants allege some sort of *quid pro quo* between Mr. Gunter and Dr. Gaitskell QC, stating that Mr. Gunter cannot help but be influenced by the fact that Dr. Gaitskell QC was responsible for providing him prestigious and lucrative appointments. They also express concern about non-specified information that they say could have been shared outside the presence of Movants' arbitrator, *i.e.* Mr. von Wobeser.

76.     The ACP addressed in detail the innuendo that the decision of the Arbitral Tribunal in the Partial Award was some sort of *quid pro quo* in its Responses to the ICC Challenges. Without seeking to set out again all of the arguments which the ACP made, and in summary the ACP pointed out:

(a)     There is a good reason why neither the ICC Note nor the IBA Guidelines refer to the situation where arbitrators sit together in a completely unrelated case: namely that it is wholly unexceptional and by itself gives rise to no possibility of bias or lack of independence on the part of the arbitrators concerned.

(b)     The Movants' argument was some sort of far-fetched conspiracy theory. It must proceed on the hypothesis first that Dr. Gaitskell QC was himself not independent and impartial; secondly, that Dr. Gaitskell QC wished, by participating in the appointment of Mr. Gunter, to suborn Mr. Gunter, so that Mr. Gunter would not act independently and impartially; and, thirdly, that Mr. Gunter did indeed, as a result, fail to act with independence and impartiality. The ACP submitted that this argument need only be stated to be rejected.

(c)     That over the years Mr. Gunter sat with other arbitrators, including well known and busy arbitrators, is not a surprise. He is an experienced and popular arbitrator. Indeed, the supplemental information he provided shows that he also sat as a co-arbitrator with Prof. Cremades (the Movants' appointee in the Cofferdam and Lock Gates Arbitrations), but I understand the Movants do not complain about that.

(d)     As to the specific appointment of Mr. Gunter in ICC Case No. 24400, Dr. Gaitskell QC and his co-arbitrator in that case, Mr. James C. Perry, appointed Mr. Gunter as President because, to Mr. Gunter's understanding, they were looking for a President who had experience with

construction arbitration cases.[76]   This arbitration is unrelated to the Panama Canal arbitrations and involves different parties and different law firms.[77] The ACP pointed out that the Movants' allegations simply ignored the involvement of Mr. James C. Parry in this process.

77.     As to the Movants' concern about the sharing of information between Mr. Gunter and Dr. Gaitskell QC outside the presence of Mr. von Wobeser, Mr. Gunter specifically addressed this. He said as follows: "As to Claimants' statement that I would have had opportunities to discuss with Dr Gaitskell – in the context of ICC arbitration case No 24400 and in the absence of Mr. Claus von Wobeser our co-arbitrator in Panama 1 and Panama 2 – issues relating to the Panama 1 and Panama 2 arbitration cases, 'thus improperly influencing the deliberations' in Panama 1, I can assure the ICC Court as well as the Parties that this is not correct. Indeed, all our discussions with Dr. Gaitskell relating to Panama 1 (in particular during our deliberations) and Panama 2 were always held in presence of our co-arbitrator Mr. Claus von Wobeser."[78]

78.     Next, the Movants challenge Mr. Gunter's previous service as arbitrator alongside Prof. Hanotiau. Recall that Prof. Hanotiau chaired the Cofferdam Arbitration. The ACP addressed this challenge before the ICC Court in similar terms to those set out above, noting that the arguments in relation to Prof. Hanotiau were even more far-fetched, given that his involvement in the Panama Canal arbitrations ended with the Cofferdam Final Award in 2017.

79.     The Movants argue that they cannot "help but wonder" whether Professor Hanotiau shared his views regarding the Panama Canal arbitrations with Mr. Gunter while they sat together on separate and unrelated arbitrations.[79] They note that they "cannot know with certainty what was discussed behind closed doors."[80]  But again critically, Mr. Gunter specifically

---

[76]   See pdf page 5 of Email from Mr. Gunter to the Parties dated October 29, 2020 at **DKT No. 6-57**.

[77]   See pdf page 7 of Letter from Mr. Gunter to the Parties dated October 23, 2020 at **R-39.**

[78]   See page 4 of Mr. Gunter's Response to the Supplemental Challenge dated November 24, 2020 at **R-27.**

[79]   See Bouchardie Declaration at paragraph 54–55.

[80]   See Bouchardie Declaration at paragraph 54–55.

rejected and rebutted the Movants' allegation of any impropriety, stating that he "never shared information with Prof. Hanotiau about [their] respective cases relating to the Panama Canal."[81]

80.     Finally, and although it is not mentioned as a ground for complaint in the Motion to Vacate, the Bouchardie Declaration refers to an alleged reluctance to investigate and disclose "potential connections of other members of his current law firm."  However, the full chronology of the Movants' requests and Mr. Gunter's responses is set out in Section II of Mr. Gunter's Response to the Movants' Challenges (dated November 12, 2020).[82] Given the breadth of the Movants' requests for information, Mr. Gunter asked for various clarifications. Even before receiving a response to his request for clarification, Mr. Gunter provided information about whether any lawyer at his firm was acting or had acted as co-counsel or arbitrator in unrelated proceedings with any of the Parties' counsel since 2013.[83] As the ACP pointed out in its Response to the ICC Challenges, it is noteworthy that there were substantially more cases involving the Movants' counsel and members of Mr. Gunter's law firm than there were involving the ACP's counsel and members of Mr. Gunter's law firm. In any event, and eventually, the Movants provided the requested clarification and said that they submitted that "matters of any nature generating revenues for the firm of an arbitrator are relevant for disclosures purposes."[84] Following receipt of that clarification, Mr. Gunter informed the Movants that there are "no matters of any nature generating revenues for my Firm . . . which are such as to call into question my independence in the eyes of the parties or to gives rise to reasonable doubts as to my impartiality."[85] Thus, as the ACP submitted before the ICC Court, there was no "reluctance" to "disclose" on Mr. Gunter's part: rather there was a willingness on his part to answer the Movants' myriad of questions, notwithstanding that they went well beyond what was required by the ICC Rules.

---

[81]  See Mr. Gunter's Response to Challenge dated November 12, 2020 at **R-23**; see page 4 of Letter from Mr. Gunter's Response to the Supplemental Challenge dated November 24, 2020 at **R-27.**

[82]  See Mr. Gunter's Response to Challenge dated November 12, 2020 (**R-23**)

[83]  See Letter from Mr. Gunter to Parties dated October 30, 2020 (**R-41**) and Letter from Mr. Gunter to Claimants dated November 2, 2020. (**R-42**)

[84]  See pages 2-3 of the pdf of Claimants' Email dated November 2, 2020 at **R-40.**

[85]  See Email from Mr. Gunter to the Claimants dated November 3, 2020 at **DKT No. 61.**

81.     By its decision dated December 17, 2020, the ICC Court rejected the challenge against Mr. Gunter in its entirety.[86] It gave its reasons for doing so by letter dated December 29, 2020.[87]

**B.     Dr. Gaitskell QC**

82.     The Movants' complaints against Dr. Gaitskell QC in the Motion to Vacate are based first upon his service as arbitrator in a completely unrelated arbitration with Mr. Gunter (as arbitrator) as explained above and secondly his alleged failure to conduct a "conflict check" extending to his barristers' chambers.[88]

83.     First, with respect to Dr. Gaitskell QC sitting together with Mr. Gunter in a pending and unrelated ICC case, the circumstances have been already addressed in the context of Mr. Gunter in paragraphs 68-81 above.  ICC Case No. 24400 is not related to the Panama cases and I understand it is the only case in which Dr. Gaitskell QC and Mr. Gunter are sitting together (besides the Panama cases).  Like Mr. Gunter, Dr. Gaitskell QC has expressly rebutted any speculation that he and Mr. Gunter discussed the Panama 1 and Panama 2 arbitrations while sitting together in ICC Case No. 24400. He stated, that "[n]eedless to say, this did not happen."[89] Just as the ICC Court rejected this ground of challenge against Mr. Gunter, so it rejected it against Dr. Gaitskell QC.[90]

84.     Secondly, with respect of Dr. Gaitskell QC's alleged failure to conduct a "conflict check" extending to his barristers' chambers, the ACP addressed this complaint at some length in its Response to the ICC Challenges.[91] The points which the ACP made are, in summary, as follows:

>       (a)     Traditional law firms and barristers' chambers are not the same. They are to be treated differently for conflicts purposes.

---

[86]   ICC's Notification of its Rejection of the Claimants' Challenge. (**R-37**)

[87]   ICC's Statement of Reasons as to its Rejection of the Claimants' Challenge. (**R-38**)

[88]   Claimants' Motion to Vacate at paragraph 19; Bouchardie Declaration at paragraph 33, 64–65.

[89]   See paragraph 4 of Dr. Gaitskell QC's Response to the Supplemental Challenge dated November 24, 2020 at **R-28.**

[90]   ICC's Notification of its Rejection of the Claimants' Challenge. (**R-37**) and ICC's Statement of Reasons as to its Rejection of the Claimants' Challenge. (**R-38**)

[91]   See paragraphs 152 to 182 of the ACP's Response to Challenge dated December 1, 2020 at **R-30**

(b)    Dr. Gaitskell QC is unable to undertake the alleged "conflict check" in respect of other self-employed barristers within his chambers because of each self-employed barrister's duty of confidentiality, which duty is set out in the rules of professional conduct (the Bar Code of Conduct) laid down by the regulator for barristers in England and Wales (the Bar Council).

(c)    The Claimants and their Counsel are familiar with the English Bar.

(d)    United States law supports the proposition that there is no need to undertake the "conflict check" for which the Movants contend.

(e)    In any event, given the nature of independent, self-employed practice at the Bar of England and Wales, there would be nothing to be disclosed.

85.    I will not try in this Declaration to set out again all of the points which the ACP made in its Response to the ICC Challenges. However, I do wish to emphasise my understanding of the differences between traditional law firms and barristers' chambers; and of the confidentiality obligations owed by individual self-employed members of barristers' chambers.

86.    As a solicitor qualified in England and Wales whose work frequently includes disputes, I regularly instruct barristers to act as counsel, or am involved in arbitrations where barristers serve as arbitrators. As such, I have some familiarity with the rules governing barristers' professional responsibilities, although I do not pretend to be an authority.

87.    While solicitors in England and Wales are regulated by the Solicitors Regulation Authority and bound by its code of conduct, there is an entirely separate regulator for barristers in England and Wales, the Bar Council. Barristers in England and Wales are subject to a different set of regulatory and ethical rules to solicitors: the Bar Code of Conduct. The most obvious manifestation of the difference between traditional law firms and self-employed members of barristers' chambers that is relevant for present purposes is that barristers from the same chambers may appear on opposite sides of the same case, representing opposing parties. This is a well-known and established practice.

88.    Indeed, in English court proceedings arising out of the Panama Canal disputes, White & Case (counsel for the Movants and there representing Salini-Impregilo S.p.A. (now Webuild S.p.A.), Jan de Nul N.V. and Sofidra S.A.) instructed two members of Essex Court Chambers (Mr. David Foxton QC (now Mr. Justice Foxton) and Mr. James Sheehan. In that same case, my own firm of solicitors (acting for the ACP) instructed two members of the very same Essex Court Chambers (Mr. Graham Dunning QC and Mr. Damien Walker, who appeared

alongside Mr. McMullan QC).[92] This illustrates that members of the same chambers are self-employed and independent of each other (and that counsel for the Movants are well aware of that), since otherwise members of the same chambers could hardly have appeared against each other in that litigation. No objection was taken – as none could be taken. The fact that members of the same chambers appeared both for and against the Movants was unexceptional.

89.     This well-known and established practice has recently been affirmed by the Bar Council (in a note addressing barristers in international arbitration):[93]

> "barristers practising from traditional sets of chambers are self-employed and are not in partnership, although many of them share expenses to some degree.  <u>The English and Welsh Courts have confirmed on a number of occasions that, because of the fact that self-employed barristers are not in partnership and do not share one another's income, there is no objection to barristers appearing against one another in the same case.  There is no conflict of interest involved in such a situation arising simply from membership of the same chambers</u>.  Indeed, particularly in certain specialist disputes, due to the limited number of experts in the given field, it is common for barristers from the same chambers to appear against one another" (emphasis added).

90.     Dr. Gaitskell QC is a member of Keating Chambers. The same points as made above are emphasised in the Keating Chambers transparency guidance, as follows:

> "Members of Keating Chambers are all self-employed and independent practitioners. This allows two or more of our barristers to be involved in the same court case, arbitration, mediation or adjudication, on opposite sides – a common occurrence in specialist engineering and construction cases. It also occasionally happens that the appointed arbitrator practises from the same chambers as one or more of the advocates. Members of Keating Chambers and our clerking team are well-versed to handle this situation and stringent provisions are put in place in such cases to ensure that confidentiality is protected at all times."[94]

91.     It follows from the above that, unlike in a traditional law firm where its employees and partners owe duties of confidentiality as a whole to their clients and where its employees and

---

[92]   See Autoridad Del Canal De Panamá v Sacyr S.A. & Ors [2017] EWHC 2228 (Comm) (September 5, 2017).

