United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Grupo Unidos por el Canal, S.A. and others, Movants, | ) ) ) | |
| v. | ) ) | Civil Action No. 20-24867-Civ-Scola |
| Autoridad del Canal de Panama, Respondent. | ) ) ) | |

## Amended Order

This matter is before the Court on the Respondent's unopposed motion to correct the Court's order dated November 18, 2021. (ECF No. 73.) For good cause shown, the Court **grants** the motion (**ECF No. 73**) and corrects certain references to the Respondent's name as follows.

The Movants—a consortium that contracted with the Respondent in connection with construction work at the Panama Canal—move to vacate two arbitration awards (a partial and a final award), the last of which was issued on February 22, 2021. (ECF No. 55.) The Respondent ("ACP"), a Panamanian governmental agency tasked with the operation and management of the Panama Canal, also filed a motion to confirm the arbitration awards at issue. (ECF No. 58.) The parties fully briefed the motions (ECF Nos. 57, 61, 62, 67.) After thorough review of the record, the parties' briefing, and the relevant legal authorities, the Court **grants** ACP's motion to confirm (**ECF No. 58**) and **denies** the Movants' motion to vacate (**ECF No. 55**).

### 1. Background

Of the Panama Canal, Theodore Roosevelt said at the time of its construction, "No single great material work which remains to be undertaken on this continent is as of such consequence to the American people." Over fifty miles long and completed over 100 years ago, the Panama Canal changed the nature of trade in the Western Hemisphere. And as with any piece of infrastructure, great or small, work continues today.

This case concerns a multi-billion-dollar contract entered between the parties for the design and build of two new sets of locks and related approach channels on both the Pacific and Atlantic ends of the Canal. (*Id.*; ECF No. 57-1 at ¶ 8.) While this project appears to have been a massive undertaking with many different components, the Court will briefly summarize the relevant background to the Contract and the work performed.

In 2007, four consortia tendered bids in response to a request for proposal ("RFP") concerning the design and build of the Locks. (ECF No. 57-1 at ¶ 13.) In 2009, the Movants' bid, priced at approximately $3.22 billion, was awarded the Contract. (*Id.*; ECF No. 55-3 at ¶ 3.) Relevant here, another entity, Consorcio C.A.N.A.L., also tendered a bid, although its bid was higher than the Movants' offer. (ECF No. 57-1 at ¶ 13.)

Work began in 2009, and pursuant to the Contract, the Movants were to complete construction by October 2014. (*Id.* at ¶ 12.) However, the construction was delayed by over twenty months. (*Id.*)

Relevant to this case, the Contract required a lot of concrete—several million cubic meters of it. (*Id.* at ¶ 19.) The contractor (the Movants) was responsible for procuring the "aggregate" (a mix of geological materials), which would then be used to produce the concrete. (*Id.*) In addition, the contractor was required to blast and excavate material on the Pacific-side of the Canal to build the lock structures—this was called the Pacific Locks Excavation ("PLE"). (*Id.* at ¶ 20.) As a general matter, the material (basalt rock) that was excavated from the PLE could serve as aggregate material to be used to produce the necessary concrete. (*Id.*)

Perhaps inevitably, disputes arose. In total, there have been at least seven arbitrations, spanning continents and near-decades, between the parties in connection with this project. (*Id.* at ¶ 23.) Next, the Court will walk through those arbitrations that are relevant to this matter and the underlying disclosure challenges at issue.

### A. The Underlying Arbitrations

***Cofferdam Arbitration***: The first arbitration, filed in 2013, was the "Cofferdam Arbitration"—named because it concerned work related to a cofferdam (a temporary enclosure that serves as a watertight barrier between a dry working environment and a surrounding body of water) that was to be constructed at the Pacific-side entrance to the Canal. (*Id.* at ¶ 25.) A panel of three arbitrators (Professor Cremades, Professor Hanotiau, and Dr. Gaitskell) issued a final award in 2017 (the "Cofferdam Award"), dismissing the Movants' claims and ordering the Movants to pay certain legal costs.[1] (*Id.* at ¶ 26.)

***Panama 1 Arbitration***: What the parties refer to as the Panama 1 Arbitration began in 2015 and concerned work relating to the excavation of PLE basalt and the use of that basalt as concrete aggregate. (*Id.* at ¶ 27; ECF No. 55-3 at ¶ 11.) The Movants nominated Mr. von Wobeser as co-arbitrator,

---

[1] In 2018, this Court denied the Movants' motion to vacate the Cofferdam Award and confirmed the Award. (ECF No. 57-3.)

and ACP nominated Dr. Gaitskell. (ECF No. 57-1 at ¶ 27) One year later, the International Court of Arbitration confirmed Mr. Gunter as president, and those three members constituted the Tribunal. (*Id.*) When accepting the nomination, Dr. Gaitskell disclosed that he had been appointed to the Cofferdam Arbitration. (ECF No. 57-1 at ¶ 28; ECF Nos. 55-12, 55-15.) Mr. Gunter did not disclose any facts, stating that he was not aware of any facts that could "call into question my independence" or otherwise "give rise to reasonable doubts as to my impartiality." (ECF Nos. 55-17, 55-18.) Mr. von Wobeser disclosed that there were no facts that could call his independence into question, although he noted that he had a general "professional relationship with both law firms." (ECF Nos. 55-13, 55-14.)