[93]   See paragraph 8 of Information Note regarding barristers in international arbitration, English Bar Council, 2015. (**R-46**)

[94]   See page 1 of Keating Chambers Transparency Guide (http://www.keatingchambers.com/compliance/transparency-guidance/) at **R-44.**

partners have knowledge of those clients through central firm databases and firmwide conflict checking, the duty of confidentiality for the English Bar is *vis-à-vis* the client and a barrister, not the entire chambers.

92.     The barrister's duty of confidentiality is set out in the applicable rules of conduct, which provide that barristers "must keep the affairs of each client confidential" and "must protect the confidentiality of each client's affairs, except for such disclosures as are required or permitted by law or to which your client gives informed consent."[95] It is that duty of confidentiality which means that the Movants' position in relation to the alleged "conflict check" which it says that Dr. Gaitskell QC ought to have undertaken in relation to other self-employed members of Keating Chambers is simply unsustainable. As Dr. Gaitskell QC himself explains:

> "were any other barrister in Keating Chambers to be asked to reveal whether he or she had acted for a particular party or firm they are forbidden to reveal that information by the rules… I do not know and cannot know in what cases other members of chambers are engaged since that is contrary to the way the English bar operates, since we are frequently on opposite sides. We are not in a "firm". Each of us is self-employed."[96]

93.     Movants allege that the England & Wales Bar Council "now encourages arbitrators to disclose relationships with another arbitrator or counsel who is a member of the same barristers' chambers."[97]  This is in fact a reference to the note from which I have quoted in paragraph 89 above. However, the Movants' reliance on it here misses the point. The Movants' complaint is that Dr. Gaitskell QC failed to disclose indirect relationships between Keating Chambers and a <u>different</u> chambers, Atkin Chambers (from where three of the barristers instructed as part of the ACP's legal team practices). As I understand, the Movants do not complain that Dr. Gaitskell QC failed to disclose relationships with other members of Keating Chambers acting as counsel or arbitrator in the Panama 1 Arbitration (because, of course, Dr. Gaitskell QC is the only member of Keating Chambers appearing as either counsel or arbitrator in the Panama 1 Arbitration). The whole purpose of the Bar Council note cited by the Movants is to provide best practice guidance for the situation where barristers <u>from the same chambers</u> appear as counsel and arbitrator <u>in the same arbitration</u>. It is in that very same note that the Bar

---

[95]  See Core Duty 6 and Rule C15.5, Bar Standard Board Handbook at **R–43**.
[96]  See pdf page 2 of Email from Dr. Gaitskell QC to the Parties dated October 29, 2020 at **DKT No. 6-56.**
[97]  Bouchardie Declaration at paragraph 64.

Council emphasizes the fact that barristers practising from traditional sets of chambers are self-employed and independent, as I have set out in paragraph 89 above.

94.     As the ACP pointed out in its Response to the ICC Challenge, the situation complained of by the Movants is not contemplated by the IBA Guidelines, paragraph 23 of the ICC Note or the Bar Council's Information Note.

95.     The ICC Court rejected this challenge against Dr. Gaitskell QC. In giving its reasons for that rejection, it said that it was not persuaded that Dr. Gaitskell QC omitted to verify or disclose information which he could and should have verified and disclosed; and it specifically found that the Movants' allegation that barristers' chambers are identical to law firms in terms of the ability to perform conflict checks and in terms of internal obligations of confidentiality between members was unfounded.[98]

96.     Although no mention is made of this in the Motion to Vacate, the Bouchardie Declaration states that the Movants have a "legitimate interest" in being informed of any cases in which Dr. Gaitskell QC may have been appointed by or have appointed other members of Atkin Chambers in arbitrations. This is akin to one of the grounds of challenge which the Movants brought before the ICC Court, namely that there had been a failure by Dr. Gaitskell QC to disclose that Mr. White QC (a member of Atkin Chambers) sat with him as arbitrator in a completely unrelated arbitration and had been nominated by Mr. White QC as president in that arbitration.

97.     Again the ACP addressed this in its Response to the ICC Challenge.[99] Again the ACP pointed out that this situation was not even contemplated by the IBA Guidelines or paragraph 23 of the ICC Note. Again the ACP pointed out that Mr. White QC is a separate self-employed barrister from Mr. McMullan QC; that neither has knowledge of the other's cases (which are confidential to him); that neither had input into the other's cases; that they are separate self-employed entities and are treated by the Bar Council as such; and that, indeed, the fact that in the arbitration in question Dr. Gaitskell QC believes that Mr. White QC was nominated by White & Case rendered the Movants' argument completely unsustainable. Again the ICC Court rejected the challenge against Dr. Gaitskell QC, and, in giving its reasons for doing so, said as

---

[98]   See page 9 of ICC's Statement of Reasons as to its Rejection of the Claimants' Challenge. (**R-38**)

[99]   See paragraph 182 of the ACP's Response to Challenge dated December 1, 2020 at **R-30.**

follows:[100] "Claimants' challenge in this respect relies on the assertion that barrister chambers should be treated the same as law firms in this respect, such that Mr. Gaitskell should have made disclosures of relevant professional relationships with all barristers belonging to the same chambers as Mr. McMullan. This general assertion finds no basis in the materials relied upon by Claimants, and ignores the structure of barristers chambers as well as confidentiality obligations applying between members of such chambers."

### C.    Mr. von Wobeser

98.    The Movants make two complaints against Mr. von Wobeser.  First, that he was "indirectly, but necessarily affected" by the circumstances relating to Mr. Gunter and Dr. Gaitskell QC.[101]   Second, the Movants alleged that Mr. von Wobeser's independence and impartiality were affected by a pending ICSID arbitration in which he sits as co-arbitrator with Mr. Andrés Jana, counsel for the ACP.[102] These were the same grounds for challenge upon which the Movants relied before the ICC Court.

99.    Mr. von Wobeser responded to the Movants' letter of October 15, 2020 by email on October 24, 2020.[103]  He "reaffirm[ed] that there are no circumstances  that could lead any of the Parties in this arbitration to question my independence or impartiality of judgment in this case." He affirmed that no facts or circumstances had arisen since his initial disclosures that required disclosure under Article 11(3) of the ICC Rules.[104]  He also reiterated his prior disclosures in stating that "both Claimants and Respondent's counsel in this arbitration are important law firms active in international arbitration and therefore I have had and have professional relationships with them."[105]

100.    Although he maintained that he had nothing to disclose under the ICC Rules, he nonetheless provided information about circumstances in which he had contact with the Parties' counsel or arbitrators in other Panama-Canal-related arbitrations.  Among these, he listed his

---

[100] See page 9 of ICC's Statement of Reasons as to its Rejection of the Claimants' Challenge. (**R-38**)

[101] Bouchardie Declaration at paragraph 69; Motion to Vacate at paragraph 20(a).

[102] Bouchardie Declaration at paragraph 70; Motion to Vacate at paragraph 20(a).

[103] See Email from Mr. von Wobeser to the Parties dated October 24, 2020 at **DKT No. 6-48.**

[104] See pdf page 2 of Email from Mr. von Wobeser to the Parties dated October 24, 2020 at **DKT No. 6-48.**

[105] See pdf page 2 of Email from Mr. von Wobeser to the Parties dated October 24, 2020 at **DKT No. 6-48.**

involvement in the case *ENAGÁS S.A. (España) and ENAGÁS Internacional S.L.U. (España) v. Republic of Peru* (ICSID Case No. ARB/18/26), stating:

> "I presently sit as party-appointed co-arbitrator (appointed by the respondent) in ICSID case no. ARB/18/26, where Andrés Jana also appears as party-appointed co-arbitrator (appointed by the claimants). The tribunal was constituted in July 2019. The proceedings, which are public and entirely unrelated to the present dispute, are currently at the document production stage."[106]

101.    The Movants responded to Mr. von Wobeser on October 26, 2020, noting his disclosure of the *ENAGÁS* case and listing two further ICSID cases in which Mr. von Wobeser interacted with counsel for the ACP.[107]  They asked him to clarify whether he had any further disclosure to make, and to disclose the dates of his and Mr. Jana's respective nominations and appointments in *ENAGÁS*.[108]  By email on October 28, 2020, Mr. von Wobeser reaffirmed that there were no circumstances affecting his independence or impartiality, including the ICSID cases mentioned. He provided the requested information. He noted that the information was already public and "readily available" on the ICSID website.[109]  Mr. von Wobeser went on to disclose four separate ICSID cases in which he served as arbitrator and Movants' counsel (White & Case LLP) appeared as counsel.[110]  In three of those, he was appointed by White & Case LLP. [111]

102.    In offering this information, Mr. von Wobeser also noted:

> "[g]iven the numerous counsel and the variety of law firms, chambers and in-house counsel present in these arbitrations, it is not surprising that I have encountered the law firms and individuals present in this arbitration in the past, and the mere fact

---

[106] See pdf page 3 of Email from Mr. von Wobeser to the Parties dated October 24, 2020 at **DKT No. 6-48.**

[107] See pdf page 2 of Email from the Claimants to Mr. von Wobeser, dated October 26, 2020 at **DKT No. 6-51.**

[108] See pdf page 2 of Email from the Claimants to Mr. von Wobeser, dated October 26, 2020 at **DKT No. 6-51.**

[109] See pdf page 2 of Email from Mr. von Wobeser to the Parties, dated October 28, 2020 at **DKT No. 6-52.**

[110] See pdf page 3 of Email from Mr. von Wobeser to the Parties, dated October 28, 2020 at **DKT No. 6-52.**

[111] See pdf page 3 of Email from Mr. von Wobeser to the Parties, dated October 28, 2020 at **DKT No. 6-52.**

that I have done so does not give rise to objective doubts regarding my impartiality and independence."[112]

103.    The Movants challenged Mr. von Wobeser on October 28, 2020[113] and in their follow-up letter of November 19, 2020.[114]  They argued that because Mr. von Wobeser sits with Mr. Gunter and Dr. Gaitskell QC, the entire Tribunal should have been replaced, as "Claimants consider[ed] that Mr. von Wobeser's impartiality and independence was indirectly, but necessarily, affected by the above-described circumstances."[115]  They also challenged Mr. von Wobeser on the basis of the *ENAGÁS* case,[116] alleging that he should have disclosed the fact that he was sitting on a tribunal with Mr. Jana "shortly before the oral closings in Panama 1" and that this called into question his independence.[117]

104.    Mr. von Wobeser responded to the Movants' original challenge and November 19 Letter by letter to the ICC Secretariat on November 12, 2020 and then by email to the ICC Secretariat on November 23, 2020.[118]  He noted that he previously made clear to the Parties (through his original disclosure statements as early as December 2016) that he has had and has professional relationships with both sets of counsel. He added that in the four years since that statement, the Movants "never expressed any concern or required further information to this effect up until the communications leading to this challenge."[119] In respect of the arbitration in which he was a co-arbitrator with Mr. Jana, he noted as follows:[120] "Mr. Jana, like myself, is a highly active and established Latin American, Spanish speaking arbitrator in investor-state cases.

---

[112]  See page 1 of Email from Mr. von Wobeser to the Parties, dated October 28, 2020 at **DKT No. 6-52.**

[113]  See page 13 of the Claimants' Challenge, dated October 28, 2020 at **R-22.**

[114]  See page 9 of the ICC Supplemental Challenge dated November 19, 2020 at **R-26.**

[115]  See page 13 of the Claimants' Challenge, dated October 28, 2020 at **R-22.**

[116]  Mr. von Wobeser also noted that he previously sat with Mr. Jana on a different ICSID case in 2007. Although the Claimants mentioned this case in their ICC Challenges, it was not the direct subject of a Challenge. In any event, the ICC Court stated the 2007 case was "not of relevance in the Court's view considering the long time period that had passed when Mr. von Wobeser was appointed in the present arbitration." See page 10 of ICC Statement of Reasons, dated December 29, 2020 at **R-38.**

[117]  See page 13 of the Claimants' Challenge, dated October 28, 2020 at **R-22;** see also page 9 of the ICC Supplemental Challenge dated November 19, 2020 at **R-26.**

[118]  See page 1 of Mr. von Wobeser's Response to the Supplemental Challenge dated November 23, 2020 at **R-29.**

[119]  See page 1 of Mr. von Wobeser's Response to the Supplemental Challenge dated November 23, 2020 at **R-29.**

[120]  See page 2 of Mr. von Wobeser's Response to Challenge dated November 12, 2020 at **R-25.**

Given the scarcity of established arbitrators with those credentials, he will necessarily be sought after in many of the same cases as I am. That our paths have now finally crossed as co-arbitrators is unsurprising, and the fact that it has now happened does not give rise to doubts concerning my impartiality and independence of judgment in these arbitrations. In any case, my limited individual contact with Mr. Jana was exclusively in the context of selecting a Chair in the case. I have had no in-person contact with Mr. Jana in the case, and since the appointment in July 2019 of the President, Diego Fernández-Arroyo, I have had no individual contact with Mr. Jana." Mr. von Wobeser reaffirmed his independence and impartiality, confirming that his views on the evidence and legal arguments as reflected in the Partial Award were entirely his own, without influence from his co-arbitrators or other circumstances referred to by Claimants.[121]