*Panama 2 Arbitration*: What the parties refer to as the Panama 2 Arbitration was first initiated in late 2016 for claims relating to a series of alleged delays and disruptions regarding concrete and earthwork. (ECF No. 55-3 at ¶ 20; ECF No. 57-1 at ¶ 31.) The Tribunal in the Panama 2 Arbitration was composed of the same members as the Tribunal in the Panama 1 Arbitration. (ECF No. 57-1 at ¶ 31.) Again, Dr. Gaitskell disclosed that he had been appointed to the Cofferdam Arbitration as well as the Panama 1 Arbitration. (*Id.* at ¶ 32.) Mr. Gunter and Mr. von Wobeser also disclosed that they had been appointed to the Panama 1 Arbitration. (*Id.*)

### B. The Panama 1 Arbitration Awards

After five years of proceedings, in September 2020, the Tribunal issued a Partial Award, and in February 2021, the Tribunal issued the Final Award (collectively, the "Awards"). (ECF No. 55-3 at ¶¶ 18–19.) The Tribunal ordered that the Movants reimburse ACP approximately $238 million. (ECF No. 57-1 at ¶ 53.) Relevant to the Movants' arguments in this matter, while the Tribunal had found that the Cofferdam Award was not to be binding, the Tribunal referenced the Cofferdam Award over 100 times. (ECF No. 55-3 at ¶ 27.)

### C. The ICC Court Challenge

Dissatisfied with the outcome of the Partial Award, the Movants first grew concerned with the Tribunal's disclosures in the Panama 1 and 2 Arbitrations in October 2020. (*Id.* at ¶ 27.) Articles 11(2) and 11(3) of the International Chamber of Commerce ("ICC") arbitration rules impose a continuing obligation on arbitrators to disclose "any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties, as well as any circumstances that

could give rise to reasonable doubts as to the arbitrator's impartiality." *See* ICC Rules, art. 11(2), 11(3).

On October 15, 2020, the Movants requested that each member of the Tribunal update their disclosures. (*Id.* at ¶ 65; ECF No. 55-3 at ¶ 30.) In late October 2020 and early November 2020, members of the Tribunals made the following disclosures for the first time:

- Mr. Gunter was appointed, in part, by Dr. Gaitskell in an ongoing, unrelated arbitration;
- During the Panama 1 and 2 Arbitrations, Mr. Gunter sat on a tribunal in an unrelated arbitration with Professor Hanotiau;
- Dr. Gaitskell did not extend his disclosures to potential conflicts within his barristers' chambers.

(ECF No. 55-3 at ¶¶ 33–34, 38–39.)

On October 28, 2020, the Movants submitted a challenge to the ICC Court against all three members of the Tribunal based on their alleged failure to make timely and appropriate disclosures. (*Id.* at ¶ 36.) In mid-December 2020, the ICC Court rejected the Movants' challenge. (*Id.* at ¶ 47; ECF No. 55-62.)

## 2. Legal Standard

Under the New York Convention, as codified by the Federal Arbitration Act ("FAA"), an international arbitration award must be confirmed unless one of the defenses set forth in Article V of the Convention applies. *See Cvoro v. Carnival Corp.*, 941 F.3d 487, 495 (11th Cir. 2019) ("[A] district court must confirm the arbitral award unless a party successfully asserts one of the seven defenses against enforcement of the award enumerated in Article V of the New York Convention.") (cleaned up); *see also* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."). Review of a foreign arbitration award is "quite circumscribed," and "there is a general pro-enforcement bias manifested in the Convention." *See Productos Roche S.A. v. Iutum Servs. Corp.*, No. 20-20059-Civ, 2020 WL 1821385, at *2 (S.D. Fla. Apr. 10, 2020) (Scola, J.) (quoting *Four Seasons Hotel & Resorts B.V. v. Consorcio Barr, S.A.*, 613 F. Supp. 2d 1362, 1366–67 (S.D. Fla. 2009)). The pro-enforcement bias of the Convention parallels that of the FAA. *See Gianelli Money Purchase Plan and Trust v. ADM Inv. Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998) ("[T]he FAA presumes that arbitration awards will be confirmed."); *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 842 (11th Cir. 2011) (holding that the FAA "imposes a heavy presumption in favor of confirming awards"). For this reason, judicial review of arbitration awards is

"among the narrowest known to the law." *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (internal quotations omitted).

The Movants rely on two grounds to challenge the Awards. First, Articles V(1)(b) and V(1)(d), which provide a defense to enforcement where a party was "unable to present [its] case" and where the arbitral panel or procedure were "not in accordance with the agreement of the parties," respectively. *See Four Seasons Hotel*, 613 F. Supp. 2d at 1369. Article V(1)(b) provides parties with a hearing that meets the "minimal requirements of fairness." *Productos Roche*, 2020 WL 1821385, at *3. It does not guarantee parties to an arbitration the "complete set of procedural rights" that would otherwise be guaranteed in a federal court. *See id.*; *cf. Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir. 1983) (noting the tradeoffs inherent in choosing arbitration as a method of dispute resolution).