105.    The ACP responded to the Movants' Challenges to Mr. von Wobeser by letter to the ICC Secretariat dated December 1, 2020.[122]  With regard to the Claimants' first challenge based on the fact that Mr. von Wobeser was allegedly indirectly affected by Mr. Gunter's and Dr. Gaitskell QC's circumstances, the ACP referred to its arguments as to why the challenges against Mr. Gunter and Dr. Gaitskell QC also failed.[123]  With regard to the second challenge, the ACP argued there was no obligation on Mr. von Wobeser to disclose the ICSID case and there was no basis on which a fair-minded and informed observer, having considered the facts, would conclude that there was a real possibility that Mr. von Wobeser was biased.[124]  The ACP pointed to the fact one of the situations which appears on the Green List of the IBA Guidelines is that: "[t]he arbitrator and counsel for one of the parties have previously served together as arbitrators"; that this reflected the fact that involvement by an arbitrator and counsel as co-arbitrators in a different unrelated dispute is not, and should not be, a matter for concern; and that it is not a relevant circumstance that an arbitrator sits with a party's counsel in an unrelated arbitration under the ICC Note.[125]

106.    The ICC Court again dismissed the challenge against Mr. von Wobeser. In its reasons for doing so, it said as follows:[126] "It is noted that Mr. von Wobeser is Claimants'

---

[121] See page 1 of Mr. von Wobeser's Response to the Supplemental Challenge dated November 23, 2020 at **R-29.**
[122] See the ACP's Response to Challenge dated December 1, 2020 at **R-30.**
[123] See page pdf page 62 of the ACP's Response to Challenge dated December 1, 2020 at **R-30.**
[124] See pdf pages 62-63 of the ACP's Response to Challenge dated December 1, 2020 at **R-30.**
[125] See pdf page pages 63 of the ACP's Response to Challenge dated December 1, 2020 at **R-30.**
[125] See pdf page 12-13 of ICC's Statement of Reasons as to its Rejection of the Claimants' Challenge. (**R-38**)

appointed arbitrator in this arbitration, while Mr. Jana is counsel for Respondent. Regardless of whether or not Mr. von Wobeser should have specifically disclosed his role as arbitrator together with Mr. Jana, the Court does not consider that role to be such that it calls into question Mr. von Wobeser's continued independence or impartiality."

## VI.   THE MOVANTS' CHARACTERIZATIONS OF THE PARTIAL AWARD

107.   I have reviewed Section II.B.2 of the Motion and Section III of the Bouchardie Declaration. Based on my review, the Movants and Mr. Bouchardie take issue with four parts of the Tribunal's reasoning in the Partial Award:

(a)   whether paragraph 1.07 D.1 of section 01 50 00 of the Employer's Requirements excludes the ACP's liability for the unsuitability (i) of the basalt rock to be excavated for use as concrete aggregate, and, in addition (ii) of the actual concrete aggregates produced from the basalt;

(b)   whether GUPC undertook sufficient efforts to inform themselves about the characteristics of the PLE basalt; and specifically, whether, during the RFP period, the Contractor acted in accordance with contractually defined Prudent Industry Practices regarding testing of the basalt;

(c)   the Tribunal's consideration of the bid price of C.A.N.A.L. compared to that of GUPC; and

(d)   the Tribunal's consideration of, and reliance on, the Cofferdam Final Award.[127]

108.   In addition to this, Mr. Bouchardie takes issue with certain aspects of the Tribunal's decision on the Concrete Mix Design claims, although I note that the Motion makes no mention of those complaints.[128]

109.   I provide context to and responses to each of these aspects of the Partial Award in the sections that follow, although it should again be noted that the submissions and evidence concerning the CAP and CMD claims were incredibly voluminous and it is therefore impossible to recount each and every relevant detail in this Declaration.

---

[127]  See paragraphs 76, 93, 100-104 of the Bouchardie Declaration; paragraphs 25, 29-31 the Motion.
[128]  See paragraphs 105-114 of the Bouchardie Declaration.

A.    **Paragraph 1.07 D.1 of ER Section 01 50 00**

110.    There is no dispute that the Contractor was contractually obliged to design and execute the Works in accordance with the Employer's Requirements. The Employer's Requirements include many volumes and are very detailed, including both prescriptive and performance requirements for the Works. They are part of the Contract. An important part of the Movants' case in the Panama 1 Arbitration was that there were supposed errors in the Employer's Requirements for which the ACP was responsible pursuant to Sub-Clause 1.9.4 [*Errors in the Employer's Requirements*] of the Conditions of Contract. Several provisions of the Employer's Requirements were at issue in the Panama 1 Arbitration, and the Movants and the ACP advanced conflicting interpretations of those provisions (including arguments as to what was, and was not, part of the Employer's Requirements). One aspect that was extensively briefed and argued about was paragraph 1.07 D.1 of Section 01 50 00 of the Employer's Requirements. This paragraph 1.07 D.1 was amended in the RFP on September 16, 2008, in Amendment 16 to the RFP.

111.    Paragraph 1.07 1 states as follows:

D.    **Employer Identified Alternatives**:

1.    [A16]**Aggregate for the Atlantic and Pacific Locks**:   A potential source of aggregates for the Atlantic and Pacific Sites may be the rock coming from the excavation at the Pacific site and sand that may be manufactured from that rock. The Employer in no way guarantees that such aggregate is adequate or meets the requirements for the Contractor's proposed design or is suitable for the Works.[A16] The Contractor may wish to consider other options; however, the Contractor should be aware that the areas of the Chagres River upstream from the Gamboa Bridge cannot be used for supply of aggregates.

112.    The interpretation of this specific three-sentence paragraph was one of very many issues in the arbitration. It was addressed in every major pleading in the case, including the Movants' Statement of Claim, the ACP's Statement of Defence, the Movants' Statement of Reply, the ACP's Rejoinder and both rounds of both Parties' Post-Hearing Briefs. It was also addressed at the Hearing on the Merits and the Closing Arguments Hearing, during which the Tribunal asked a number of questions regarding the interpretation of this provision.[129] Because of how Mr. Bouchardie portrays this part of the Parties' oral closing arguments, I will discuss it in greater detail below. The Parties offered competing interpretations of the provision as set out below,

---

[129]  See, for example, Transcript of the Closing Hearing in (Day 22). (**R–47**)

although it must be said the ACP's defence of the CAP claim did not stand or fall on this provision and, as it happens, the CAP claims failed for other reasons stated in the Partial Award, irrespective of the Tribunal's decision on this provision.  In other words, even if Mr. Bouchardie was correct (he is not) the result of the CAP claim would have been the same.

### 1.    The Movants' Interpretation

113.    The Movants first referred to paragraph 1.07 D.1 in the Statement of Claim.  In doing so, the Movants focused in particular on the second sentence of the paragraph: "The Employer in no way guarantees that such aggregate is adequate or meets the requirements for the Contractor's proposed design or is suitable for the Works." According to the Movants, paragraph 1.07 D.1 confirmed that the ACP "did not guarantee the suitability of the end product (the aggregates), but did not say anything about the suitability of the PLE basalt itself."[130]

114.    In other words, the Movants drew a distinction between, on the one hand, basalt rock from the Pacific Locks Extension, and on the other hand, the aggregates that were produced by crushing that basalt rock from the PLE. The Movants recognized that paragraph 1.07 D.1 was a disclaimer of liability, but stated that the disclaimer was "inapplicable to the issue at stake in this arbitration."[131] According to the Movants, the issues that they encountered during the Works "did not relate to the suitability of the *aggregates* once [they were] produced using the PLE basalt." Instead, the issues were encountered "when *processing the basalt itself*."[132]

115.    The Movants based their interpretation of the scope of paragraph 1.07 D.1 on what they contended was a literal reading of the provision, including the fact that the second sentence of paragraph 1.07 D.1 refers only to "such aggregate," and does not refer to both aggregate *and* basalt.  Importantly, as explained below, this is not how the provision appeared to have been previously interpreted by the Contractor at the time; as has been stated by the Contractor itself during the DAB proceedings.

### 2.    The ACP's Interpretation

116.    The ACP disagreed with the Movants' interpretation.  It detailed its disagreement in its Statement of Defence, Rejoinder and both Post-Hearing Briefs. The ACP's position was that, pursuant to paragraph 1.07 D.1, the ACP expressly disclaimed responsibility for both (1)

---

[130]  Movants' Statement of Claim at paragraph 399 on pdf page 129. (**R-48**)

[131]  Movants' Statement of Claim at paragraph 979 on pdf page 314. (**R-48**)

[132]  Movants' Statement of Claim at paragraph 980 on pdf pages 314–315. In response to the argument, the ACP pointed out numerous instances in which the Movants did, in fact, complain of the degradation of the aggregates, rather than the PLE basalt.  (**R-48**)

the suitability of the basalt rock itself, and (2) the aggregates produced from the basalt.[133] The ACP based its argument on (1) the plain language of paragraph 1.07 D.1; (2) the fact that paragraph 1.07 D.1 is consistent with the overall risk allocation under the Contract as evidenced by other contractual provisions;[134] and (3) other evidence, including the Contractor's very own statements during the Referral 11 proceedings regarding the meaning of paragraph 1.07 D.1.[135] Indeed, the provision itself states in unambiguous terms, a "potential source of aggregates for the Atlantic and Pacific Sites may be *the rock coming from the excavation* . . ." (emphasis added).

117.    Throughout the Panama 1 Arbitration, the ACP relied on paragraph 1.07 D.1 as one of a number of provisions of the Contract that unambiguously confirmed that the Contractor was responsible for the excavated basalt, and therefore had no claim against the ACP in relation to the characteristics or physical conditions of the PLE basalt. The ACP repeatedly stated that paragraph 1.07 D.1 should also be considered in the context of the broader, contractually agreed risk allocation, which was evident in other parts of the Contract. This includes, in particular, Sub-Clause 4.20 [*Employer's Equipment and Free-Issue Material*] of the Conditions of Contract, which states as follows:

> The Contractor may use in relation to the Works, free of charge, any "accumulated materials" and/or "borrow material" within areas under the Employer's responsibility in accordance with the details stated in Section 01 50 00 *(Temporary Facilities, Accesses And Controls)* of the Employer's Requirements. The Employer shall not have any responsibility for any shortage, defect or default in these materials.

118.    Sub-Clause 4.20 [*Employer's Equipment and Free-Issue Material*] of the Conditions of Contract refers to Section 01 50 00 [*Temporary Facilities, Accesses and Controls*] of the Employer's Requirements. Section 01 50 00 includes paragraph 1.07. The ACP made, *inter alia*, the following points with respect to paragraph 1.07 A – 1.07 D:

(a)      paragraph 1.07 concerns Borrow Material and Available Aggregates, which are considered free-issue materials. The ACP has no responsibility for any shortage, defect or default in such materials, pursuant to Sub-Clause 4.20 [*Employer's Equipment and Free-Issue Material*] of the Conditions of Contract;

(b)      paragraph 1.07 A identifies the PLE as a borrow area;

---

[133]  See paragraph 2.22 on pdf page 186-187 of the ACP's Statement of Defense. (**R-3**)

[134]  See Section 2 of Chapter V from pdf page 182 of the ACP's Statement of Defense (**R-3**) and Section 7 from pdf page from 113 of the ACP's Post-Hearing Brief. (**R-49**)

[135]  See paragraph 7.25 on pdf page 118 of the ACP's Post-Hearing Brief. (**R-49**)

(c)     paragraph 1.07 B confirms that "The Employer in no way guarantees that the material at the borrow areas indicated on the drawings in Subparagraph 1.07 A.1. is adequate or meets the requirements for the Contractor's proposed design or is suitable for the Works; moreover, the Contractor may procure borrow material from other sources or propose other sources within the areas under the responsibility of the Employer";

(d)     paragraph 1.07 C confirms that certain material coming from the excavation of the Pacific approach channel would be made available to the Contractor, subject to the same exclusion in paragraph 1.07 B; and

(e)     paragraph 1.07 D.1 confirms that the ACP did not in any way guarantee the suitability or adequacy of the PLE basalt, or the aggregate produced from such basalt.[136]

119.    The ACP based its interpretation of paragraph 1.07 D.1 on the plain language of the provision, including the fact that the paragraph expressly refers to both "the rock coming from the excavation," and "such aggregate." The ACP also specifically noted that the provision applies to the "suitability of the basalt," and that "the ACP expressly disclaimed responsibility for the suitability of the basalt."[137]

120.    But, in addition to this, the ACP confirmed that its plain-language interpretation was consistent with the overall allocation of risk as set out in other provisions of the Contract, including specifically Sub-Clause 4.12 [*Unforeseeable Physical Conditions*].[138]

121.    In addition, the ACP also cited <u>the Contractor's own statements</u> about Amendment 16 to the RFP (which included the final version of paragraph 1.07 D.1), as evidence of the Contractor's understanding of what paragraph 1.07 D.1 really meant. Specifically, the Contractor made the following statement in its Referral 11 submissions to the DAB:[139]

---

[136] See paragraphs 2.13-2.30 on pdf pages 184-188 of the ACP's Statement of Defence. (**R-3**)
[137] See paragraph 7.25 on pdf page 118 of the ACP's Post-Hearing Brief. (**R-49**)
[138] See, e.g., paragraph 2.60 on pdf page 154 of the ACP's Rejoinder. (**R-51**)
[139] See paragraph 167 on pdf page 64 of the Contractor's RRSOC in Referral No. 11 dated June 2, 2014. (**R-52**)

> A further relevant change in **Amendment No. 16** concerned the suitability of basalt as aggregate. <u>For the first time</u>, on 16 September 2008, in Volume II, Part 3, Subpart 1, Section 01 50 00, Sub-Section 1.07 D.1, the following provision was added: "[…] *The Employer <u>in no way guarantees that such aggregate is adequate</u> or meets the requirements for the Contractor's proposed design or is suitable for the Works*" (emphasis added). Until 16 September 2008 basalt was the obvious material that all tenderers had considered to use as aggregate for concrete production, but <u>but 2.8 months ahead of the then foreseen bid deadline the Employer made this fundamental expectation unwarranted.</u>

(emphasis added)

122.    In other words, the ACP contended that the Movants' statement before the DAB was evidence that the Contractor itself <u>at the time</u> (i.e. at the time of the RFP) had understood paragraph 1.07 D.1 in the same way as the ACP. The Contractor was saying that its expectation that the <u>basalt</u> was suitable for use as aggregate was rendered unwarranted by the wording in 1.07 D.1. Thus the Contractor's position at the time (that the effect of 1.07 D.1 was that the Employer was not guaranteeing the suitability of the <u>basalt</u>) is exactly the same as the position which the ACP argued before the Tribunal.