Second, Article V(2)(b), which provides that confirmation of an award "may . . . be refused if . . . recognition or enforcement of the award would be contrary to the public policy" of the country where enforcement is sought. *See Cvoro*, 941 F.3d at 495 (citing New York Convention, art. V(2)(b)). This is a "very narrow" defense, which only applies to explicit public policies that are "well-defined and dominant" and ascertainable by "reference to the laws and legal precedents and not from general considerations of supposed public interests." *See id.* at 496. Moreover, the public-policy defense only applies if confirmation would "violate the forum state's most basic notions of morality and justice." *See id.*

### 3. Analysis

The gravamen of the Movants' challenge is that all three members of the Tribunal failed to properly disclose various facts—facts that the Movants contend would lead a reasonable person to question each of the arbitrators' impartiality. (ECF No. 55 at 8.) But at issue is not necessarily whether the arbitrators had a duty to disclose or whether they should have, but did not, disclose certain information. Rather, at issue is whether the arbitrators' failure to disclose certain facts constitutes a ground for vacatur provided under the Convention. (*See* Expert Report of Gary B. Born, ECF No. 57-92 at 58.) In particular, the Movants seek to vacate the Awards under the public-policy defense of Article V(2)(b), as well as under the procedural defenses contained in Articles V(1)(b) and V(1)(d). ACP seeks to confirm the Awards under 9 U.S.C. § 207. The Court will address each argument in turn.

### A. Evident Partiality

As an initial matter, the Court holds that maintaining the partiality of arbitrators, as expressed in 9 U.S.C. § 10(a)(2), is a "well-defined" and "dominant" public policy within the United States that is capable of determination by reference to law. *See Cvoro*, 941 F.3d at 495; *see also Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147 (1968) (recognizing that Congress sought "to provide not merely for any arbitration but for an impartial one"). Therefore, maintaining the evident partiality of arbitrators is a cognizable public policy within the meaning of Article V(2)(b).

As eliminating evident partiality in arbitration is a well-defined and dominant public policy, the Court must determine (1) whether the Movants have established a *prima facie* case of a violation of that public policy and (2) if so, whether confirmation of the award would "violate the forum state's most basic notions of morality and justice." *See Cvoro*, 941 F.3d at 495; *cf. Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 433 (11th Cir. 1995) ("[T]he mere appearance of bias or partiality is not enough to set aside an arbitration award."). Partiality, as used in the FAA, means "bias in favor of or against a party." *Aviles v. Charles Schwab & Co., Inc.*, 435 F. App'x 824, 829 (11th Cir. 2011). An arbitration award may be vacated due to evident partiality where "(1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1339 (11th Cir. 2002).

The Movants make no allegation of an "actual conflict," and therefore the Movants must proceed by showing that "the arbitrator [knew] of, but fail[ed] to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *See id.* When challenging the partiality of the arbitration panel under the second prong of the *Univ. Commons* test, the moving party must establish facts permitting a reasonable person to believe that there existed a potential—not actual—bias in favor of a party that was "direct, definite and capable of demonstration rather than remote, uncertain, and speculative." *See Gianelli*, 146 F.3d at 1312 (internal quotations and citations omitted). Moreover, courts largely find that an arbitrator's failure to disclose a relationship only warrants vacatur where it was a substantial or close personal relationship to a party or counsel. *See Fed. Vending, Inc. v. Steak & Ale of Fla., Inc.*, 71 F. Supp. 2d 1245, 1250 (S.D. Fla. 1999) (Hurley, J.) (holding that "failure to disclose substantial business dealings, and close social or familial relationships with one of the parties will justify setting aside an award").

### 1. Pierre-Yves Gunter

The Movants point to the following facts as *prima facie* evidence of Mr. Gunter's evident partiality:

- In 2019, Mr. Gunter was confirmed as president of an unrelated ICC case. (ECF No. 55 at 11; ECF No. 55-3 at ¶ 53.) Mr. Gunter had been nominated and appointed to that position by Dr. Gaitskell and the other co-arbitrator in the unrelated matter. (*Id.*)
- In 2013, 2016, and 2017, Mr. Gunter sat as co-arbitrator in three unrelated arbitrations with Professor Hanotiau, who had been the president of the Cofferdam Tribunal. (ECF No. 55 at 12–13; ECF No. 55-3 at ¶ 55.)

The Court will address these bases in turn.

*First*, the Movants refer to Mr. Gunter's appointment by Dr. Gaitskell as the "most egregious" example of evident partiality. (ECF No. 55 at 10.) The Movants posit that there may or may not have been a "quid pro quo," but that in any event, Mr. Gunter received a "lucrative" appointment that may have "influenced" him, "consciously or subconsciously," in favor of Dr. Gaitskell. (*Id.* at 10–12.)

The question before the Court is whether Mr. Gunter's appointment, in part due to Mr. Gaitskell, in an unrelated arbitration would lead a "reasonable person to believe that a potential conflict exists." *See Univ. Commons*, 304 F.3d at 1339. The Court holds that this standard is not met. Rather, while the Movants call this the "most egregious" example of evident partiality, it is an exemplar of an accusation that is "remote, uncertain, and speculative." *See Gianelli*, 146 F.3d at 1312. The fact that Mr. Gunter was appointed by Mr. Gaitskell and a second arbitrator, Mr. Perry, in an unrelated arbitration is likely a testament to Mr. Gunter's experience and expertise. *See Commonwealth Coatings*, 393 U.S. at 150 (White, J. concurring) ("It is often because [arbitrators] are men [or women] of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function."); *Scott v. Prudential Secs., Inc.*, 141 F.3d 1007, 1016 (11th Cir. 1998) ("The courts have repeatedly explained, however, that an arbitrator's experience in an industry, far from requiring a finding of partiality, is one of the factors that can make arbitration a superior means of resolving disputes."), *abrogated on different grounds Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008). Indeed, that was Mr. Gunter's stated belief for why he was selected by two of his peers to serve as an arbitrator in the unrelated arbitration. (*See* ECF No. 55-46 at 5 ("I was appointed by my two co-arbitrators, Dr. Robert Gaitskell and Mr. James C.