123.    In making this argument the ACP again emphasized the importance of the term "suitability" in the context of paragraph 1.07 D.1 (a point the Tribunal also later emphasized in its own analysis). The ACP stated as follows in its Statement of Defence:[140]

> 2.22    In Referral No. 11, the Contractor accepted that, not only did Section 01 50 00 [*Temporary Facilities, Accesses and Controls*] apply <u>to the suitability</u> of the basalt for the production of aggregate, as it plainly does, but also contended that <u>the ACP had expressly disclaimed responsibility for its suitability</u>, and that GUPC appreciated this fact during the RFP period:[12]

(emphasis added)

124.    The ACP picked up the same point in the next paragraph, averring that "the suitability of the basalt for the production of aggregate is exactly what that section of the Employer's Requirements was intended to cover…"[141]

125.    Finally, the ACP made the further point in its submissions that the Contractor's complaint was, in fact, not just with basalt rock, but was in fact with the actual aggregates.[142] The ACP cited several sections of the Movants' submissions and oral evidence in which the Movants and their experts repeatedly described alleged problems specifically with the end product, i.e., the aggregates. As a result, the ACP contended that even if the Contractor's

---

[140]  See paragraph 2.22 on pdf page 186 of the ACP's Statement of Defence. (**R-3**)
[141]  See paragraph 2.23 on pdf page 187 of the ACP's Statement of Defence. (**R-3**)
[142]  See paragraphs 2.61–2.66 on pdf pages 154–156 of the ACP's Rejoinder. (**R-51**)

interpretation of the scope of paragraph 1.07 D.1 was correct, the claim should still fail, as it related to aggregates.

### 3.    The Tribunal's Decision

126.    The Tribunal devoted a sizable portion of the Partial Award to addressing the meaning of paragraph 1.07 D.1. This analysis can be found from paragraph 919 to paragraph 939 of the Partial Award, and is briefly summarized below.

127.    However, it is first worth noting Mr. Bouchardie's statement in his Declaration that "the Parties agreed that the Tribunal should interpret [paragraph 1.07 D.1] in accordance with its literal terms."[143] This statement should be clarified. First, for the avoidance of doubt and as described above, the Parties took different positions as to the meaning of paragraph 1.07 D.1 when interpreted according to its literal terms. In addition, throughout the proceedings, the Parties considered evidence that went beyond the literal terms of the provision itself.

128.    More specifically, the statement drawn from the Transcript of the Closing Hearing is a citation to only the Movants' counsel's statement.[144] It is incomplete. The response of ACP's counsel was not simply to agree.[145] Any agreement by Mr. McMullan QC showed that the ACP's position on interpretation differed: he insisted that paragraph 1.07 D.1 had to be construed in the context of the entire agreement and he listed other provisions of the Contract that bore on the ACP's proffered interpretation of paragraph 1.07 D.1.

129.    In other words, there was no agreement by the Parties to apply only the three sentences of Section 1.07 D.1 in isolation, nor was there agreement to exclude evidence that went beyond the literal meaning of the provision, nor was there any agreement to ignore the context of the provision by disregarding other provisions of the Contract. Nor was there any agreement by the ACP that the exercise at hand was not interpretation of Section 1.07 D.1.[146]

130.    In addition, as already discussed in paragraphs 116 - 125 above, the ACP repeatedly argued that the Movants' statements to the DAB during the Referral 11 proceedings regarding the scope of paragraph 1.07 D.1 were evidence of the Movants' own understanding of the provision. Such evidence went beyond the "literal terms" of the provision. The ACP

---

[143]  Paragraph 80 of the Bouchardie Declaration.

[144]  Bouchardie Declaration paragraph 80, n. 87(citing id. Ex 33 ("You can apply [the provision] according to its literal terms.").

[145]  See Id. at 174:1: 175:25 of the Transcript of the Closing Hearing (Day 22).  (**R-47**)

[146]  E.g. id. at page 174 lines 9–10 (as the ACP's counsel stated "you must construe the contract as a whole") of the Transcript of the Closing Hearing (Day 22).  (**R-47**)

consistently took the position in its written submissions that paragraph 1.07 D.1 must be considered in the context of the risk allocation under the Contract as a whole. The Tribunal summarized the ACP's submissions regarding relevant contractual context in the Partial Award at paragraphs 808–812.

131.    With this in mind, the sections below provide a brief summary of the Tribunal's findings.

### a.    The Tribunal's Analysis of the Text of Paragraph 1.07 D.1

132.    The Tribunal began by noting the Parties' disagreement as to the meaning of the term "aggregate" as referenced in paragraph 1.07 D.1, and specifically "whether the disclaimer contained in the second sentence would cover the suitability of the PLE Basalt for use as a source of aggregate."[147] For ease of reference, the provision is set out again below:

D.    **Employer Identified Alternatives**:

1.    [A16]**Aggregate for the Atlantic and Pacific Locks**:  A potential source of aggregates for the Atlantic and Pacific Sites may be the rock coming from the excavation at the Pacific site and sand that may be manufactured from that rock. The Employer in no way guarantees that such aggregate is adequate or meets the requirements for the Contractor's proposed design or is suitable for the Works.[A16] The Contractor may wish to consider other options; however, the Contractor should be aware that the areas of the Chagres River upstream from the Gamboa Bridge cannot be used for supply of aggregates.

133.    The Tribunal then analysed each of the three sentences in paragraph 1.07 D.1. As to the first sentence, the Tribunal stated that it "merely indicates that the Contractor could potentially use the PLE Basalt as a source of aggregates and contains no instruction or obligation to do so."[148] As to the second sentence, the Tribunal read this as "more affirmative," stating that it "can be characterized as an exclusion of liability clause."[149] The Tribunal then considered that the second sentence referred specifically to "such aggregate," stating that this "would not necessarily be understood as a reference to the PLE Basalt prior to being processed into aggregates."[150] It was on that basis that the Tribunal concluded that the second sentence could not be read as an exclusion of liability limited solely to the source of aggregate." The Tribunal

---

[147]  Partial Award at paragraph 920. (**DKT No. 6-1**)
[148]  Partial Award at paragraph 922. (**DKT No. 6-1**)
[149]  Partial Award at paragraph 923. (**DKT No. 6-1**)
[150]  Partial Award at paragraph 927. (**DKT No. 6-1**)

further noted that the second sentence "clearly includes an exclusion of liability for the end-product aggregates."[151]

134.    In other words, the Tribunal determined that the disclaimer in the second sentence of paragraph 1.07 D.1 was (1) not limited *only to* the basalt excavated from the PLE; but (2) that the disclaimer did comprise the end-product aggregates.

135.    This left one remaining unanswered question, which was "whether such exclusion could cover <u>*both the source of the aggregate as well as the aggregate*</u>."[152] (emphasis added).

136.    The Tribunal's ultimate conclusion was that the exclusion in paragraph 1.07 D.1 should comprise *both* the source of the aggregate *and* the aggregate itself. In reaching this decision the Tribunal noted the second sentence's reference to the (1) "adequacy" of the aggregate; (2) "meet[ing] the requirements for the Contractor's proposed design;" and (3) the "suitab[ility]" of the aggregate.[153] The Tribunal concluded that [w]ith respect of the 'suitab[ility] for the Works'…this element, as well as the element of adequacy, "lead to the conclusion that the disclaimer applies to both the aggregate as well as the source of the aggregate."[154] Thus, the reference to "suitab[ility]" was at the heart of the Tribunal's reasoning here.

137.    The Tribunal then addressed the third sentence of paragraph 1.07 D.1, noting that it "indicates that it is the Contractor's responsibility to consider what source of aggregate it intends to use," and that this "reinforces the Tribunal's conclusion that the exclusion of liability applies both to the source of the aggregate as well as to the aggregate itself."[155]

138.    Finally, the Tribunal referred to the "evolution" of paragraph 1.07 D.1 through the successive drafts of the Employer's Requirements, in particular the fact that Amendment 16 to the RFP introduced a "modification of the first sentence concerning the PLE as a source of aggregates, as well as the second sentence concerning the exclusion of liability,"[156] which again reinforced the "direct connection between the second sentence (exclusion of liability) and the first sentence (source of the aggregate)."[157]

---

[151]  Partial Award at paragraph 927. (**DKT No. 6-1**)
[152]  Partial Award at paragraph 928. (**DKT No. 6-1**)
[153]  Partial Award at paragraph 931. (**DKT No. 6-1**)
[154]  Partial Award at paragraph 931. (**DKT No. 6-1**)
[155]  Partial Award at paragraph 932. (**DKT No. 6-1**)
[156]  Partial Award at paragraph 933. (**DKT No. 6-1**)
[157]  Partial Award at paragraph 933. (**DKT No. 6-1**)

b.    **The Documentary Evidence Relating to Paragraph 1.07 D.1**

139.    After analyzing the text as described above, the Tribunal proceeded to address certain documentary evidence, stating as follows:[158]

> 934.    To the extent that the above textual analysis does not fully resolve the inherent ambiguity of the term "aggregates" and whether it refers to the raw material coming from the PLE or the end product, Articles 1132 and 1133 of the Civil Code invite the interpreter of an objectively ambiguous provision to review the parties' conduct, including contemporaneous conduct, to assess their mutual intention as to the meaning of the provision. In this regard, the Arbitral Tribunal finds the documentary evidence on record that led to the wording "aggregates" being inserted in RFP Amendment 16 instructive.

140.    In assessing the relevant documentary evidence, the Tribunal made three points. First, in the Question and Answer sessions that took place between the ACP and the tenderers during the RFP period, "the Tenderers' questions repeatedly referred to the sources of the aggregate as 'aggregates.'"[159] Second, in internal communications referencing the tenderers' questions, "the ACP equally made clear that when it referred to 'aggregate' it was in fact referring to the raw material, i.e. the "natural sand for concrete."[160]

141.    And third, "the Claimants themselves, during the Interim Claim, stated that with Amendment 16, the 'risk of unsuitability of PLE basalt was transferred entirely to the Contractor' by this provision, therefore admitting that the exclusion of liability covered both the suitability of the aggregate as well as the source of the aggregate."[161]

142.    This third argument regarding the Contractor's admission during Referral 11 is the argument as already discussed in paragraphs 116 – 125 above.  This was indeed a crucial admission which ran contrary to the Movants' interpretation in the arbitration. The Contractor's statement in its Referral 11 submissions is again set out below:

> 167.    A further relevant change in **Amendment No. 16** concerned the suitability of basalt as aggregate. <u>For the first time</u>, on 16 September 2008, in Volume II, Part 3, Subpart 1, Section 01 50 00, Sub-Section 1.07 D.1, the following provision was added: "[…] *The Employer <u>in no way guarantees that such aggregate is adequate</u> or meets the requirements for the Contractor's proposed design or is suitable for the Works*" (emphasis added).   Until 16 September 2008 <u>basalt</u> was the obvious material that all tenderers had considered to use as an aggregate for concrete production, <u>but 2.8 months ahead of the then foreseen bid deadline the Employer made this fundamental expectation unwarranted.</u>

---

[158]  Partial Award at paragraph 934. (**DKT No. 6-1**)
[159]  Partial Award at paragraph 935. (**DKT No. 6-1**)
[160]  Partial Award at paragraph 936. (**DKT No. 6-1**)
[161]  Partial Award at paragraph 937. (**DKT No. 6-1**)

(emphasis added)

### 4.   Statements in the Motion and the Bouchardie Declaration

143.    I have reviewed the Motion and the Bouchardie Declaration, both of which assert that the Tribunal reached its conclusions based on arguments not raised by the Parties during the Arbitration. The Movants and Mr. Bouchardie make several specific allegations in this regard. I respond to those allegations below.