Perry, who were looking according to my recollection for a President who had experience with construction arbitration cases.").

Arbitrators are appointed every day, and oftentimes the same arbitrators, particularly in matters concerning subjects that are highly specialized, will sit together. *See Leatherby Ins.*, 714 F.2d at 679 ("Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it.") (quoting *Andros Co. Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 701 (2d Cir. 1978)). The mere fact that arbitrators may sit together on other panels and may have an opportunity to discuss matters, outside the presence of another member of another arbitration panel, does not constitute a "direct, definite and capable of demonstration" allegation of partiality. *See Gianelli*, 146 F.3d at 1312. The ICC agreed, holding that "[t]he mere theoretical opportunity to discuss the matter without the third arbitrator . . . cannot qualify as a reasonable doubt as to Mr. Gunter's independence or impartiality." (ECF No. 55-62 at 9.) Moreover, the Movants do not clearly assert that this late disclosure would lead a reasonable person to believe that there existed possible partiality *in favor of* any party. Rather, it seems that the Movants rely on an unfounded train of speculation that: because Mr. Gunter was well paid in the unrelated arbitration, and because Dr. Gaitskell was also on the panel in the unrelated arbitration, and because Dr. Gaitskell was nominated in the Panama 1 Arbitration by ACP, therefore a reasonable person would conclude that Mr. Gunter was biased in favor of ACP. Such a position depends on multiple speculative assumptions, each assuming the worst in Mr. Gunter's and Dr. Gaitskell's character. No reasonable person would follow the Movants down this conspiratorial web. For these reasons, this allegation does not equal a *prima facie* showing of evident partiality.

**Second**, the Court similarly holds that Mr. Gunter's service with Professor Hanotiau in a handful of unrelated arbitrations does not constitute evident partiality. The only basis that the Movants identify to tie any potential bias to these facts is that Professor Hanotiau authored the Cofferdam Award, issued in 2017. (ECF No. 55 at 13.) The Movants' theory appears to be that Mr. Gunter was unduly influenced in a manner that compelled him to impartially defer to the Cofferdam Award, which the Movants believe was substantively "wrong." (*Id.* at 13, 34.) To the extent that the Movants argue that the Cofferdam Award was substantively wrong and that the Awards are substantively wrong given the extensive citations to the Cofferdam Award, the Court will disregard such arguments. Review of an arbitration award is extremely limited, and the Court will not consider the Movants' gestures to the merits of the Tribunal's citations to the Cofferdam Award. *See generally Cat*

*Charter*, 646 F.3d at 842 (holding that an arbitration award need only provide a "mention of expressions or statements offered as a justification").

As the Court will not adopt the Movants' implicit argument that the Cofferdam Award was wrong, there is nothing more than speculation to the Movants' arguments. As discussed above, arbitrators will often overlap in unrelated cases—the fact that Mr. Gunter and Professor Hanotiau appeared in three unrelated arbitrations is unremarkable and does not raise the appearance of a "direct, definite and capable of demonstration" allegation of partiality. *See Gianelli*, 146 F.3d at 1312. Moreover, it is not clear where the alleged partiality lies. Partiality means a bias in favor of a party, *see Aviles*, 435 F. App'x at 829; at most, the Movants argue that Mr. Gunter's and Professor Hanotiau's co-service presented the "opportunity" to discuss the case. (ECF No. 55 at 22.) Having the opportunity to discuss a case is not the same as having a possible bias in favor of a party.[2]

In total, the Movants have not shown a "direct, definite and capable of demonstration" allegation of partiality as to Mr. Gunter that warrants vacatur of the award. *See Gianelli*, 146 F.3d at 1312. Nonetheless, for the avoidance of doubt, even if the Movants made a showing of a non-speculative impression of possible bias that could lead "a reasonable person to believe that a potential conflict exists," *see Univ. Commons*, 304 F.3d at 1339, the Court holds that confirmation of the award would not "violate the forum state's most basic notions of morality and justice." *See Cvoro*, 941 F.3d at 495. The allegations of possible bias are so weak here that, even if a reasonable person could believe that a potential conflict exists, confirmation of the award would not violate the "most basic notions of morality and justice." *See id.*

### 2. *Dr. Robert Gaitskell*

The Movants point to the following facts as *prima facie* evidence of Dr. Gaitskell's evident partiality:

- In 2019, Dr. Gaitskell, with another co-arbitrator, appointed Mr. Gunter as president of an unrelated ICC arbitration. (ECF No. 55 at 14.)
- Dr. Gaitskell refused to investigate any potential conflicts of interest that may exist with respect to his barristers' chambers, Keating Chambers. (*Id.*)

---

[2] Furthermore, Professor Hanotiau was confirmed to the Cofferdam Arbitration by the ICC; he was not appointed by a party. (ECF No. 57-1 at ¶ 25.) Therefore, the Movants cannot conjecture, as they appear to regarding Dr. Gaitskell, that Mr. Gunter's opportunity to discuss the case with Professor Hanotiau must have led to discussions in favor of the Respondent by virtue of his appointment alone.