### a.   Regarding the assertion about the Tribunal's "Literal Reading" of Paragraph 1.07 D.1

144.    First, the Movants state that the Parties agreed that paragraph 1.07 D.1 should be interpreted in accordance with its literal terms. According to the Movants, the Tribunal conducted such "literal reading," and "concluded that the exclusion of liability referred only to aggregate, and not to the PLE Basalt."[162] The Movants then state that the Tribunal "disregarded" this "literal reading," and interpreted the provision based on arguments not raised by the Parties.[163]

145.    As discussed above, the ACP did state that its interpretation, or "construction", of paragraph 1.07 D.1 was the correct interpretation based on a literal reading of the provision itself, in context. The Movants contended that there was "no need for [the Tribunal] to interpret this provision," and that the Tribunal "can apply it according to its literal terms."[164] However, the ACP never agreed that no other evidence beyond the language of the provision could or should be considered. Instead, the ACP stated that paragraph 1.07 D.1 must be considered in the context of the contract as a whole.[165] Moreover, and to repeat, the ACP also referred to the evidence from Referral 11, in which the Contractor made statements that were consistent with the ACP's interpretation of the provision.  Moreover, throughout the proceedings, the ACP repeatedly argued that this provision excluded the ACP's liability for the basalt rock as well as the aggregates made from the rock.

146.    In addition, the Movants' statement that the Tribunal conducted a literal reading of the provision and "concluded that the exclusion of liability referred only to aggregate, and not

---

[162]  Motion at paragraph 26.

[163]  Motion at paragraph 26.

[164]  Transcript of the Closing Hearing in (Day 22) from page 173 line 20 to page 174 line 1. (**R-47**)

[165]  Transcript of the Closing Hearing in (Day 22) from page 174 line 3 to page 175 line 25. (**R-47**)

to the PLE Basalt,"[166] is not an accurate and complete reproduction of the Tribunal's Partial Award. The Tribunal did not reach its conclusion based solely on a literal reading of the provision, instead stating that a literal reading "<u>suggests</u> that the disclaimer concerning "such aggregate" refers only to the aggregate produced from the rock excavated from the PLE, and not to the rock itself," and that the "use of the term "such aggregate" <u>would not necessarily</u> be understood as a reference to the PLE Basalt prior to being processed into aggregates."[167] (emphasis added).

147.    The Tribunal then stated at paragraph 927 that it that it "concludes that the second sentence [of paragraph 1.07 D.1] cannot be read as an exclusion of liability limited to the source of aggregate, and clearly includes an exclusion of liability for the end-product aggregates."[168] In other words, the Tribunal determined that the exclusion of liability as stated in the second sentence of paragraph 1.07 D.1 (1) does not <u>only</u> apply to the basalt, i.e., the "source of aggregate"; and (2) <u>does</u> apply to the end-product aggregates.

148.    But, as the Tribunal stated, this still left one question unanswered. The Tribunal posed that question in the very next paragraph, stating in paragraph 928 that the "question that remains to be determined is whether such exclusion could cover both the source of the aggregate <u>as well as</u> the aggregate." (emphasis added).

149.    In other words, the Tribunal did not "disregard[] its own analysis." Instead, the Tribunal acknowledged that its own reading of the second sentence of paragraph 1.07 D.1 left an additional question unanswered, i.e., the question in paragraph 928, and the Tribunal then addressed that question beginning at paragraph 929. As discussed above, the Tribunal's conclusion took into account the references in the second sentence of paragraph 1.07 D.1 to the adequacy and suitability of the aggregates, in addition to whether they met the requirements of the Contractor's proposed design.   The Tribunal ended up agreeing with the ACP's interpretation, which was also consistent with the way the Contractor had said that it had interpreted this provision at the time.

**b.     The Basis of the Tribunal's Conclusion as to Paragraph 1.07 D.1 in Relation to Arguments Raised by the Parties**

150.    The Tribunal ultimately determined that the Contractor "was put on notice by [paragraph 1.07 D.1] that the Employer was not assuming any responsibility for the aggregates

---

[166]  Motion at paragraph 26.
[167]  Partial Award at paragraph 927. (**DKT No. 6-1**)
[168]  Partial Award at paragraph 927. (**DKT No. 6-1**)

obtained from the PLE Basalt or the material's suitability for that purpose."[169] Again, this is consistent with the ACP's interpretation of the provision. Both the Movants and Mr. Bouchardie have stated that the Tribunal gave its own reasons for reaching this conclusion, "based on arguments not raised by the Parties."[170]

151.    However, to the contrary, I note that the ACP's position throughout the Panama 1 Arbitration was that, during Referral 11 before the DAB, "the Contractor accepted that, not only did Section 01 50 00 [*Temporary Facilities, Accesses and Controls*] apply to the suitability of the basalt for the production of aggregate, as it plainly does, but also contended that the ACP had expressly disclaimed responsibility for [the basalt's] suitability, and that GUPC appreciated this fact during the RFP period."[171] Through the course of the arbitration, the ACP repeatedly cited the following extract from the Contractor's very own Referral 11 submissions:[172]

> 167.   A further relevant change in **Amendment No. 16** concerned the suitability of basalt as aggregate. <u>For the first time</u>, on 16 September 2008, in Volume II, Part 3, Subpart 1, Section 01 50 00, Sub-Section 1.07 D.1, the following provision was added: "[…] *The Employer <u>in no way guarantees that such aggregate is adequate</u> or meets the requirements for the Contractor's proposed design or is suitable for the Works*" (emphasis added). Until 16 September 2008 <u>basalt</u> was the obvious material that all tenderers had considered to use as an aggregate for concrete production, <u>but 2.8 months ahead of the then foreseen bid deadline the Employer made this fundamental expectation unwarranted.</u>

(emphasis added)

152.    The Tribunal agreed with this position based on this evidence. As set out in paragraph 937 of the Partial Award, the Tribunal specifically referred to the Contractor's very own Referral 11 submissions. In doing so, the Tribunal stated that "at the relevant time of RFP Amendment 16 both GUPC and the ACP understood the term 'aggregates' to include the raw material, and that this is how the Parties intended the term when it was used in Article 1.07 D."[173] The Tribunal therefore agreed with one of the ACP's key arguments and accepted the Contractor's own statements as evidence of the validity of the ACP's argument about the intent of the Parties with respect to paragraph 1.07 D.1.

---

[169]   Partial Award at paragraph 939. (**DKT No. 6-1**)
[170]   Motion at paragraph 26; Bouchardie Declaration at paragraph 80.
[171]   Paragraph 2.22 on pdf page 186-187 of the ACP's Statement of Defence. (**R-3**)
[172]   See paragraph 167 on pdf page 64 of the Contractor's RRSOC in Referral No. 11 dated June 2, 2014. (**R-52**)
[173]   Partial Award at paragraph 938. (**DKT No. 6-1**)

153.    But this was not the only reason. In addition to this, the Tribunal did provide other reasons for reaching the same conclusion as the ACP with respect to the scope of paragraph 1.07 D.1. As set out above, the Tribunal emphasized the fact that the second sentence of the paragraph specifically included the element of "suitab[ility] for the Works": it was this element (as well as the element of adequacy) that led the Tribunal to the conclusion that the disclaimer applied both to the aggregate and to the source of the aggregate. As set out above, the ACP had emphasized paragraph 1.07 D.1's reference to suitability in its pleadings, stating as follows in its Statement of Defence (and see also paragraph 2.23 of the Statement of Defense, as set out in paragraph 123 above):

> 2.22    In Referral No. 11, the Contractor accepted that, not only did Section 01 50 00 [*Temporary Facilities, Accesses and Controls*] apply to the suitability of the basalt for the production of aggregate, as it plainly does, but also contended that the ACP had expressly disclaimed responsibility for its suitability, and that GUPC appreciated this fact during the RFP period:[12]

154.    The importance of the term "suitability" in the context of paragraph 1.07 D.1 was certainly raised by the ACP, in reference to the Contractor's admission during the Referral 11 proceedings.

155.    The Tribunal also considered the evolution of paragraph 1.07 D.1 in the various drafts of the Employer's Requirements. In doing so, it was evaluating the Parties' evidence and argument. Amendment 16 (paragraphs 110, 121, 138, 141, 151-152 above) was discussed in detail by the Parties, and the ACP consistently emphasized the significance of Amendment 16, in particular that the amendment to the wording in paragraph 1.07 D.1 was "fully consistent with the allocation of risk clauses of the draft Contract."[174]

156.    The Tribunal further considered that the documentary evidence on record that led to Amendment 16 was "instructive" as to the meaning of paragraph 1.07 D.1.[175] In addition to the Contractor's own statement as to how it understood Amendment 16 (considered in detail above), the Tribunal also referred to certain questions and answers in the Q&A session to Amendment 10; and the internal ACP communications referencing one of those questions, which, as the Tribunal found, led to Mr. Quijano demanding an amendment to the RFP. Again, these documents were the subject of discussion and briefing throughout the proceedings.

---

[174] See paragraph 7.29 on pdf page 90 of the ACP's Reply Post-Hearing Brief. (**R-50**)
[175] Partial Award at paragraph 934. (**DKT Nos. 6-1 and 6-2**)

157.    Without seeking to set out all of the references to these documents, the Movants pleaded in the Statement of Claim Q&A 110 in support of their case that the ACP was making it clear that the PLE basalt would and could be used as the primary source of concrete aggregates for the Project and the PLE basalt was suitable for that purpose.[176] Likewise, in their slides for opening the Aggregate part of the hearing, the Movants referred to Q&As 110 and 111, in connection with their case that the ACP had considered only the production of manufactured sand from PLE basalt.[177]

158.    As to the ACP's internal communications, the email to which the Tribunal referred at paragraph 936 of the Partial Award was, as the Tribunal itself noted, specifically dealing with question 110. This led, as the Tribunal found, to an internal ACP email from Mr. Quijano in which he demanded an amendment to the RFP to discount the ACP's responsibility for "aggregates." The Movants pleaded these two emails (and a third) in paragraphs 1202 to 1204 of the Statement of Reply. It was their case that these emails referred only to aggregates and that this was "entirely consistent with ER Section 01 50 00" and supported their case that the suitability of the aggregates and the suitability of the PLE basalt were two different things.[178] The ACP's pleaded case in relation to this (and related emails) included as follows: "Following legal advice, which has been produced, it was clear that the ACP did not consider it should be responsible for the free-issue materials, which included the basalt, from which any aggregates might be made."[179]  As, the ACP went on to plead: "Once this discrepancy had been resolved, by Mr. Quijano's decision, it was hardly surprising that a few weeks later a similar amendment was made to Article 1.07 D.1 of the same Section to bring it into line."[180] Thus the ACP expressly linked the emails in question to the amendment made to Article 1.07 D.1.[181]

159.    In drawing together their submissions in their Post-Hearing Brief, the Movants began by summarizing what they understood the ACP's case here to be, stating that "ACP has alleged in its Rejoinder that the evolution of SCs 4.10, 4.12, 4.20, and the related Art. 1.07 D of Section 01 50 00 of the Employer's Requirement . . . shows the Parties' mutual intent to have

---

[176]  See paragraphs 513 and 514 on pdf page 165 of the Movants' Statement of Claim. (**R-48**)

[177]  See slide 35 in the Movants' Opening Statement on Concrete Aggregate Production. (**R-53**)

[178]  See paragraph 1205 at pdf page 416 of the Movants' Statement of Reply. (**R-57.1**)

[179]  See paragraph 2.81 at pdf page 158 of the ACP's Rejoinder. (**R-51**)

[180]  See paragraph 2.83 at pdf page 159 of the ACP's Rejoinder. (**R-51**)

[181]  See also Appendix 1 at pdf page 388 of the ACP's Rejoinder, where the ACP set out the chronology of the amendments to the RFP concerning risk and responsibility for the excavated basalt.

GUPC assume the risk for the unsuitability of the PLE Basalt."[182] Then, under the sub-heading "The changes to SC 4.20 and to Art. 1.07.D of Section 01 50 00 were not discussed with the tenderers and do not show any mutual intent of the Parties to transfer the risk for the unsuitability of the PLE Basalt to GUPC," the Movants went on to discuss Q&A 110 and the emails referred to by the Tribunal in paragraph 936 of the Partial Award.[183] Again, it was their case that "neither the tenderer's question nor ACP's internal email exchange referred to the basalt excavated from the Pacific Site as a source of basalt available for the *manufacture* of aggregates"; they contended that the documents exclusively referred to potential natural sources of, and responsibility for, aggregates.[184]

160.    The ACP responded to this section of the Movants' Post-Hearing Brief in their Reply Post-Hearing Brief.[185] The ACP set out its case that the mutual intention of the Parties was evidenced by the clear and unambiguous wording of the relevant Contract provisions, but then went on also to set out its case that "the ACP's correct interpretation of the relevant contractual provisions aligns with (and/or is not contradicted by) the discussions which the Parties had during the course of the RFP period."[186] In summarizing its position at the end of this section, the ACP submitted as follows (with regard to the three emails referred to above, two of which are those referred to in paragraph 936 of the Partial Award): "These also (in effect) explain the changes to Section 01 50 00 [*Temporary Facilities, Accesses and Controls*] of the Employer's Requirements to align them with the Sub-Clause 4.20 [*Employer's Equipment and Free-Issue Material*] of the Conditions of Contract, which provided that the ACP was not responsible for the materials that the ACP made available for free, which included rock from the excavations."[187]

161.    Thus, it was the Movants' case that the history behind Amendment 16 was inconsistent with the ACP's case on the meaning of paragraph 1.07 D.1; while it was the ACP's case that that same history was consistent with the ACP's case. In those circumstances, the Tribunal was perfectly entitled to have regard to that history (and those documents) as it did in paragraphs 934-936 of the Partial Award.