- Dr. Gaitskell was appointed to sit in an unrelated arbitration by one of the Respondent's counsel (Mr. McMullen) during the Panama 1 Arbitration. (*Id.* at 14–15.)

***First***, the Court holds that Dr. Gaitskell's failure to disclose his role in the appointment of Mr. Gunter as president in an unrelated arbitration does not warrant vacatur for the reasons set out above. ***Second***, the Eleventh Circuit "has clearly stated that arbitrators don't have a duty to investigate potential conflicts." *See Mendel v. Morgan Keegan & Co., Inc.*, 654 F. App'x 1001, 1005 (11th Cir. 2016). Therefore, while the parties argue about whether an arbitrator can, let alone should, investigate potential conflicts in British barristers' chambers, the Court holds that Dr. Gaitskell's refusal to investigate conflicts within Keating Chambers does not provide a basis to vacate the Awards. In any event, due to the nature and structure of barristers' chambers, the Court holds that Dr. Gaitskell's failure to investigate Keating Chambers for potential conflicts does not constitute evident partiality or provide a basis for vacatur.

***Third***, the appearance of one of the Respondent's attorneys, on behalf of an unrelated client in an unrelated arbitration, before Dr. Gaitskell also does not provide a basis to vacate the award. Similar to the principles discussed above, "the reoccurrence of appearing before arbitrators . . . does not, by itself create an appearance of bias[.]" *Boll v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 04-80031-CIV, 2004 WL 5589731, at *8 (S.D. Fla. June 28, 2004) (Johnson, M.J.). While the Movants assert that the circumstances here create an impression of bias, the Court holds that the Movants have not established a "direct, definite and capable of demonstration" allegation of evident partiality. *See Gianelli*, 146 F.3d at 1312. The fact that Mr. McMullan, counsel for the Respondents, played some role in appointing Dr. Gaitskell to an unrelated arbitration panel during the Panama 1 Arbitration is, of itself, unremarkable and would not lead a reasonable person to conclude that there was a potential, non-speculative bias.

In total, the Movants have not shown a "direct, definite and capable of demonstration" allegation of partiality as to Dr. Gaitskell that warrants vacatur of the award. *See Gianelli*, 146 F.3d at 1312. Nonetheless, for the avoidance of doubt, even if the Movants made a showing of a non-speculative impression of possible bias that could lead "a reasonable person to believe that a potential conflict exists," *see Univ. Commons*, 304 F.3d at 1339, the Court holds that confirmation of the award would not "violate the forum state's most basic notions of morality and justice." *See Cvoro*, 941 F.3d at 495. As above, the allegations of possible bias are so weak that, even if a reasonable person could

believe that a potential conflict exists, confirmation of the award would not violate the "most basic notions of morality and justice." *See id.*

### 3. Claus von Wobeser

The Movants point to the following facts as *prima facie* evidence of Mr. von Wobeser's evident partiality:

- The evident partiality of Mr. Gunter and Dr. Gaitskell "taint the work" of Mr. von Wobeser, as Mr. Gunter and Dr. Gaitskell had the opportunity to discuss the arbitration without Mr. von Wobeser's input. (ECF No. 55 at 15.)
- Mr. von Wobeser failed to disclose that, beginning in July 2019, one of the Respondent's attorneys (Mr. Jana) sat with Mr. von Wobeser as co-arbitrators in an unrelated arbitration. (*Id.*)

***First***, as the Movants' challenges to Mr. Gunter and Dr. Gaitskell fail, the Movants' contention that Mr. von Wobeser was tainted also fails. ***Second***, the Court holds that Mr. von Wobeser's service with one of the Respondent's attorneys as co-arbitrators in an unrelated arbitration does not permit a reasonable person to believe that a potential conflict exists. The reasons mirror the principles above.

As discussed above, it is axiomatic that arbitrators are selected because of their expertise and experience. *See Scott*, 141 F.3d at 1016; *see also Morelite Const. Corp. v. New York City Distrib. Council Carpenters Benefit Fund*, 748 F.2d 79, 83 (2d Cir. 1984) ("[P]arties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute."). Therefore, it is unremarkable that arbitrators and attorneys would overlap. Given the inherent oscillations among arbitrators and practitioners in arbitration, courts require a "substantial relationship between the arbitrator and a party" to establish evident partiality. *See Austin S. I, Ltd. v. Barton-Malow Co.*, 799 F. Supp. 1135, 1142 (M.D. Fla. 1992); *Antietam Indus., Inc. v. Morgan Keegan & Co., Inc.*, No. 6:12-cv-1250, 2013 WL 1213059, at *5 (M.D. Fla. Mar. 25, 2013) (holding that parties must show an undisclosed "relationship[] that the arbitrator had with a party or a party's counsel, family, or others" to establish evident partiality); *see also Fed. Vending*, 71 F. Supp. 2d at 1250 (holding that "failure to disclose substantial business dealings, and close social or familial relationships with one of the parties will justify setting aside an award").