---

[182]  See paragraph 152 of the Movants' First Post-Hearing Brief. (**R-67**)
[183]  See paragraphs 155-156 of the Movants' First Post-Hearing Brief. (**R-67**)
[184]  See paragraph 157 of the Movants' First Post-Hearing Brief. (**R-67**)
[185]  See paragraphs 7.1 to 7.34 of the ACP's Reply Post-Hearing Brief. (**R-50**)
[186]  See paragraph 7.14 of the ACP's Reply Post-Hearing Brief. (**R-50**)
[187]  See paragraph 7.34 of the ACP's Reply Post-Hearing Brief. (**R-50**)

162.    Finally, and looking at the Claimants' conduct, the ACP has already set out above how it relied throughout upon the Contractor's very own statements during the Referral 11 proceedings as to its position at the time of the RFP period, which the Tribunal relied on in paragraph 937 of the Partial Award.

### 5.    The Effect of the Tribunal's Ruling as to Paragraph 1.07 D.1

163.    As mentioned above, the ACP's position throughout the proceedings was that (1) pursuant to paragraph 1.07 D.1, the ACP expressly disclaimed responsibility for the suitability of the basalt, and the aggregates produced from the basalt; and (2), as a consequence, the Contractor's claim must fail, pursuant to the express risk allocation under the Contract. While the Tribunal agreed with the ACP's first argument, the Tribunal nevertheless stated this did not mean that a claim could not be raised for an error in the Employer's Requirements.

164.    Paragraph 940 states that "[w]hile the Arbitral Tribunal has concluded, as detailed above, that the risk of the unsuitability of the PLE Basalt for use as concrete aggregates was allocated to the Contractor in light of the disclaimer contained in Paragraph 1.07 D of Section 01 50 00 of the Employer's Requirements, the Arbitral Tribunal considers that such findings do not prevent the Contractor from raising a claim for alleged errors in the Employer's Requirements pursuant to Sub-Clause 1.9.4."[188]

165.    It is worth recalling that the Movants' argument included that there was an error in the Employer's Requirements for which the ACP was was responsible under the Contract. The discussion of paragraph 1.07 D.1 was a threshold defense to that claim. Having rejected the ACP's contention that the CAP claim for an error in the Employer's Requirements must fail for this reason, the Tribunal then went on to independently assess the Contractor's claim for compensation for errors in the Employer's Requirements pursuant to Sub-Clause 1.9.4 [*Errors in the Employer's Requirements*], and the Tribunal ultimately dismissed that claim because there was "no error" in the Employer's Requirements about the quality of the basalt or its suitability of use as concrete aggregates.[189]. In doing so it relied on points other than paragraph 1.07 D.1.[190]

166.    In the Motion, the Movants have stated that the Tribunal's "interpretation of paragraph 1.07 D.1 vitiated Movants' alternative theories for their concrete aggregate

---

[188]   Partial Award at paragraph 940. (**DKT No. 6-1**)
[189]   Partial Award at paragraphs 943-72. (**DKT No. 6-1**)
[190]   Partial Award at paragraphs 943-72. (**DKT No. 6-1**)

production claims (such as the breach of the Employer's Requirements)."[191] The Movants do not cite to any specific section of the Partial Award in support of this statement.[192] Instead, the Movants cite to paragraph 92 of Mr. Bouchardie's Declaration, which also makes no reference to any specific aspect of the Partial Award.

167.    The Motion further states that the Tribunal "explicitly relied on its interpretation of paragraph 1.07 D.1 to reject Movants' claims for breach of the duties to inform and to act in good faith."[193] Yet, the Tribunal's ruling on paragraph 1.07 D.1 was not the sole reason the Tribunal rejected these two Panamanian law claims.

168.    As to the alleged breach of the duty to inform, the Tribunal only referred to paragraph 1.07 D.1 in discussing the Movants' contention that the ACP "should have made clear to the tenderers that its representations had not been properly verified and validated."[194] In addressing this contention, the Tribunal first determined that "in reality, the ACP did inform the Tenderers as to which information could be relied upon (specifically, not the Volume VI information)."[195] This specifically referred to contractual provisions other than section 1.07 D.1. Independent of that, the Tribunal referred to the Parties' agreement pursuant to paragraph 1.07 D.1 that "the ACP was not taking any responsibility for the suitability of the PLE Basalt for use as aggregate."[196] The Tribunal's decision did not turn solely on its interpretation of paragraph 1.07 D.1. Instead, the Tribunal referred to the Volume VI information, and to the fact that

---

[191]  Motion at paragraph 28.

[192]  The Movants make the following statement in footnote 63 of the Motion but again, they have failed to cite any section of the Partial Award in support of this statement, nor have they offered any further elaboration on this point: "With respect to Movants' claim under the Employer's Requirements, the Tribunal's finding that ACP did not bear the risk for the unsuitability of the PLE Basalt necessarily affected the Tribunal's interpretation of the statements included by ACP in the Employer's Requirements regarding the suitability of the PLE Basalt. Similarly, if Movants did not bear the risk for the unsuitability of the PLE Basalt for use as concrete aggregates, that would reduce the level of investigation that Movants would have been expected to carry out prior to submitting their tender." Motion at footnote 63.

[193]  Partial Award at paragraph 28. (**DKT No. 6-1**)

[194]  Partial Award at paragraph 1097. (**DKT No. 6-1**)

[195]  Partial Award at paragraph 1097 n. 978 (referring to "e.g. last paragraph of Sub-Clause 5.1 of the Conditions of Contract (as amended through Variation Order No. 175) of February 2009…"). (**DKT No. 6-1**)

[196]  Partial Award at paragraph 1097 text supported by footnote 979. (**DKT No. 6-1**)

"indications were given in the RFP documents that the Tenderers had to assess the suitability of the PLE Basalt as the best source of aggregates."[197]

169.    As to the alleged breach of the duty of good faith, the Tribunal referred specifically to the Contractor itself having recognized that a further relevant change to the Contract was made by Amendment 16 (i.e. the change to Para 1.07 D.1). So here the Tribunal was relying upon the Contractor's own statement in Referral 11 as to its understanding of that paragraph at the time of the RFP (as discussed in detail above). Moreover, the Tribunal gave several further reasons why the Contractor could not show legitimate reliance, referring to, among other things (1) the contractual status of the Volume VI Documents, which were provided "for information purposes only"; (2) the Entire Agreement clause in Sub-Clause 1.16 [*Entire Agreement*] of the Conditions of Contract; and (3) the "substantial alterations to Sub-Clauses 4.10 [*Site Data*] and 4.12 [*Unforeseeable Physical Conditions*] carried out with Amendment 10.[198]

## B.    The Duty to Self-Inform and Prudent Industry Practices

170.    The second complaint that the Movants and Mr. Bouchardie have made regarding the Partial Award is that the Tribunal "effectively imposed its own views of Prudent Industry Practices based on a biased and incomplete analysis of the evidence, and ignoring important arguments raised by Movants."[199] The Motion further states that "while the Tribunal erroneously claimed it was relying on positions asserted by ACP's experts for its finding that Movants did not conduct sufficient validation tests, no such position was presented."[200]

171.    Mr. Bouchardie elaborates on this point in his Declaration by making two specific points. First, Mr. Bouchardie states that "Prudent Industry Practices do not require bulk testing," or the "crushing of large quantities of rock," during the RFP period of the Works. Mr. Bouchardie further states that, "[c]ontrary to the Tribunal's finding, [the ACP's crushing expert] Mr. Pauletto thus never opined that bulk testing was a necessary step for a prudent tenderer, as he noted that pilot testing, *i.e.* tests made on small samples, was enough."[201] Second, Mr. Bouchardie states that the "Tribunal, however, failed to consider the evidence of Movants' crushing tests on

---

[197]  Partial Award at paragraph 1097-98. (**DKT No. 6-1**)
[198]  Partial Award at paragraph 1106-08. (**DKT No. 6-1**)
[199]  Motion at paragraph 29.
[200]  Motion at paragraph 29.
[201]  Bouchardie Declaration at paragraph 95-96.

Cerro Escobar basalt in its decision, insisting that the PLE Basalt should have been crushed instead."[202]

172.    I provide information about each of Mr. Bouchardie's points below, but it is first worth noting once again that the Tribunal determined in paragraph 972 that "there was no error in the Employer's Requirements regarding the quality of the basalt or its suitability as concrete aggregates." On that basis, the Tribunal dismissed the Contractor's claim under Sub-Clause 1.9.4 [*Errors in the Employer's Requirements*]. There was therefore no need in fact to consider whether a tenderer acting in accordance with Prudent Industry Practices would have discovered the error that the Contractor alleged, as the Tribunal determined that no such error existed. Regardless, the Tribunal noted in paragraph 972 that even if there were an error, "the Tribunal considers that such error would have been discoverable by an experienced contractor exercising Prudent Industry Practices."[203] The Tribunal then went on to address whether the Movants should have discovered this hypothetical (non-existent) error, with reference to Prudent Industry Practices.

### 1.    Bulk Testing During the RFP Period

173.    Although ultimately it proved irrelevant to the decision of the Tribunal on liability, the question of whether GUPC acted in accordance with Prudent Industry Practices in investigating potential sources of concrete aggregate during the RFP period was an issue in the Panama 1 Arbitration. The Movants put forth extensive evidence on this point, including two separate reports from Mr. David Shilston (relating to geology and geotechnics) and Mr. Greg Gold (relating to crushing) as well as witness evidence. The ACP put forth extensive evidence as well, including from experts Dr. David Rothstein (geology and petrography), Mr. Tom Kuper (geology) and Mr. Mike Pauletto (crushing). All of these experts were cross examined at the hearing, and all of these experts offered evidence in relation to the steps that a prudent tenderer would have taken during the RFP period, whether in their expert reports and/or during their cross examinations.

174.    In his Declaration, Mr. Bouchardie first takes issue with a statement made by the Tribunal at paragraph 984 of the Partial Award, in which the Tribunal stated that it "agrees with Mr. Pauletto, and with his opinion that where an owner has not carried out bulk testing on

---

[202]  Bouchardie Declaration at paragraph 97.
[203]  Partial Award at paragraph 972. (**DKT No. 6-1**)

material to be used as aggregate, it would be prudent for a tenderer to do so."[204] Bulk testing was described by Mr. Pauletto in his Second Report as follows:[205]

3.11   Crushing tests include both bulk testing and pilot testing, and I feel the need to make a clarification in this regard. I would refer to "*bulk testing*" as the testing of approximately three truckloads of source material or representative material with the key pieces of equipment to be used during the works. I would refer to "*pilot testing*" as smaller-scale crushing tests on 55-gallon barrels of material.

175.   According to Mr. Bouchardie, Mr. Pauletto "never opined that bulk testing was a necessary step for a prudent tenderer, as he noted that pilot testing, *i.e.* tests made on small samples, was enough."[206] However, in this regard, I note the following extract from Mr. Pauletto's Second Report:[207]

3.10   Contrary to Mr. Gold's opinion, bulk testing was a feasible undertaking and justified by the scope of the project, regardless of whether the crushing facilities were considered to be temporary or permanent.[5] I have conducted crushing tests on several projects for which I was the tendering contractor. Based on my extensive crushing experience, if the owner has not conducted crushing tests, in my view, the contractor should undertake such testing during the RFP period.

176.   In addition, I note the following exchange between Mr. Gunter and Mr. Pauletto, during Mr. Pauletto's cross examination at the Hearing:[208]

---

[204]  Partial Award at paragraph 984. (**DKT No. 6-1**)
[205]  Second Expert Report of Mike Pauletto at paragraph 3.11. (**R-58**)
[206]  Bouchardie Declaration at paragraph 96.
[207]  Second Expert Report of Mike Pauletto at paragraph 3.10. (**R-58**)
[208]  Transcript of Hearing on the Merits (Day 10), page 99, lines 13 to 23. (**R-54**)

```
13          THE PRESIDENT:  Is your expectation and your
14   evidence that a contractor, based on what you explain on
15   your slide 3 with the photograph, should conduct a pilot and
16   a bulk test or only a pilot test?
17       A.  The contractor or the owner?
18          THE PRESIDENT:  The contractor.
19       A.  The contractor on a design−build, I would do the
20   bulk test.
21          THE PRESIDENT:  You would do even on a
22   design−build?
23       A.  Yes.
```

177.    Thus, Mr. Pauletto emphasized the importance of bulk testing not only in his reports, but also in his oral testimony. I further note the Tribunal's statement at paragraph 1084 of the Partial Award that "the Arbitral Tribunal considers that the Tenderers should have performed further investigations of the PLE Basalt, _even if it was not bulk testing_."[209] (emphasis added)  In other words, the Tribunal agreed with Mr. Pauletto that it would have been prudent for the tenderers to carry out bulk testing, but also recognized that the tenderers could have informed themselves through other means.