Courts have held that situations where an arbitrator and attorney served as co-counsel in an unrelated arbitration could constitute evident partiality. *See Univ. Commons*, 304 F.3d at 1340 ("Whether [the arbitrator] acts as co-

counsel or opposing counsel in a mediation, litigation or other arbitration, the arbitrator could seem biased[.]"). However, despite the Movants' arguments, the Court holds that *Univ. Commons* is inapplicable to this case. Rather, here, the arbitrator (Mr. von Wobeser) served as a co-arbitrator, not co-counsel or opposing counsel, with one of Respondent's attorneys (Mr. Jana) in an unrelated arbitration. (ECF No. 55 at 20.) Unlike in *Univ. Commons*, Mr. von Wobeser and Mr. Jana did not share a duty to a client, nor did Mr. von Wobeser share an identifiable bias with Mr. Jana or otherwise stand to gain anything from any relationship with Mr. Jana. *Compare Univ. Commons*, 304 F.3d at 1340 (holding that where an arbitrator also serves as co-counsel in another matter to an attorney before her, a "ruling in the arbitration could be seen as a way to curry favor in the other matter"). The Movants point to no tangible or identifiable "favor" that Mr. von Wobeser could be swayed to "curry" from Mr. Jana while the two of them served together on a separate, unrelated arbitration panel.[3]

For these reasons, the Movants' challenges to Mr. von Wobeser fail. But, as above, the Court holds that, for the avoidance of doubt, even if the Movants made a showing of a non-speculative impression of possible bias that could lead "a reasonable person to believe that a potential conflict exists," *see Univ. Commons*, 304 F.3d at 1339, confirmation of the award would not "violate the forum state's most basic notions of morality and justice." *See Cvoro*, 941 F.3d at 495. As with Mr. Gunter and Dr. Gaitskell, the allegations of possible bias as to Mr. von Wobeser are so weak that, even if a reasonable person could believe that a potential conflict exists, confirmation of the award would not violate the "most basic notions of morality and justice." *See id.*

### B. The Awards

The Movants next contend that the evident partiality of the Tribunal "manifested itself" through the Partial and Final Awards. (ECF No. 55 at 23.) Rhetoric aside, the crux of the Movants' arguments is that the Awards violate Articles V(1)(b) and V(1)(d). In particular, the Movants argue that the substance of the Awards violate the Convention's guarantees that parties will have an arbitration that accords with their agreement and that all parties will have the opportunity to present their case. The Court will address each argument.

---

[3] In their reply brief and their opposition to the motion to confirm, the Movants also identify an alleged conflict where Dr. Gaitskell chaired an unrelated arbitration in which another one of ACP's counsel also sat as an arbitrator. (ECF No. 61 at 6; ECF No. 62 at 10.) This occurred years before the Panama 1 Arbitration. (*Id.*) However, courts do not consider arguments raised for the first time in a reply brief. *See Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003). In any event, this challenge fails for the same reasons that the challenge to Mr. von Wobeser fails.

### 1. Paragraph 1.07.D.1

The Movants first argue that the Tribunal improperly interpreted paragraph 1.07.D.1 of section 01 50 00 of the Employer's Requirements, which are part of the Contract and set out requirements relating to the design and construction of the Locks. (ECF No. 55 at 25; ECF No. 55-3 at ¶ 82.) In particular, the Movants argue that the Tribunal ignored the "plain meaning" of the Contract and interpreted this provision in a manner that was not presented by the parties. (ECF No. 55 at 25–26.)

As discussed above, Article V(1)(b) provides parties with a hearing that meets the "minimal requirements of fairness." *Productos Roche*, 2020 WL 1821385, at *3. It does not guarantee parties to an arbitration the "complete set of procedural rights" that would otherwise be guaranteed in a federal court. *See id.* And as courts have long recognized, "[f]ederal courts do not superintend arbitral proceedings. Our review is restricted to determining whether the procedure was fundamentally unfair." *Hispasat, S.A. v. Bantel Telecom, LLC*, No. 17-20534, 2017 WL 8896241, at *4 (S.D. Fla. Aug. 2, 2017) (Torres, M.J.) (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1999)).

The Movants invite the Court to nitpick the Tribunal's opinion and decipher whether every holding was based on some argument by the parties over the five-year arbitration. However, the Court will not dive into the substantive merit of the Awards or determine whether the Tribunal correctly interpreted paragraph 1.07.D.1. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 572–73 (2013) ("So long as the arbitrator was arguably construing the contract . . . a court may not correct [the arbitrator's] mistake . . . however good, bad, or ugly."). Rather, the Court's review is limited to whether the Movants had an adequate opportunity to present its case regarding the interpretation of paragraph 1.07.D.1 and whether the Tribunal acted in accordance with the parties' arbitration agreement.