### 2.    Testing of Cerro Escobar Basalt During the RFP Period

178.    Mr. Bouchardie next states that "the Tribunal, however, failed to consider the evidence of Movants' crushing tests on Cerro Escobar basalt in its decision."[210] However, in this regard, I note the following extract from the Partial Award at paragraphs 985-86.

---

[209] Partial Award at paragraph 1084. (**DKT No. 6-1**)
[210] Bouchardie Declaration at paragraph 97.

985.    The evidence shows that GUPC in fact did carry out some crushing tests on the material from Cerro Escobar, which their geologist Mr. Picco considered to be representative of the PLE Basalt.[860] Cerro Escobar was indeed within the same Miraflores Basalt formation as the PLE Basalt[861], but was located approximately 8.5km from the PLE. Regardless of whether the Cerro Escobar could truly be said to be representative of the PLE Basalt, the Contractor appears to have thought it prudent and necessary to carry out some crushing tests to assess the suitability of the basalt.

986.    Moreover, while the Claimants' witness, Mr. Buffa, gave evidence that these tests did not raise any concerns regarding the suitability of the basalt when crushed[862], other contemporaneous evidence indicates that GUPC had identified the presence of swelling clays (smectites) in the basalts from Ciricito and Cerro Escobar (neither located in the PLE, but both on the Pacific side) as early as December 2007[863] and that Dr. Di Pace, who was working with MWH to prepare GUPC's tender, had recommended that ethylene glycol and x-ray diffraction tests be conducted on the basalts.[864] It appears that GUPC did carry out some additional testing on the 1939 excavation basalt that showed 3.8% nontronite, also a swelling clay.[865]

179.    The Tribunal did consider the evidence of the crushing tests on Cerro Escobar basalt, and noted that some of the issues that the Contractor complained of with respect to the PLE basalt, including the presence of swelling clays (smectites), were also present in the Cerro Escobar basalt.

### C.    The C.A.N.A.L. Tender

180.    The Movants state that they "were denied the opportunity to introduce evidence and arguments in rebuttal to the Tribunal's own speculation about C.A.N.A.L.'s bid."[211] Again, it should be understood that this issue about C.A.N.A.L. was, ultimately, immaterial to the Tribunal's decision on liability.  Mr. Bouchardie makes a similar statement, citing to paragraph 1060 of the Partial Award. In paragraph 1060, the Tribunal stated that the "position of C.A.N.A.L., who bid for much higher amount, also suggests that a higher contingency for risk had been factored into their tender. It may be no coincidence that the Tenderer who chose not to rely primarily on PLE Basalt for the Project's aggregate needs put in a much more expensive bid." Below is a brief discussion of the issues that arose in relation to the other tenderers, including consideration of C.A.N.A.L.'s tender, albeit as I have said this does not appear material to the decision the Tribunal reached on liability for the CAP claim.

---

[211]  Motion at paragraph 30.

### 1.    The Alleged "Fundamental Datum" Relating to use of the PLE basalt

181.    Paragraph 1060 is part of the section of the Partial Award titled, "The alleged 'fundamental datum' regarding the use of the PLE Basalt for the production of concrete aggregates."[212] The Tribunal outlined the issue in paragraph 1018. The Movants claimed that it was a "fundamental datum" between the parties to the Contract that the PLE basalt would be used "as feedstock to the crushing plants."[213] There was significant debate between the Parties as to the significance of the term "fundamental datum." This specific terms appears to have been created by the Movants for the purposes of the Panama 1 Arbitration, and the Movants defined it as the "basis of the Parties' deal," and "the basis of which the Contract was entered into by both Parties."[214] According to the Movants, the "fundamental datum" turned out to be incorrect given the alleged unsuitability of the PLE basalt, and this entitled the Contractor to full compensation.

182.    The Movants relied on numerous documents made available as part of the RFQ and RFP packages, in support of their "fundamental datum" argument. According to the Movants, the ACP made certain representations relating to the characteristics of the PLE basalt in these documents, and those representations were evidence of the "fundamental datum." The Tribunal analyzed these documents in detail from paragraphs 1020 through 1051 of the Partial Award. This included reviewing and considering the alleged representations, and also considering fact and expert testimony as to the meaning and effect of the alleged representations. The documents containing the alleged representations included Cost and Schedule Estimates, the Conceptual Design, the Environmental Impact Study (the "EsIA"), the Geotechnical Data Report (the "GDR"), the Geotechnical Interpretive Report (the "GIR"), and several other documents.  The Tribunal rejected the arguments that these showed a fundamental datum and rejected the arguments there had been misrepresentations by the ACP.[215]

### 2.    The Tribunal's Consideration of the C.A.N.A.L. and BTM Tenders

183.    In addition to reviewing and addressing the documents, the Tribunal considered the tender proposals of C.A.N.A.L. and BTM, and whether there was any evidence that either of them considered there to be a "fundamental datum" regarding the use of the PLE basalt. The Parties made extensive submissions as to both C.A.N.A.L. and BTM's proposals, referencing

---

[212]   Partial Award at paragraph 1060.
[213]   Movants' Statement of Reply Chapter IV paragraph 3 on pdf page 101. (**R-57.1**)
[214]   Movants' Statement of Reply Chapter IV paragraph 32 on pdf page 105, Chapter IV paragraph 1451 on pdf page 470. (**R-57.1**)
[215]   Partial Award at paragraph 1061.

multiple provisions of their respective bids in detail in each of the substantive written submissions, and at the Hearing.[216] The ACP's position was that neither C.A.N.A.L. nor BTM tendered on the basis of a "fundamental datum" regarding the PLE basalt.

184.    C.A.N.A.L. specifically planned to source sand and gravel from the Chagres River rather than the PLE, and BTM intended to use the PLE basalt only partly for the production of fine aggregates—BTM also planned to use it for structural backfill.[217] Again, the Tribunal considered these aspects of the C.A.N.A.L. and BTM tenders in addressing the "fundamental datum" argument. The Tribunal further considered GUPC's own tender, which contemplated sourcing basalt from other quarries such as Aguadulce Hill and Cocoli Hill Quarry.

185.    It was only after this analysis of the documents, and the tenderers' respective plans with respect to the PLE basalt, that the Tribunal referenced C.A.N.A.L.'s tender price in the paragraph cited by Mr. Bouchardie, stating as follows: [218]

> 1060.    The position of C.A.N.A.L., who bid for much higher amount, also suggests that a higher contingency for risk had been factored into their tender.[951] It may be no coincidence that the Tenderer who chose not to rely primarily on PLE Basalt for the Project's aggregate needs put in a much more expensive bid. In this regard, it is noted that Mr. Shilston took the position in his Second Expert Report that "if the PLE basalt was judged to be unsuitable for the production of concrete aggregate, the overall cost of the project would have been significantly different"[952].

186.    Notably, the Tribunal linked its observation regarding C.A.N.A.L.'s tender price to statements made by the Movants' own expert Mr. Shilston, who stated that "if the PLE basalt was judged to be unsuitable for the production of concrete aggregate, the overall cost of the project would have been significantly different."[219]

187.    The ACP also specifically addressed the price of the various tenders in the context of tenderers' assessment of risk. I note in this regard, for example, paragraph 1.5 of the ACP's Statement of Defence:

---

[216] See, for example, paragraphs 586 to 595 from pdf page 187 of the Movants' Statement of Claim (**R-48**); paragraphs 9.54 to 9.64 from pdf page 310 of the ACP's Statement of Defence (**R-3**); paragraphs 371-397 from pdf page 196 of the Statement of Reply (**R-57.1**); paragraphs 5.52 to 5.56 from pdf page 231 of the ACP's Rejoinder (**R-51**)

[217] See paragraphs 5.28 to 5.39 of Chapter IV from pdf page 217 of the ACP's Statement of Defence. (**R-3**)

[218] Partial Award at paragraph 1060. (**DKT No. 6-1**)

[219] See paragraph 74 of Chapter VI on pdf page 117 of the Movants' Statement of Reply. (**R-57.1**)

> 1.5     The other Tenderers perhaps each had different attitudes to risk.  For example, consider their very different financial proposals, with GUPC the lowest at USD 3.1 billion, BTM at USD 4.2 billion and CANAL at USD 5.98 billion.

188.     The Tribunal ultimately determined that it did "not accept that the Contract was concluded upon the 'fundamental datum' that the PLE Basalt be used as the primary source of concrete aggregates or that the Tenderers were led to believe that this was a 'fundamental datum' for the Project."[220] This was after a detailed analysis of the documents containing the alleged representations, and the plans of the various tenderers with respect to the PLE basalt.

### D.     The Cofferdam Final Award

189.     The Movants have also noted the Tribunal's reliance in places on the Cofferdam Final Award. The Movants have stated that the Tribunal "relied on large block quotes from the Cofferdam Arbitration majority award and imported the Cofferdam majority's approach for many of its conclusions, offering no additional analysis of its own."[221]

190.     The ACP argued throughout the Panama 1 Arbitration that the Cofferdam Final Award and the Advance Payments Award are final and binding and should have preclusive effect as to a variety of different issues, pursuant to the U.S. doctrine of collateral estoppel (issue preclusion) as well as the ICC Rules, general principles of international law, and the express language of the Contract. However, the Tribunal considered this argument and disagreed with the ACP's position, stating as follows:[222]

> 498.     For all of these reason, the Arbitral Tribunal finds that the doctrine of issue preclusion does not bind this Tribunal to the legal reasoning contained in the Cofferdam and Advance Payments Awards. It shall only be bound by the dispositive parts of those decisions.

> 499.     This being said, the Arbitral Tribunal further notes that the Cofferdam and Advance Payments arbitrations were heard by highly experienced and eminent international commercial arbitration experts and their legal findings certainly have some persuasive authority. This Arbitral Tribunal has determined the issues before it *de novo*, on the basis of the Parties' submissions in this case and not simply in reliance on the findings of any other tribunal. However, it should come as no surprise that the Arbitral Tribunal agrees with many of the legal findings of the Cofferdam (Majority) and Advance Payment tribunals, as will be clear from the Arbitral Tribunal's findings below.

---

[220] Partial Award at paragraph 1061. (**DKT No. 6-1**)
[221] Motion at paragraph 31.
[222] Partial Award at paragraph 498-99. (**DKT No. 6-1**)

191.    In other words, the Tribunal explained that (1) the doctrine of issue preclusion does not bind the Tribunal to the legal reasoning in the Cofferdam Final Award or the Advance Payment Award; (2) the Tribunal determined the issues before it *de novo*, on the basis of the Parties' submissions; and (3) the Tribunal agreed with many of the legal findings of the Cofferdam Majority.  Point (3) was hardly surprising given that the Tribunal were considering disputes under the very same Contract, between the very same Parties, subject to the same governing law.

192.    It is also important to note, however, that the Panama 1 Tribunal did <u>not</u> accept all of the findings of the Cofferdam Tribunal, and in fact stated its disagreement with certain findings. For example, as to the question of whether certain Panamanian laws were applicable to the ACP's own duties, the Tribunal made comment on the Cofferdam Final Award.[223] In addition, in respect of the contractual status of the Plates, the Tribunal reached a different conclusion to the Cofferdam Majority,[224] and even stated that it was not bound to follow that decision.[225]

### E.    The Tribunal's Findings with Respect to Concrete Mix Design

193.    The Tribunal's findings with respect to CMD are not even mentioned in the Motion. However, it appears from paragraphs 105 to 114 of Mr. Bouchardie's Declaration that the Movants take issue with two particular aspects of the Tribunal's reasoning on CMD in the Partial Award. I consider these below, although I do so without prejudice to the fact that these points have not even been mentioned in the Motion. Moreover, it is important to set these points in context. The Movants have tried to identify strands of the reasoning with which they disagree. But the Tribunal set out in detail the parties' positions (at paragraphs 1509 to 1605 of the Partial Award) and then spent 63 pages and 202 paragraphs considering the factual and expert evidence, the law and the parties' submissions. As I explain below, the matters highlighted by Mr. Bouchardie were all matters which were before the Tribunal, on which both parties had the opportunity to make (and did make) submissions, and on which the Tribunal ultimately found in favor of the ACP. Yet further, and again as I explain below, these points would not have affected the overall result in any event.

### 1.    Meeting of 16 February 2011

---

[223]  Partial Award at paragraphs 678-80. (**DKT No. 6-1**)
[224]  Partial Award at paragraph 1308. (**DKT No. 6-2**)
[225]  Partial Award at paragraphs 1287-1308. (**DKT No. 6-2**)

194.    In paragraphs 109 to 112 of Mr. Bouchardie's Declaration, he takes issue with particular parts of the Tribunal's reasoning in relation to a meeting which took place on 16 February 2011. However, regardless of the Tribunal's findings in relation to that meeting, it would still have reached the same overall conclusion in the Partial Award since it found *inter alia* that the Contractor was not ready to pour contractually-compliant SMC in February 2011.[226] As explained above, this was a key issue on CMD, and the Tribunal concluded that (at the time of the February 2011 Submittal) "in reality the Contractor was not ready to pour contractually-compliant Structural Marine Concrete."[227] Moreover, the Tribunal went on to hold that the situation did not change with the Contractor's March 2011 and May 2011 Submittals.[228] Again this was key given that the Contractor's claim was for an extension of time and prolongation costs: the Tribunal found that "the ACP cannot be held responsible for the ongoing delay in beginning SMC placement experienced by the Contractor during this period, which was in fact the result of the Contractor's own readiness (or lack thereof) to begin placement of contractually-compliant Structural Marine Concrete."[229] These findings of themselves dispose of the Contractor's claim.