The Court holds that the Movants had an adequate opportunity to be heard and that the Tribunal's interpretation of paragraph 1.07.D.1 was in accordance with the parties' arbitration agreement. The Movants point to paragraph 931 of the Partial Award as evidence of the Tribunal's adoption of an interpretation of paragraph 1.07.D.1 that was not presented by the parties. (ECF No. 55 at 26.) However, the parties had ample opportunity to brief and argue the meaning and interpretation of paragraph 1.07.D.1. (*See, e.g.*, ECF No. 55-22 at 7, 46–47 ECF No. 57-19 at 97–100.) The Tribunal adopted the Movants' argument to interpret the "literal reading" of paragraph 1.07.D.1—the Movants merely disagree with what the Tribunal found the literal meaning of the paragraph to be. (*See* ECF No. 55-5 at 225–26.) Therefore, the Movants

have not shown that they were foreclosed from presenting their case in violation of Articles V(1)(b) and V(1)(d).[4]

## 2. *Prudent Industry Practices*

Similarly, the Movants complain that the Tribunal "ignore[ed]" their arguments and "did not engage" with their evidence regarding the definition of "Prudent Industry Practices." (ECF No. 55 at 28; ECF No. 55-3 at ¶¶ 101–03.) The Movants, understandably, are disappointed that the Tribunal did not rule in their favor on the question of whether the Movants complied with "Prudent Industry Practices" by failing to conduct additional tests on the PLE basalt. But this is not a ground for vacatur. *See Oxford Health*, 569 U.S. at 572–73. In particular, the Movants point to no authority that a Tribunal violates Article V(1)(b) or V(1)(d) when it fails to expressly discuss all evidence before it in the final or interim award. *Cf. Cat Charter*, 646 F.3d at 844 (holding that an arbitration award need only be "something short of findings and conclusions but more than a simple result"); *Leeward Constr. Co., Ltd. v. Am. Univ. of Antigua College of Med.*, 826 F.3d 634, 640 (2d Cir. 2016) (holding that an arbitration award need not have "full findings of fact and conclusions of law on each issue raised before the panel").[5]

To establish grounds for vacatur under Articles V(1)(b) and V(1)(d), the Movants must show that they were "unable to present [their] case" or that the arbitral panel or procedure were "not in accordance with the agreement of the parties," respectively. *See* Convention, art. V(1)(b), V(1)(d). The Movants complain on three grounds that they contend show the Tribunal did not appropriately consider Prudent Industry Practices.

First, the Movants argue that the Tribunal did not address the evidence that the Movants provided concerning bulk testing. (ECF No. 55 at 28; ECF No. 55-3 at ¶ 101.) It is noteworthy that the Movants do not argue that they

---

[4] In a footnote, the Movants argue that the Tribunal also violated Article V(1)(c), which provides for vacatur where the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." *See* Art. V(1)(c); (ECF No. 55 at 32 n.135.) In particular, the Movants press that the Tribunal contradicted itself and therefore exceeded its authority under Article V(1)(c). However, the interpretation of paragraph 1.07.D.1 was squarely before the Tribunal, as discussed above. Therefore, there is no violation of Article V(1)(c). *Cf. Johnson v. Directory Assistants Inc.*, 797 F.3d 1294, 1302 (11th Cir. 2015) (holding that an arbitrator did not exceed the scope of his authority when the ruling was "derived" from the contract at issue).
[5] *Cat Charter* and *Leeward* discuss what constitutes a "reasoned award" under Section 10(a)(4) of the FAA. The Court notes that a "reasoned award," as established under Section 10(a)(4) of the FAA, generally comports with the "minimal requirements of fairness" that is guaranteed by Article V(1)(b), *see Productos Roche*, 2020 WL 1821385, at *3, as well as the procedural protections in Article V(1)(d).

were "unable" to present their case—only that the Tribunal did not consider their evidence, which as discussed above is not a basis to vacate an award. In any event, the Movants point to no facts establishing that the Tribunal ignored their evidence. Rather, the Tribunal weighed the evidence, considered the actions of other tenderers as the Movants urged, and concluded that Prudent Industry Practices required bulk testing of the PLE basalt.

Second, the Movants argue that the Tribunal adopted arguments that were not made by the parties. (ECF No. 55 at 28; ECF No. 55-3 at ¶ 102.) However, the one example that the Movants provide—that the Respondent never argued that bulk testing was a necessary step for a prudent tenderer—is flatly wrong. One of the Respondent's expert reports before the Tribunal opined that "[b]ulk testing is the best way" to determine the behavior of material when crushed. (ECF No. 57-46 at 8.) This was quoted in the Awards. (*See* ECF No. 55-5 at 238.) Moreover, the Respondent's expert testified at the hearing that he believed a contractor should perform a bulk test. (ECF No. 57-47 at 27.) Therefore, both parties had the opportunity to present and argue their evidence; the Tribunal merely determined the definition of Prudent Industry Practices in the Respondent's favor.

Last, the Movants argue that the Tribunal "did not even engage" with its argument that its testing of Cerro Escobar basalt was representative of the PLE basalt at issue or that the Movants could not conduct bulk testing on the PLE basalt. (ECF No. 55 at 28; ECF No. 55-3 at ¶ 103.) Again, this is not an argument that the Movants were "unable" to present their case, only that the Tribunal did not satisfactorily consider their evidence. In any event, the Tribunal explicitly considered the arguments above. (*See* ECF No. 55-5 at 238.) To the extent that the Movants argue that the Tribunal did not engage *enough* with their evidence, the Movants essentially ask the Court to improperly wade into the substantive reasoning of the Awards. *See Oxford Health*, 569 U.S. at 572–73. In all, the Movants point to no evidence that the Tribunal did not consider the arguments that they made; therefore, the Movants have not shown that they were "unable to present their case" or otherwise deprived of the arbitration that they agreed to under Articles V(1)(b) and V(1)(d). *See Cat Charter*, 646 F.3d at 844; *Leeward Constr.*, 826 F.3d at 640.