195.    Turning then to paragraphs 109 to 112 of Mr. Bouchardie's Declaration, in paragraphs 109 and 110 the complaint which he makes is that the Tribunal allegedly did not address certain arguments which the Claimants made about what was said at the meeting on 16 February 2011. First, there was not actually any dispute between the parties as to what was said at the meeting,[230] and so no need to cross-examine Mr. Hillebrenner (who was in fact from CICP, and not the Contractor) on it. Secondly, the question of the characterization and effect of what was said at the meeting on 16 February 2011 was a matter on which the parties joined issue and on which they made extensive submissions.[231] The Tribunal did not, as it made clear in paragraph

---

[226] Partial Award at paragraph 1777. (**DKT No. 6-2**)
[227] Partial Award at paragraph 1777. (**DKT No. 6-2**)
[228] Partial Award at paragraph 1778. (**DKT No. 6-2**)
[229] Partial Award at paragraph 1778. (**DKT No. 6-2**)
[230] See for example paragraph 4.10 of Chapter V on pdf page 674 of the ACP's Rejoinder. (**R-51**)
[231] See for example paragraphs 1720 to 1727 on pdf page 537-539 of the Movants' Statement of Claim. (**R-48**); paragraphs 4.36 to 4.41 and 7.97 to 7.106 of Chapter VII from pdf page 681 of the ACP's Statement of Defense (**R-3**)); paragraphs 124-127 and 303-306 of Chapter VI from pdf page 354 of the Movants' Statement of Reply (**R-57.3**); paragraphs 4.9 to 4.19 of Chapter V from pdf page 674-677 of the ACP's Rejoinder (**R-51**); paragraphs 100 to 106 of Chapter V from pdf page 248 of the Movants' First Post-Hearing Brief (**R-67**); paragraphs

450 of the Partial Award, provide a summary of each and every argument raised by the Parties, but rather reproduced only what it viewed as the important and relevant arguments for its decision. That said, and thirdly, the Tribunal considered <u>in terms</u> the Claimants' argument "that by (i) prohibiting the start of SMC placement during the meeting held on 16 February 2011…the ACP was treating [the February 2011 Submittal] as if it had been submitted for approval in breach of Sub-Clause 5.2."[232] The Tribunal rejected that argument for the reasons which it gave at paragraphs 1763 *et seq.*. Those reasons include (at paragraphs 1764 and 1765), expressly, consideration of whether <u>the ACP</u> itself would have been entitled to say what Mr. Cazares said at the meeting on 16 February 2011.

196.    In paragraphs 111 and 112 of Mr. Bouchardie's Declaration, his argument is that the Tribunal, in interpreting the phrase "more than a letter", reached a conclusion "not based on the position taken by either Party." In fact, the Parties took positions on the question. As to the position taken by the Movants, I disagree with Mr. Bouchardie's assertion that the Movants "had stated this phrase to be a threat of termination of the Contract (as testified by Movants' Project Director at the time, Mr. Antonio Zaffaroni)." At least as I read it, that was neither what the Movants submitted in paragraph 105 of their Post-Hearing Brief nor what Mr. Zaffaroni's evidence was. Mr. Zaffaroni gave oral evidence about such an alleged threat in an alleged "private conversation" "at the level of the owner of the company" (<u>not</u> the meeting of 16 February 2011).[233] (Incidentally, he did not mention such alleged threat in either of his detailed witness statements; and the ACP flatly denied the allegation: this was all addressed in detail in the ACP's Post-Hearing Brief.)[234]

197.    As to the position taken by the ACP, the ACP set out its position in its slides for its closing presentation:[235] if the ACP had issued a letter of suspension, then (because the Contractor did not have a compliant CMD for the SMC which it was proposing to pour) the Contractor would not have been entitled to an extension of time or more money; if the Contractor had poured, then the ACP could have rejected the work (as not in accordance with the Contract,

---

25.179 to 25.187 from pdf page 293 of the ACP's Post-Hearing Brief **(R–49)**; and paragraphs 23.128 to 23.129 from pdf page 202 of the ACP's Reply Post-Hearing Brief. **(R–50)**

[232]  Partial Award at paragraph 1762. **(DKT No. 6-2)**

[233]  See Transcript of the Merits Hearing at Day 14, at page 92, lines 12-13 and page 97 line 20 to page 98 line 20. **(R–55)**

[234]  Paragraphs 25.186 to 25.187 on pdf pages 295-296 of the ACP's Post-Hearing Brief. **(R–49)**

[235]  See slides 73-74 in the ACP's CMD & Delay Closing Presentation. **(R–59)**

pursuant to Sub-Clause 7.5); and, if the ACP had issued a letter of suspension and the Contractor had gone ahead and poured in the teeth of that, "there would have been options open to the ACP going beyond the letter of suspension: including the withholding of payments pursuant to Sub-Clause 14.6 of the Contract." In paragraph 1765 of the Partial Award, the Tribunal held that "[b]y the language 'more than a letter [of suspension of the works]', Mr. Cazares was indicating both a suspension of the works and legal action would result should GUPC have decided to pour its concrete mixes. It is clear that the ACP <u>did</u> have the right to take such action, because under Sub-Clause 8.8.1 of the Conditions of Contract, the ACP had the right to suspend the works. It follows that ACP was entitled to suggest to GUPC that it would exercise that right, and of further consequences if GUPC poured non-compliant concrete." Thus, the Tribunal, in referring to "legal action" and "further consequences", was simply accepting the very submission which the ACP made to the Tribunal, namely that there would have been options to the ACP going beyond a letter of suspension, including the withholding of payments pursuant to Sub-Clause 14.6 of the Conditions of Contract. Indeed, as the ACP pointed out in closing,[236] the way in which the Movants put matters in <u>their own</u> Reply Post-Hearing Brief was telling. They said:[237] "GUPC was prevented from doing so under strong threats from the Employer's top management. As Mr. Zaffaroni explained, when faced with this situation, no reasonable Contractor can be expected to proceed in a multi-billion dollar project <u>knowing that it will not be paid for the Works</u>" [emphasis added]. Thus, the Movants' own case identified the key alleged threat as one of non-payment.

**2.    The 1,000 Coulomb Requirement in the Employer's Requirements**

198.    In paragraphs 113 to 114 of Mr. Bouchardie's Declaration, he takes issue with the Tribunal's interpretation of the Employer's Requirements in relation to one of the requirements with which the Final Design of the CMD had to comply (for shorthand: the 1,000 Coulomb requirement). However, and importantly, the Tribunal made clear that, even if the Movants' position on this question were correct, it would nevertheless have concluded that the CMD did not comply with the Contract. Thus, at paragraph 1774 of the Partial Award, the Tribunal found that "even if the Contractor's position were correct and it only had to demonstrate that its proposed concrete mixes would meet all of the requirements before the Locks would be put into service, the SIMCO report that was part of the February 2011 Submittal stated that the ASTM

---

[236] See slide 77 in the ACP's CMD & Delay Closing Presentation. **(R-59)**

[237] See paragraph 24 of Chapter V on pdf page 164 of the Movants' Second Post-Hearing Brief. **(R-20)**

C 1202 test results for mixes S1, S8 and S9 'do not respect the 1000 C requirement set forth in the project'."

199.    As to the proper interpretation of the Employer's Requirements in relation to the 1,000 Coulomb requirement, that was a matter on which the Tribunal heard expert evidence and detailed submissions.[238] The Tribunal preferred the meaning for which the ACP contended (and preferred the evidence of the ACP's experts on this issue to that of the Movants' experts). Moreover, it is telling that, as the Tribunal found, Mr. Hillebrenner (who was the Deputy Design Manager for CICP, the Designer of Record for the CMD submittals) agreed that the February 2011 Submittal did not show compliance with the Employer's Requirements;[239] and, again as the Tribunal found, that the evidence suggested that the Contractor itself (at the time) "also understood that the 1000 Coulombs requirement needed to be met at the design submittal stage and not at some later date."[240]

200.    One strand of the reasoning in reaching that conclusion, with which paragraph 114 of Mr. Bouchardie's Declaration takes issue, was whether the testing requirement was one which could reasonably be understood as a requirement that the Contractor would carry out long after pouring tons of concrete, in light of the risk of non-compliant concrete having been poured.

201.    On this, I make clear that I disagree with Mr. Bouchardie's characterization of the expert evidence to which he refers in paragraph 114 of his Declaration. In particular, the argument that the extrapolation for which the Contractor contended is done on large projects all over the world was simply not borne out by the evidence. To the contrary, it was the ACP's submission in its Post-Hearing Briefs and oral closing submissions that it was a striking feature of the case that "[t]here is, before this Tribunal, which has heard from seven concrete experts, not a single example of an industry standard or a standard specification (or, indeed, even a single project) in which a distinction is drawn between a testing age for ASTM C 1202 tests and a time for compliance for ASTM C 1202 tests, and in which extrapolation is to be carried out from the former to the latter at the stage of the submittal of the final mix design."[241]

---

[238]   See for example paragraphs 25.90 to 25.136 from the pdf page 271 of the ACP's Post-Hearing Brief **(R-49)** and paragraphs 23.31 to 23.58 from pdf page 181 of the ACP's Reply Post-Hearing Brief (and the evidence referred to therein). **(R-50)**

[239]   See paragraph 1775 of the Partial Award. **(DKT No. 6-2)**

[240]   See paragraph 1747 of the Partial Award. **(DKT No. 6-2)**

[241]   See paragraph 23.56 on pdf page 186 of the ACP's Reply Post-Hearing Brief **(R-50)**. See also paragraphs 25.114 to 25.116 from pdf page 276 of the ACP's Post-Hearing Brief **(R-49)**; paragraphs 23.54 to 23.58 from pdf page 185 of the ACP's Reply Post-Hearing Brief **(R-50)**;

202.     More generally, the very question of industry practice on this was firmly before the Tribunal. The Tribunal had evidence from the ACP's experts that the extrapolation for which the Contractor contended was not industry practice. For example, it was the evidence of Prof. Hooton (one of the ACP's experts) that "[t]he fact that extrapolation is not 'standard practice' at the submittal stage is demonstrated by the fact that the main codes and standards for the US and Canada and the European Code EN206-1 2000 Part 1…do not mention the use of extrapolation for the acceptance of concrete mixes based on the extrapolation of early-age test results for ASTM C1202…"[242] Mr. McCall (the ACP's second concrete expert) was of the same opinion that such extrapolation "is not an industry practice nor is it permitted under any standards."[243] So there is no question of the Tribunal following "its own notion of industry practice", as alleged by Mr. Bouchardie.

## VII.   DOCUMENTATION

203.     Attached to this Declaration are true and correct copies of the documents referenced. In addition, the exhibits described below are attached to the ACP's Response to the Motion to Vacate Partial Award and Incorporated Memorandum of Law, and/or the ACP Cross-Motion to Confirm and Enforce Partial Arbitration Award and Supporting Memorandum of Law.

(a)     Exhibit **DKT Nos. 6-1 and 6-2** is a true and correct copy of the Partial Award in the Panama 1 Arbitration, dated September 21, 2020.

(b)     Exhibit **R-21** is a true and correct copy of the Parties' Joint Quantum Summary submitted to the Panama 1 Tribunal on November 12, 2020.

(c)     Exhibit **R-62** is a true and correct copy of the Terms of Reference in the Panama 1 Arbitration, dated July 7, 2016.

(d)     Exhibit **R-68** is a true and correct copy of the Addendum to the Partial Award in the Panama 1 Arbitration, dated December 22, 2020.

---

slide 41 in the ACP's CMD & Delay Closing Presentation **(R-59)**; and Transcript of the Closing Hearing, Day 21, page 273 line 9 to page 274 line. **(R-56)**

[242] See paragraph 28 (and also paragraphs 21-22) of the Second Expert Report of Prof. Hooton. **(R-66)**

[243] See paragraph 35 of the First Expert Report of Mr. McCall **(R-63).** See also paragraphs 46 and 47 on pdf page 13 of the Second Expert Report of Mr. McCall **(R-64)**; and slide 16 in the Expert Presentation of Mr. McCall. **(R-65)**

(e)     Exhibit **R-69** is a true and correct copy of the Conditions of Contract for the Design and Construction of the Third Set of Locks, dated August 11, 2009.

(f)     Exhibit **R-70** is a true and correct copy of Joint and Several Guarantee in Respect of the Third Set of Locks Project, dated May 31, 2020.

(g)     Exhibit **R-71** is a true and correct copy of the Guarantor Arbitration Agreement, dated August 1, 2014.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 8th day of February, 2021, in London, United Kingdom.

_____

Nicholas Henchie