### 3. C.A.N.A.L.

Last, the Movants complain that the Tribunal considered an argument that neither party raised when the Tribunal noted that C.A.N.A.L. may have bid a higher price because it may have better assessed the suitability of PLE basalt for use as concrete aggregate. (ECF No. 55 at 29.) But, as held above, the Convention does not require an arbitration panel to issue detailed findings of

fact and conclusions of law as to every possible point raised by a party. *See Cat Charter*, 646 F.3d at 844. Moreover, fundamental fairness does not necessarily bind a finder of fact or law to the exact arguments made by a party. *Cf. U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) ("[A] court may consider an issue antecedent to . . . and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief.").

In any event, the parties briefed and argued in detail C.A.N.A.L.'s bid. (*See, e.g.*, ECF No. 57-4 at 146; ECF No. 57-42 at 199–201; ECF No. 57-38 at 128, 231.) Moreover, the Tribunal's reference to C.A.N.A.L.'s higher bid was dicta and was not controlling. Therefore, such a reference in the Awards cannot violate Articles V(1)(b) and V(1)(d).

### 4. Request for Hearing and Discovery

The Movants requested an evidentiary hearing and expedited discovery. (ECF No. 55 at 34–35.) While courts hold that the question of evident partiality is a "fact intensive inquiry," *see Lifecare Int'l*, 68 F.3d at 435, discovery and an evidentiary hearing are not always required. *See Perez v. Cigna Health and Life Ins. Co.*, No. 20-12730, 2021 WL 2935260, at *3 n.5 (11th Cir. July 13, 2021) (holding that it is not an abuse of discretion to deny discovery and an evidentiary hearing where the movant fails to allege sufficient evidence to vacate an arbitration award); *see also Aviles*, 435 F. App'x at 829. Here, the Movants do not allege sufficient evidence to vacate an arbitration award, despite dispensing reams of briefing, declarations, expert reports, and exhibits. The Movants allege only speculation that, even if credited in favor of the Movants, affords only an inference that various arbitrators had an opportunity to discuss the arbitration outside of the full Tribunal (an opportunity that is always present given the ease of communication) and that each arbitrator is well respected in their fields and in high demand. Therefore, the Court denies the Movants' request for an evidentiary hearing and discovery.[6]

### 5. Confirmation of the Award

Section 207 of the FAA controls the confirmation of an international arbitration award under the Convention.[7] Section 207 states that a court

---

[6] The Movants argue that they are entitled to discovery because the Court entered a discovery order in this matter. (ECF No. 55 at 35 n.153.) However, the Court merely entered a form order that is entered in most civil cases. This order does not compel or guarantee discovery. In any event, this order only mentions discovery pursuant to Rule 26, which has limited application in arbitration-review proceedings, as such proceedings are "summary in nature." *See O.R. Secs., Inc. v. Pro. Planning Assocs., Inc.*, 857 F.2d 742, 747–48 (11th Cir. 1988); *cf.* Fed. R. Civ. P. 81(a)(6)(B).

[7] The arbitration agreements and Awards at issue fall under the Convention, as the parties' legal relationships are commercial in nature, involve written agreements involving parties in

having jurisdiction "shall confirm" the award unless one of the defenses listed in the Convention applies. *See* 9 U.S.C. § 207. As ACP timely brought this motion to confirm, and as the Court has been provided with a certified copy of the Awards and the arbitration agreements, ACP has made a *prima facie* showing in support of confirmation. *See Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1292 n.3 (11th Cir. 2004) (holding that once the party requesting confirmation provides the court with certified copies of the award and arbitration agreement, the award is "presumed to be confirmable"); (*see* ECF Nos. 55-4, 55-5, 55-6, 55-9; ECF Nos. 57-89, 57-90.) And as none of the Convention defenses apply, as discussed above, the Court finds confirmation of the Awards appropriate.

The Movants last contend that confirmation is not appropriate as the Movants already paid the amounts found due in the Awards, therefore mooting the motion for confirmation. (ECF No. 62 at 33.) As a general matter, courts "shall confirm" arbitration awards under the Convention unless one of the seven defenses set out in the Convention apply. *See* 9 U.S.C. § 207. Mootness is not a listed defense under the Convention. In any event, the Movants brought a motion to vacate the Awards—therefore, there is a live, actual controversy for purposes of mootness. *See Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011) (holding that an issue is moot when it "no longer presents a live controversy with respect to which the court can give meaningful relief"). The Court will confirm the Awards.

### 6. Conclusion

For the reasons set out above, the Court **denies** the Movants' motion to vacate (**ECF No. 55**) and **grants** the Respondent's motion to confirm (**ECF No. 58**). The Court confirms the Awards and enters final judgment in favor of ACP and against the Movants. The Court **directs** the Clerk to **close** this case.

**Done and ordered** at Miami, Florida on December 9, 2021.

Robert N. Scola, Jr.
United States District Judge

---

foreign countries, provide for arbitration in the United States, and revolve around property in foreign states. *See Alberts v. Royal Caribbean Cruises, Ltd.*, 834 F.3d 1202, 1204 (11th Cir. 2016) (setting out the prerequisites to the Convention); *see also* 9 U.S.C. § 202.